---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

ESTATE OF GAVIN WALLMOW, by its Special
Administrators Matthew and Michelle Wallmow,

      Plaintiff-Appellee,

v.

ONEIDA COUNTY, et al.,

      Defendants-Appellees.

---

## BRIEF OF PLAINTIFF-APPELLANT

---

Appeal from the United States District Court
for the Western District of Wisconsin,
Case No. 22-cv-241-jdp
The Honorable James D. Peterson, W.D.

---

**GINGRAS, THOMSEN & WACHS LLP**
Attorneys for Plaintiff-Appellant


Paul A. Kinne
WI State Bar No. 1021493

8150 Excelsior Drive
Madison, WI 53717
Phone: 608-833-2632
Fax: 608-833-2874
Email: kinne@gtwlawyers.com

# DISCLOSURE STATEMENT

Save As     Clear Form

Case: 23-2141     Document: 6     Filed: 06/20/2023     Pages: 1

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __23-2141__

Short Caption: Estate of Gavin Wallmow v. Oneida County, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> [ ] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
The Estate of Gavin Wallmow, by its Special Administrators, Matthew Wallmow

and Michelle Wallmow

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Gingras, Thomsen & Wachs, LLP

(3) If the party, amicus or intervenor is a corporation:

i)   Identify all its parent corporations, if any; and

     N/A

ii)  list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

     N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: _s/ Paul A. Kinne_     Date: __06/20/2023__

Attorney's Printed Name: _Paul A. Kinne_

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [✓]  No [ ]

Address: _Gingras, Thomsen & Wachs, LLP_

_8150 Excelsior Drive, Madison, WI 53717_

Phone Number: _(608) 833-2632_     Fax Number: _(608) 833-2874_

E-Mail Address: _kinne@gtwlawyers.com_

rev. 12/19 AK

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

JURISDICTIONAL STATEMENT ..................................................................................... 1

STATEMENT OF THE ISSUES............................................................................................ 2

STATEMENT OF THE CASE............................................................................................... 2

    I.     Procedural Background......................................................................................... 2

    II.    Factual Background .............................................................................................3

SUMMARY OF THE ARGUMENT ....................................................................................12

STANDARD OF REVIEW ...................................................................................................14

ARGUMENT ........................................................................................................................14

    I.     The Parties Applied the Fourteenth Amendment on Summary Judgment....................14

    II.    The Court of Appeals Should Reverse the District Court's Decision to Grant Summary Judgment for Rudolph, Holewinski, Symonds, and Turkiewicz Because a Reasonable Jury Could Conclude That These Defendants Violated Wallmow's Rights Secured by the Fourteenth Amendment. ...............................................................................................15

        a.   Wallmow's Mental Illness Was a Serious Medical Condition in Addition to His Suicidality .............................................................................................................18

        b.   A Reasonable Jury Could Conclude that Katie Rudolph and Carrie Holewinski Violated Wallmow's Fourteenth Amendment Rights .............................................20

            i.   A Reasonable Jury Could Conclude that Rudolph's Conduct was Objectively Unreasonable ...........................................................................22

           ii.   A Reasonable Jury Could Conclude that Holewinski's Conduct was Objectively Unreasonable ...........................................................................28

        c.   A Reasonable Jury Could Conclude that Reed Symonds and Matthew Turkiewicz Violated Wallmow's Fourteenth Amendment Rights ............................................30

    III.   The Court of Appeals Should Reverse the District Court's Decision to Grant Summary Judgment for Oneida County Because a Reasonable Jury Could Conclude That Oneida County Had Notice Its Policy Was Constitutionally Inadequate. ..................................33

CONCLUSION.....................................................................................................................36

CERTIFICATE OF COMPLIANCE.....................................................................................37

CIRCUIT COURT 30(D) STATEMENT...............................................................................38

CERTIFICATE OF SERVICE ..............................................................................................39

TABLE OF CONENTS TO REQUIRED SHORT APPENDIX.....................................................40

TABLE OF CONENTS TO SUPPLEMENTAL APPENDIX.......................................................41

# TABLE OF AUTHORITIES

## Cases

*Cavalieri v. Shepard*,
   321 F.3d 616 (7th Cir. 2003) ................................................................. 16

*Darden v. City of Fort Worth*,
   880 F.3d 722 (5th Cir. 2018) ................................................. 18, 22, 27

*Estate of Clark v. Walker*,
   865 F.3d 544 (7th Cir. 2017) ................................................................. 15

*Estate of Perry v. Wenzel*,
   872 F.3d 439 (7th Cir. 2017) ................................................................. 17

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ...................................................... 17, 26, 30, 32

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) .......................................................... 13, 17, 24

*Guitierrez v. City of San Antonio*,
   139 F.3d 441 (5th Cir. 1998) ................................................. 18, 22, 27

*Hackett v. City of South Bend*,
   956 F.3d 504 (7th Cir. 2020) ....................................................... 14, 31

*Joseph v. Brierton*,
   739 F.2d 1244 (7th Cir. 1984) ............................................................. 18

*Jump v. Vill. Of Shorewood*,
   42 F.4th 782 (7th Cir. 2022) ....................................................... 27, 28

*Kingsley v. Hendrickson*,
   576 U.S. 389, 135 S. Ct. 2466 (2015) ....................................... 15, 16, 32

*Knight v. Wiseman*,
   590 F.3d 458 (7th Cir. 2009) ....................................................... 19, 20

*Mathis v. Fairman*,
   120 F.3d 88 (7th Cir. 1997) ......................................................... 30, 31

*McCormick v. City of Chicago*,
   230 F.3d 319 (7th Cir. 2000) ....................................................... 14, 33

*McGill v. Duckworth*,
   944, F.2d 344 (7th Cir. 1991) ............................... 17, 18, 25, 26, 30

*Miller v. Harbaugh*,
   698 F.3d 956 (7th Cir. 2012) ................................................................. 19

*Miranda v. Cty. Of Lake*,
   900 F.3d 335 (7th Cir. 2018) ................................................................. 25

*Monell v. Department of Soc. Servs.*,
   436 U.S. 658, 98 S. Ct. 2018 (1978) ........................................... 33, 34

*Payne v, Churchich*,
   161 F.3d 1030 (7th Cir. 1998) ............................................................. 17

*Perez v. Oakland County*,
   466 F.3d 416 (6th Cir. 2006) ................................................................. 16

*Pulera v. Sarzant,*
    966 F.3d 540 (7th Cir. 2020) ................................................. 34
*Redman v. Downsi,*
    854 Fed. Appx. 736 (7th Cir. 2021)............................. 13, 17, 18
*Roe v. Elyea,*
    631 F.3d 843 (7th Cir. 2011) ........................................... 13, 19
*Rogers v. Sheriff of Santa Rosa Cnty.,*
    2023 U.S. App. LEXIS 6482 (11th Cir. 2023) ......................... 32, 34, 35, 36
*Sanville v. McCaughtry,*
    266 F.3d 724 (7th Cir. 2001) ........................................... 16, 19
*Scaife v. VA,*
    49 F.4th 1109 (7th Cir. 2022) ................................................ 14
*Stockton v. Milwaukee Cty.,*
    44 F.4th 605 (7th Cir. 2022) ................................................. 33
*Thomas v. Dart,*
    39 F. 4th 835, (7th Cir. 2022) ..................... 12, 15, 16, 20, 29, 32
*Velez v. Johnson,*
    395 F.3d 732 (7th Cir. 2005) .............................. 13, 16, 17, 25, 32

## **Statutes**

28 U.S.C. § 1291 ................................................................... 1
28 U.S.C. § 1331 ................................................................... 1
28 U.S.C. § 1343 ................................................................... 1
42 U.S.C. § 1983 ................................................................. 1, 2

## **Rules**

Circuit Rule 30(A) ................................................................ 38
Circuit Rule 30(b) ................................................................ 38
Circuit Rule 30(d) ................................................................ 38
Circuit Rule 32 ..................................................................... 37
Fed. R. App. P.32(a)(5) ........................................................ 37
Fed. R. App. P. 32(a)(6) ....................................................... 37
Fed. R. App. P. 32(a)(7)(B) .................................................. 37
Fed. R. App. P. 32(f) ............................................................ 37
Fed. R. Civ. P. 56 ................................................................. 14

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant, Estate of Gavin Wallmow (hereinafter "Wallmow"), filed this lawsuit under 42 U.S.C. § 1983 alleging several officials at the Oneida County Jail were deliberately indifferent to Wallmow's serious medical need and that such conduct was due to the failure of the Oneida County Jail and its contracted medical provider to enact certain policies.

The case was filed in the United States District Court for the Eastern District of Wisconsin on March 14, 2022. (Suppl. A. App. 1.) The district court granted a motion to change venue to the United States District Court for the Western District of Wisconsin, and the complaint was amended twice. (Suppl. A. App. 6, 8, 18.) The final complaint, case no. 22-cv-231-jdp, was filed on January 23, 2023. (Suppl. A. App. 18.) The United States District Court for the Western District of Wisconsin possessed jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343.

Defendants-Appellees filed a Motion for Summary Judgment on February 21, 2023. (Suppl. A. App. 97.) On May 18, 2023, the Honorable James D. Peterson granted the motion, entering judgment for all Defendants and closing the case. (A. App. 2.)

On June 7, 2023, Wallmow filed a timely Notice of Appeal. (Suppl. A. App. 279.) A district court's order granting summary judgment is a final decision, and the United States Court of Appeals for the Seventh Circuit has jurisdiction over this case pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. May a jury find that a reasonable officer in Katie Rudolph's position would have appreciated that Wallmow was at a substantial risk of suffering serious harm?

2. May a jury find that a reasonable officer in Carrie Holewinski's position would have appreciated that Wallmow was at a substantial risk of suffering serious harm?

3. May a jury find that a reasonable officer in Reed Symonds' position would have appreciated that Wallmow was at a substantial risk of suffering serious harm?

4. May a jury find that a reasonable officer in Matthew Turkiewicz's position would have appreciated that Wallmow was at a substantial risk of suffering serious harm?

5. May a jury find that a jail's policy or practice is constitutionally deficient when it does not require officers to visualize inmates during cell checks, effectively ignoring the jail's prohibition of cell coverings?

## STATEMENT OF THE CASE

### I. Procedural Background

On March 14, 2022, Wallmow, represented by counsel, filed this lawsuit under 42 U.S.C. § 1983 against Oneida County in the United States District Court for the Eastern District of Wisconsin. (Suppl. A. App. 1.) In his Complaint, Wallmow alleged that his constitutional rights were violated when he was incarcerated at the Oneida County Jail on July 8, 2021, when jail staff were deliberately indifferent to Wallmow's serious medical conditions, namely suicide and severe mental illness, that resulted in the Wallmow's death by suicide. On April 29, 2022, the district court granted a motion to transfer the case to the United States District Court for the Western District of Wisconsin. (Suppl. A. App. 6.)

On July 15, 2022, Wallmow filed an Amended Complaint, naming twelve (12) Oneida County employees as defendants in their individual capacities, along with Oneida County. (Suppl. A. App. 8.) On January 23, 2023, Wallmow filed a Second Amended Complaint. (Suppl A. App. 18.) In the Second Amended Complaint, only Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph, and Carrie Holewinski were named as defendants. (*Id.*)

On February 21, 2023, Defendants-Appellees filed a Motion for Summary Judgment seeking dismissal of all claims as a matter of law and affirmatively asserting the defense of qualified immunity. (Suppl A. App. 97.) On May 18, 2023, the District Court issued an Order granting Defendants-Appellees' motion. (A. App. 2.)

Wallmow now submits this appeal and respectfully asks the Court to overturn the District Court's decision to enter summary judgment as to all Defendants.

**II. Factual Background**

On July 4, 2021, the Rhinelander Police Department brought Wallmow to the Oneida County Jail (hereinafter "OCJ") on a probation hold. (A. App. 3.) At the time Wallmow was taken to OCJ, he was suffering from bi-polar disorder and unspecified schizophrenia spectrum disorder – serious medical conditions. (Suppl. A. App. 198, ¶¶ 170-171.) During the booking process at OCJ, a correctional officer screens the inmate to determine if they suffer from any serious medical conditions, including mental illness. (Suppl. A. App. 142, ¶ 62.) At the time of the incident, OCJ officers used a form whereby they are prompted to make observations or ask the inmate questions. (Suppl. A. App. 148, ¶ 73.) One of the categories on the form included the officer's observations of "bizarre behavior." (*Id.*) If the booking officer observed the inmate exhibiting bizarre behavior, the officer would note that on the form. (*Id.*) Moreover, the officer was supposed to notify their sergeant of the observed bizarre behavior. (Suppl. A. App. 148, ¶ 74.) The officer also had the

option to directly contact medical staff about an inmate displaying bizarre behavior. (Suppl. A. App. 148, ¶ 75.)

Bizarre behavior should be noted on a standardized form during the booking process because it can be a sign of mental illness, which is a serious health condition. ( Suppl. A. App. 138-139, ¶¶ 51, 53.) OCJ had a duty to protect inmates and ensure they receive medical care for mental illness. (Suppl. A. App. 133-134, ¶¶ 41, 42.) According to OCJ policy, an inmate suffering from mental illness was supposed to receive care as soon as reasonably practicable. (Suppl. A. App. 140, ¶ 57.) The completed forms were given to health care providers at OCJ; usually, the officers would place the form in the location routinely checked by health care providers at the beginning of their shifts at OCJ. (Suppl. A. App. 149, ¶ 77.)

If the inmate was displaying bizarre behavior, the officers were supposed to hold the inmate in an observation cell until they were cleared by a health care provider. (Suppl. A. App. 146, ¶ 68.) When officers place an inmate in the observation cell, the inmate would be subject to 15-minute checks, during which time the officers would speak with the inmate. (*Id*.)

During the booking process, OCJ officers did not learn anything that would have indicated that Wallmow was suffering from mental illness. (A. App. 4) Wallmow was placed in a single-occupancy cell in a secure block, as required by OCJ's COVID-19 quarantine protocols. (A. App. 3.)

Notably, the same criteria for notifying the sergeant and health care providers about bizarre behavior applied after the booking process. (Suppl. A. App. 153, ¶ 88.) An inmate exhibiting signs of bizarre behavior in the jail was supposed to be treated exactly the same as the inmate would have been treated if the officer observed the behavior during the booking process. (Suppl. A. App.

142, ¶ 60.) During the booking process, if an inmate showed signs of bizarre behavior, medical staff would be automatically notified via the screening form. (Suppl. A. App. 149, ¶ 77.)

On July 6, Wallmow's probation officer, Alexis Bunce (hereinafter "Bunce") visited OCJ to obtain a written statement about Wallmow's July 4 arrest. (A. App. 4.) Bunce inquired about the police department allegations that Wallmow attempted to have sexual contact with his sister, leading to a confrontation with Wallmow's parents. (*Id*.) When Bunce asked Wallmow about the incident, Wallmow became distraught. (Suppl. A. App. 201, ¶ 184.) Wallmow told Bunce that he felt like driving his car into traffic. (Suppl. A. App. 201, ¶ 183.) He also said, "[t]his whole thing is just so fucking demonic. This is the point where I fall off the face of the earth. This is the part where I die again. It's set up like this, my parents have killed me over and over. Nobody cares. They are psionically[1] torturing me. You are speaking to a dead man." (Suppl. A. App. 201, ¶ 185.) Wallmow also told Bunce that his skin was beginning to burn because he was entering hell. (Suppl. A. App. 202, ¶ 187.)

During the interview, Wallmow's demeanor would shift from hysterically laughing one moment to crying the next, repeating statements that did not make any sense. (Suppl. A. App. 202, ¶ 188.) At one point, he began striking himself on the head. (*Id*.) Wallmow stated that no one would help him, no one cared, and that Bunce must think he was crazy. (Suppl. A. App. 202, ¶ 189.) Wallmow continued to make strange comments, telling Bunce that when he ends up in a psych ward, he will have to drink his own intestines from a cup. (Suppl. A. App. 202, ¶ 190.)

Based on this interaction, Bunce concluded that Wallmow was not stable. (Suppl. A. App. 203, ¶ 192.) From the OCJ parking lot, she called OCJ to express her concerns. (Suppl. A. App.

---

[1] At the time, Bunce did not know what the word "psionically" meant, but Bunce looked it up and determined it meant something demonic, like torturing him on the inside. It means using psychic powers to torture someone. (Suppl. A. App. 201, ¶ 186.)

203, ¶ 194) Bunce spoke with corrections officer Katie Rudolph (hereinafter "Rudolph"). (Suppl. A. App. 203, ¶ 196.)

At this point, two different, equally believable versions of fact exist. Bunce testified in her deposition that she could not remember what she told Rudolph. (A. App. 5.) Therefore, it is disputed whether Bunce told Rudolph the specific details of her interview with Wallmow, including that Wallmow said he was already dead and that his skin was beginning to burn as he entered hell. (Suppl. A. App. 207, ¶ 199.) Similarly, Bunce could not rule out whether she told Rudolph that she believed Wallmow was suicidal. (*Id.*) Rudolph does not remember exactly what Bunce told her, but she stated that Bunce informed her about what she had heard from Wallmow. (Suppl. A. App. 204, ¶ 197.) In Bunce's July 9, 2021, report, just three days after her discussion with Wallmow, Bunce stated that she reported what she had witnessed in her interaction with Wallmow, highlighting his concerning behavior. (Suppl. A. App. 209, ¶ 202.)

Based on these facts, a jury could reasonably conclude that Bunce told Rudolph that Wallmow said he wanted to drive his car into traffic and further stated that "[t]his whole thing is just so fucking demonic. This is the point where I fall off the face of the earth. This is the part where I die again. It's set up like this, may parents have killed me over and over. Nobody cares. They are psionically torturing me. You are speaking to a dead man." A reasonable jury could conclude that Bunce told Rudolph that Wallmow said that when he was in a psych ward, he would have to drink his own intestines from a cup. A reasonable jury could conclude that Bunce told Rudolph that Wallmow would go from hysterically laughing to crying, making statements that made no sense, and that he began striking himself in the head. A jury could reasonably conclude that Rudolph was informed that Wallow stated no one would help him, no one cares, and that Bunce must think he is crazy.

A jury could also believe that all Bunce told Rudolph was that Wallmow was acting strangely, that he was speaking of demonic things, and that he had been striking himself on the head. (Suppl. A. App. 210, ¶ 206.) Under either version of facts, it is undisputed that Rudolph did not ask Bunce any follow-up questions. (Suppl. A. App. 212, ¶ 212.) Rudolph made no effort to establish any context for Wallmow's statements, nor did she ask Bunce to provide more details about the interview with Wallmow. (Suppl. A. App. 212, ¶ 212.) Rudolph knew that bizarre behavior may be a sign of mental illness, a serious medical condition. (Suppl. A. App. 138, ¶ 50.) Rudolph also knew that it was out of the ordinary for a probation officer to call the jail expressing concerns about the well-being of an inmate. (Suppl. A. App. 188, ¶ 154; Suppl. A. App. 215, ¶ 218.)

Rudolph called Sergeant Carrie Holewinski (hereinafter "Holewinski"). (Suppl. A. App. 220, ¶ 226.) The contents of the Rudolph-Holewinski call are disputed. (Suppl. A. App. 220, ¶ 227; Suppl. A. App. 221, ¶ 228.) Rudolph claims that she told Holewinski that Bunce told her Wallmow was acting strangely, talking about demonic things, and hitting himself. (Suppl. A. App. 220, ¶ 227.) Assuming this is true, Holewinski admitted that it would have required that she contacted medical staff and place Wallmow in an observation cell until medical staff could examine him (Suppl. A. App. 223, ¶ 232.) Wallmow's actions were a sign of a serious medical condition. According to Holewinski, if Wallmow was hitting himself, that was a sign that something needed to be done immediately. (Suppl. A. App. 222-223, ¶¶ 229-231, 233.)

With respect to the other version of events, Holewinski stated that Rudolph only told her that Bunce said Wallmow was acting strangely and talking about demonic things, not that Wallmow had been hitting himself. (Suppl. A. App. 221, ¶ 228.)

Rudolph also called the Secure G pod operator, Ian Conkey, to tell him about her phone call with Bunce. (Suppl. A. App. 226, ¶ 246.) Rudolph claims that she told Ian Conkey that Bunce had called and stated that Wallmow was acting strangely, talking about demonic things, and hitting himself, but Ian Conkey testified that Rudolph only told him that Bunce called about Wallmow and that Ian Conkey should keep an eye on him. (Suppl. A. App. 227, ¶ 248.) It is disputed whether Rudolph told Ian Conkey about Wallmow's strange behavior, his talking of demons, or hitting himself. (Suppl. A. App. 228, ¶ 249.)

It is undisputed that, at a minimum, Holewinski knew that Wallmow had been acting strangely and speaking of demonic things – conduct that would have led an officer at screening to mark "bizarre behavior" on the form and alert medical staff. (Suppl. A. App. 148, ¶¶ 73, 74.) An inmate exhibiting bizarre behavior creates a strong suspicion that the inmate is mentally ill, which prompts an officer to discovery more information according to OCJ policy. (Suppl. A. App. 149, ¶ 77.) The fact that Holewinski knew that Bunce had been alarmed enough to call OCJ about Wallmow's demeanor strengthened the suspicion that Wallmow was suffering from a mental illness. (Suppl. A. App. 188, ¶ 154.)

 Holewinski's only response to learning about Wallmow's bizarre behavior was making one notation on the muster sheet: "Keep an eye on Wallmow in Secure G3. According to his probation agent, he was acting a little weird and talking about demonic stuff." (Suppl. A. App. 224, ¶ 238.) The muster was a log used to communicate information across shifts. (A. App. 5) Holewinski did not follow up with Bunce to learn more about Bunce's concerns. (Suppl. A. App. 226, ¶ 243.) Holewinski did not inform medical staff about the contents of Bunce's call. (Suppl. A. App. 223, ¶ 232.) Holewinski did not speak to Wallmow about his behavior. (Suppl. A. App.

226, ¶ 242.) Holewinski did not instruct any other officer to speak with Wallmow about his behavior. (Suppl. A. App. 222, ¶ 229.)

OCJ medical staff verified that the officers kept them in the dark about Wallmow's bizarre behavior. (Suppl. A. App. 270, ¶¶ 362, 363.) Nurse Melissa Wilhelm would have contacted Mental Health and assessed Wallmow if she had been informed that he was acting strangely, talking of demons, and hitting himself on the head. (Suppl. A. App. 270, ¶ 362.) If Melissa Wilhelm had known about Wallmow's interaction with Bunce, she would have ensured Wallmow was evaluated. (Suppl. A. App. 270, ¶ 363.) Wallmow speaking about demons could be a result of failing to take medication for schizophrenia, which is a serious medical issue. (Suppl. A. App. 271, ¶ 364.)

Only July 8, 2021, Wallmow was in cell 3 in Secure G. (Suppl. A. App. 200, ¶ 178.) At approximately 9:01 p.m., Officer Reed Symonds (hereinafter "Symonds") conducted a cell check of Secure G. (Suppl. A. App. 237, ¶ 273.) Symonds indicated that all the inmates in Secure G appeared to be okay. (*Id.*)

The pod operator is required to perform a visual check from the secure pod at least once an hour. (A. App. 6.) This visual check was conducted from the pod where the officers were stationed. (*Id.*) The officer will scan the cells from the pod as best they can without moving from the pod. (*Id.*) Cell 3, where Wallmow was located, was on the second tier and was difficult to see from the pod. (Suppl. A. App. 125, ¶ 24; Suppl. A. App. 126, ¶ 26.)

The officers also used the video surveillance system to check on the inmates. (A. App. 6) On July 8, surveillance footage was able to capture a view of Wallmow's cell, which was sufficient for an officer to determine, at the very least, if Wallmow was engaging in bizarre behavior. (Suppl. A. App. 240, ¶ 278.) Officers were expected to monitor the surveillance footage between cell

checks unless another duty took precedence. (Suppl. A. App. 173, ¶ 121.) The cell checks did not require the officers to speak with an inmate, and in practice, officers would simply glance in the direction of the cells. (Suppl. A. App. 172, ¶ 119; A. App. 6.)

At approximately 9:04 p.m., the video surveillance shows Wallmow sitting on the bottom bunk in his cell. (A. App. 6.) The video surveillance from July 8 does not capture anything suspicious in Wallmow's cell until approximately 9:06 p.m. (A. App. 6-7.) Following about a two-minute skip in the footage, at approximately 9:06 p.m., the video displays a covering hanging from Wallmow's bed, blocking the view of him and his cell. (Suppl. A. App. 240, ¶¶ 278, 279; A. App. 6-7.) Presumably, the missing footage between 9:04 p.m. and 9:06 p.m. would have shown Wallmow hanging the covering from his bunk. (A. App. 6-7.) At approximately 9:07 p.m., the footage shows Wallmow moving with part of himself on the floor and the rest of his body on the bed. (Suppl. A. App. 277, ¶ 378.)

According to OCJ policy, cell coverings were prohibited from covering their cell, but officers did not strictly enforce this rule. (Suppl. A. App. 188, ¶ 153.)

At approximately 9:08 p.m., the video surveillance shows Wallmow thrust his legs and body out from the bed. (Suppl. A. App. 277, ¶ 378; A. App. 7.) The footage then skips ahead about seven or eight minutes to 9:16 p.m. (A. App. 7.) At this point, the video displays Wallmow's feet and lower body hanging off the bed. (Suppl. A. App. 277, ¶ 378.) Between 9:06 p.m. through 9:08 p.m., Wallmow had placed a ligature around his neck and thrust his body out to generate pressure, strangling himself. (Suppl. A. App. 245, ¶ 289.)

Wallmow's conduct – obstructing the view of the cell, kneeling on the floor behind the covering, kicking his legs outward from the bed, and then going limp while half-lying on his bunk and the floor – all occurred while Symonds knew that he was supposed to "keep an eye on

Wallmow" because Wallmow had been exhibiting bizarre behavior. (Suppl. A. App. 253, ¶ 301.) This incident occurred in a cell that the officers knew was difficult to see from the pod and on the surveillance footage. (Suppl. A. App. 125-126, ¶¶ 24-26.) The video footage does not indisputably show whether Wallmow was moving between 9:15 p.m. and 9:43 p.m.

Symonds performed another cell check at 9:43 p.m., and he indicated the inmates were all okay. (Suppl. A. App. 253, ¶ 303.) In other words, Symonds actually looked at Wallmow and failed to notice that he was lying half off his bed with a jail uniform tied around his neck at a time when Wallmow was still alive (if Wallmow was moving). Even if a reasonable jury determined that Wallmow was not moving, Wallmow was lying half off his bed with a cell covering, motionless, for nearly thirty minutes without Symonds reacting. Wallmow's lack of movement, along with the muster warning that Wallmow was displaying odd behavior, the cell covering, and the odd position in which Wallmow was lying, should have drawn Symond's attention.

Turkiewicz took over as the secure pod operator for Wallmow's block at approximately 9:49 p.m. (A. App. 7.) Turkiewicz performed a cell check at 9:50 p.m. and did not report any issues. (*Id.*) Similar to Symonds, Turkiewicz failed to recognize that Wallmow was lying in his cell with a jail uniform tied around his neck. (Suppl. A. App. 255, ¶ 310.) At this point, the cell covering had been hanging for about 45 minutes. (Suppl. A. App. 240, ¶¶ 278, 279; A. App. 6-7.)

Neither Symonds nor Turkiewicz attempted to use the intercom to get Wallmow's attention or to demand that he take down his cell covering. (Suppl. A. App. 252, ¶ 299; Suppl. A. App. 255, ¶ 312.)

At approximately 10:05 p.m., Symonds heard Sergeant Glenn Kortenof summon him for help. (Suppl. A. App. 256, ¶ 316.) Symonds responded, and he saw Wallmow lying half off his

bunk. (Suppl. A. App. 256, ¶ 316.) Wallmow had his orange jail uniform wrapped around his neck. (Suppl. A. App. 256, ¶ 317.)

Officer and EMS attempted to resuscitate Wallmow. (A. App. 8.) Symonds reported that some color returned to Wallmow's face, but ultimately staff could not resuscitate Wallmow. (*Id.*) Wallmow was pronounced dead at 11:36 p.m. on July 8, 2021. (Suppl. A. App. 257, ¶ 319.) Wallmow committed suicide on July 8, 2021. (Suppl. A. App. 257, ¶ 321.)

## SUMMARY OF THE ARGUMENT

The District Cout erred in its decision to grant summary judgment for Rudolph, Holewinski, Symonds, and Turkiewicz (hereinafter collectively referred to as "Officers"). A pretrial detainee's right to be free from physical harm inflicted by others in the institution arises under the Due Process Clause of the Fourteenth Amendment. *Thomas v. Dart*, 39 F. 4th 835, 841 (7th Cir. 2022). To state a viable Fourteenth Amendment claim, a plaintiff must show that: (1) the defendant made an intentional decision regarding the conditions of their confinement; (2) those conditions placed the plaintiff at substantial risk of suffering serious harm; (3) the defendant's decision was objectively unreasonable; and (4) the defendant's decision caused the plaintiff's injuries. *Id.*

Throughout its decision, the District Court misapplied the Fourteenth Amendment standard, requiring Wallmow to demonstrate that the Officers were aware of facts that would have led a reasonable officer to believe that there was a substantial risk that Wallmow was suicidal. (A. App. 11.) Wallmow is not required to prove that a reasonable officer with the Officer's knowledge of Wallmow's behavior would believe there was a substantial risk he was "**suicidal**," – all that is required is that Wallmow demonstrate a reasonable officer would believe there was a substantial risk he would suffer **serious harm**. *Thomas*, 39 F.4th at 841. (Emphasis added). "Mental-health

disorders resulting in suicidal ideation are serious medical conditions." *Redman v. Downsi,* 854 Fed. Appx. 736, 739 (7th Cir. 2021). An objectively serious medical condition can create a substantial risk of serious harm to an inmate's health or safety. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Therefore, even if a reasonable officer in these circumstances would not have believed there was a substantial risk Wallmow was **suicidal**, the Officers may still be culpable under the Fourteenth Amendment if a reasonable officer would believe there was a substantial risk Wallmow would suffer **serious harm.**

Officers cannot turn a blind eye to the activities of an inmate. *Id.* at 738. An officer's failure to discover additional information may be willful blindness if there is evidence that the officer took affirmative steps to avoid learning the information. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Even if an officer does not know the specifics of the incident that posed a significant risk to the inmate, they may still be liable if they were aware of a serious risk of harm in "some form." *Velez v. Johnson*, 395 F.3d 732 (7th Cir. 2005). In fact, a jury could find that the vague nature of an inmate's complaint makes it even more incumbent on the officer to investigate further. *Id.* It is disputed how many specific details of Wallmow's interaction with Bunce the Officers were made privy to, but they were provided sufficient information to be aware that Wallmow presented a serious risk of harm in "some form." None of the Officers followed up with Wallmow, Bunce, or with other officers to evaluate the health and safety of Wallmow, which according to *Velez*, is evidence of unreasonableness.

The District Court also erred in its conclusion that Oneida County's cell-check policy, which, in effect, allowed inmates to hang cell coverings and obstruct officers' view of their cells, was constitutionally adequate. A municipality's liability may stem from a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well

settled that it constitutes a custom or usage within the force of law. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). While Oneida County's actual cell-check policy may not have been inadequate, the County acquiesced to a practice of constitutionally insufficient cell checks which presented a significant risk that inmates would harm themselves.

Viewing the facts and inferences in a light most favorable to Wallmow, there is sufficient evidence for a reasonable jury to conclude that the Officers violated Wallmow's rights under the Fourteenth Amendment and that Oneida County's policy was constitutionally inadequate. Therefore, Wallmow respectfully requests that this Court reverse the District Court's decision to grant summary judgment for the Defendants-Appellees.

## STANDARD OF REVIEW

This Court reviews a district court's order granting summary judgment de novo. *Scaife v. VA*, 49 F.4th 1109, 1115 (7th Cir. 2022). Summary judgment is only proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, establish that no genuine issue of material fact exists. Fed. R. Civ. P. 56. In reviewing an order granting summary judgment, the Court of Appeals draws all justifiable inferences in favor of the nonmoving party. *Scaife*, 49 F.4th at 1115. A reviewing court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts: courts must be alert to "credibility traps" and avoid them. *Hackett v. City of South Bend*, 956 F.3d 504, 507-08 (7th Cir. 2020). Courts not only allow jurors to draw inferences from the facts, but courts expect them to do so. *Id.* A reviewing court is to consider generously the full range of possible inferences and affirm the district court only when no reasonable jury could have found for the plaintiff. *Id.*

## ARGUMENT

### I.     The Parties Applied the Fourteenth Amendment on Summary Judgment.

14

On July 4, 2021, Wallmow was taken into custody by the Rhinelander Police Department on a probation hold and transported to the Oneida County Jail. (Suppl. A. App. 56.) This Court had thus far declined to answer the question as to whether the Eighth Amendment convicted prisoner standard, or the Fourteenth Amendment pretrial detainee standard applies to an inmate who had already been convicted of a crime but had then been arrested on a probation violation and was awaiting adjudication of the probation. *See e.g., Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017). However, the parties agreed to follow the District Court's precedent for such cases and apply the Fourteenth Amendment standard. (A. App. 10.) Moreover, because the District Court granted summary judgment on the merits, it did not decide whether the officers were entitled to qualified immunity. (A. App. 11.) In turn, Wallmow will not address qualified immunity in this appeal.

II. **The Court of Appeals Should Reverse the District Court's Decision to Grant Summary Judgment for Rudolph, Holewinski, Symonds, and Turkiewicz Because a Reasonable Jury Could Conclude That These Defendants Violated Wallmow's Rights Secured by the Fourteenth Amendment.**

The District Cout erred in its decision to grant summary judgment for Rudolph, Holewinski, Symonds, and Turkiewicz. A pretrial detainee's right to be free from physical harm inflicted by others in the institution arises under the Due Process Clause of the Fourteenth Amendment. *Thomas v. Dart*, 39 F. 4th 835, 841 (7th Cir. 2022). This Court has concluded that after *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015), the objective-unreasonableness standard applies to Fourteenth Amendment claims by pretrial detainees, including failure-to-protect claims. *Id.* To state a viable Fourteenth Amendment claim, Wallmow must show that: (1) the defendant made an intentional decision regarding the conditions of Wallmow's confinement; (2) those conditions placed Wallmow at substantial risk of suffering

serious harm; (3) the defendant's decision was objectively unreasonable; and (4) the defendant's decision caused Wallmow's injuries. *Id.*

Specific to the third element, the court must assess whether the officers' actions were objectively unreasonable "from the perspective of a reasonable officer on the scene, including what the officer knew at the time." *Thomas v. Dart*, 39 F.4th 835, 842 (7th Cir. 2022) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). To demonstrate that the officers' conduct was objectively unreasonable, the plaintiff must show that the officers knew, or should have known, of a serious risk to the inmate. *Id.* at 841. In cases where the inmate had demonstrated a tendency to harm himself, Courts of Appeal have uniformly held that a genuine dispute remains whether the defendants were aware of substantial risk of serious harm, even when the inmate denies feelings of suicide. *See Cavalieri v. Shepard*, 321 F.3d 616, 619-20 (7th Cir. 2003) (noting that an inmate's statement that he was "doing fine" was not dispositive); *see also*, *Perez v. Oakland County*, 466 F.3d 416 (6th Cir. 2006) (providing that summary judgment was not appropriate even though the inmate denied suicidal ideations).

Under the stricter Eighth Amendment standard, "[w]hat matters is that the [officer] was aware of a serious risk of harm in some form . . . just because [the plaintiff] did not volunteer detailed information does not mean that [the officer] was not made aware of a serious risk." *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005). A reasonable jury could find that an inmate's vague complaint makes it "even more incumbent on [the officer] to investigate further." *Id.* If the circumstances suggest that the officer had been exposed to information concerning the risk to the inmate and thus must have known about the risk, then such evidence could be sufficient to permit a trier of fact to find that the officer had actual knowledge of the risk. *Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001). To rule otherwise would reward officers who put their heads in the

sand and incentivize guards to stay willfully blind to risks to inmates' safety. *Velez*, 395 F.3d at 736.

Officers cannot turn a blind eye to the activities of an inmate. *Id.* at 738. An officer's failure to discover additional information may be willful blindness if there is evidence that the officer took affirmative steps to avoid learning the information. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). If the officer (1) subjectively believes that there is a high probability that a fact exists and (2) takes deliberate action to avoid learning of that fact, they are willfully blind. *Id.* An officer going out of their way to avoid acquiring unwelcome knowledge is a species of intent. *McGill v. Duckworth*, 944, F.2d 344, 351 (7th Cir. 1991). An officer may be liable for failing to confirm their suspicion that an inmate is at risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994).

A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Farmer*, 511 U.S. at 842; *Payne v, Churchich*, 161 F.3d 1030, 1042 (7th Cir. 1998). When determining if a risk is obvious, the Seventh Circuit has considered warnings from family members of a mental disturbance as well as allegations of the inmate's behavior becoming increasingly bizarre, erratic, or wild. *Id.* (citing *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (1983) and *Hall v. Ryan*, 957 F.2d 402, 404-05 (7th Cir. 1992)). Just because an inmate receives some attention from officers at some point during the inmate's detention does not mean the officers are absolved of liability as a matter of law. *Estate of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017). The attention received must be considered in the totality of circumstances based on whether the officers acted in an objectively reasonable way. *Id.* [2] For example, in *Redman*

---

[2] While *Estate of Perry*, 872 F.3d considered the Fourth Amendment standard, the Fourth Amendment standard is the same as the Fourteenth Amendment standard: the objectively-unreasonable-under-the-circumstances standard is a less demanding standard than the Eighth Amendment deliberate indifference standard. *Id.* at 453.

*v. Downs*, 854 Fed. Appx. 736 (7th Cir. 2021), the Court reasoned that jail officials may violate the Fourteenth Amendment by failing to protect inmates from genuine threats of self-harm and by significantly and inexplicably delaying effective medical treatment for a serious condition where it exacerbates a detainee's suffering. *Id.* at 739.

Furthermore, disputes about knowledge and mental states, such as willful blindness, are classic questions of fact for resolution by the jury. *McGill*, 944 F.2d at 352. For example, in *Joseph v. Brierton*, 739 F.2d 1244 (7th Cir. 1984), one week before dying of a heart attack in prison, the inmate began displaying increasingly bizarre behavior, including tearing his clothes off, spreading feces in his cell, and shouting that he was Moses and Christ. *Id.* at 1246. The *Joseph* Court ruled that it was appropriate for the jury to decide whether the prison officials were willfully blind to the inmate's psychological needs. *Id.* at 1246. [3]

While an officer's failure to follow administrative policies, by itself, may not be sufficient to make out a constitutional violation, evidence of such a violation may certainly be considered as relevant evidence in analyzing the reasonableness of actions under the totality of circumstances. *See Darden v. City of Fort Worth*, 880 F.3d 722, 732, n.8 (5th Cir. 2018) (citing *Guitierrez v. City of San Antonio*, 139 F.3d 441, 448-49 (5th Cir. 1998)).

### a. **Wallmow's Mental Illness Was a Serious Medical Condition in Addition to His Suicidality.**

Neither the Officers nor the District Court dispute that suicidality is a serious medical condition. (Suppl. A. App. 37.) However, suicidality is not the only serious medical condition at issue in this case. "Mental-health disorders resulting in suicidal ideation are serious medical conditions." *Redman v. Downsi, 854 Fed. Appx.* 736, 739 (7th Cir. 2021). The Seventh Circuit has noted that "mental illness, including suicidal ideation, comes in many degrees of severity. For

---

[3] The *Joseph* Court ultimately reversed the jury verdict on the grounds of trial errors. *Id.* at 1250.

those who have only a fleeting notion that suicide might be the answer, psychiatric care is normally the responsible option to take . . . ." *Miller v. Harbaugh*, 698 F.3d 956, 964 (7th Cir. 2012). This Court has also held that mental illness can be an objectively serious medical condition. *See Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001). A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need to treat the condition would be obvious to a layperson. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). An objectively serious medical condition can create a substantial risk of serious harm to an inmate's health or safety. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

Along with being suicidal, in 2021, Wallmow suffered from unspecified schizophrenia spectrum disorder as well as antisocial personality disorder. (Suppl. A. App. 198, ¶ 170.) Wallmow also had a history of bipolar disorder and displayed symptoms of schizophrenia. (Suppl. A. App. 198, ¶ 171.) Rudolph and Symonds both testified that they believed that mental illness, including a mental health crisis, is a serious medical condition that required prompt medical treatment. (Suppl. A. App. 138, ¶ 50.) Symonds further testified that an inmate speaking delusionally or incoherently required immediate medical treatment. (Suppl. A. App. 150, ¶ 79.) Turkiewicz testified that when an officer observes an inmate exhibiting bizarre behavior during booking, the officer would ensure medical staff was notified. (Suppl. A. App. 149, ¶ 77.) Holewinski testified that an officer who knew an inmate was acting strangely, talking about demonic things, and hitting himself would have restrained the inmate from harming himself and then notified medical staff. (Suppl. A. App. 212, ¶ 211.) Moreover, OCJ policy required an officer who identified a serious mental health condition to promptly notify a medical provider. (Suppl. A. App. 142, ¶ 62; Suppl. A. App. 146, ¶ 68; Suppl. A. App. 147, ¶ 71.) Corrections officers are not qualified to diagnose mental illness. (Suppl. A. App. 161, ¶ 101.) Given that the need to treat symptoms of schizophrenia

and bipolar disorder were obvious to the officers, it is undisputed that Wallmow's mental-health disorders were objectively serious medical conditions. *Knight*, 590 F.3d at 463.

Here, the District Court improperly applied the Fourteenth Amendment standard. According to *Thomas v. Dart*, 39 F. 4th 835, 841 (7th Cir. 2022), an inmate's Fourteenth Amendment right is violated, in part, when the "conditions place the [inmate] at a **substantial risk of suffering serious harm**," and the officer did not take "reasonabl[y] available measures to abate the risk." (Emphasis added.) Rather than considering whether a reasonable officer would believe that Wallmow's conduct posed a substantial risk of **suffering serious harm**, the District Court inquired whether a reasonable officer would have known that there was a substantial risk that Wallmow was **suicidal**. (A. App. 11.) (Emphasis added). Such a narrow analysis fails to consider a mental-health disorder, which is a serious medical condition, as a significant risk to the inmate's health. The court's inquiry does not end simply because a reasonable officer would not have been aware that the inmate was suicidal – that misinterprets the standard applied by the Seventh Circuit.

There is no requirement that a reasonable officer had knowledge the inmate was suicidal. All the Fourteenth Amendment analysis demands is that a reasonable officer in the circumstances would have appreciated that the inmate was at "a substantial risk of suffering serious harm." *Id.* Courts of Appeal have established that mental-health disorders, without a threat of suicide, are objectively serious medical conditions that may pose a substantial risk of harm to the inmate. Therefore, whether or not Wallmow's conduct would have led a reasonable officer to believe that there was a substantial risk Wallmow was **suicidal** is not dispositive, and the District Court's application of that standard was improper.

   **b. A Reasonable Jury Could Conclude that Katie Rudolph and Carrie Holewinski Violated Wallmow's Fourteenth Amendment Rights.**

The District Court erred in its analysis of Rudolph's and Holewinski's conduct. When analyzing if Rudolph's and Holewinski's actions were objectively reasonable, the District Court should have held Rudolph and Holewinski to the same standard that a reasonable officer would have been held to at the screening process during booking. The same standards enforced during the OCJ booking process to identify mental illness and the required reactions to signs of mental illness applied to Rudloph and Holewinski once Wallmow passed through booking. (Suppl. A. App. 142, ¶ 60.)

During the booking process, officers screen the inmates by asking questions to determine if an inmate is stable or if he is suffering from a serious medical condition, such as a mental-health disorder. (Suppl. A. App. 143, ¶ 63.) As part of the screening process at booking, officers look for bizarre behavior, which is noted on the screening form. (Suppl. A. App. 148, ¶ 73.) If the inmate's answers to the screening questions leave the officers concerned that the inmate might need treatment for physical or mental problems, the officer must make a referral to the Corrections Sergeant and/or a nurse to obtain treatment as required. (Suppl. A. App. 144, ¶ 66.) If an inmate at booking is delusional or speaking incoherently, the inmate would be screened by a mental health provider immediately so the inmate can get the help he needs. (Suppl. A. App. 150, ¶ 79.) If the inmate showed signs of suicidality or mental illness during the booking process, the inmate was kept on close observation or suicide watch until health care staff could assess the inmate. (Suppl. A. App. 146, ¶ 68.) An inmate is placed on suicide watch if the inmate harms himself in the presence of an officer. (Suppl. A. App. 147, ¶ 69.) Expressed differently, if an officer were to observe bizarre behavior at booking and ignore it, that officer would be playing ostrich with respect to that inmate's serious medical condition.

If Wallmow had exhibited the same behavior during the booking process, as opposed to post-booking, a reasonable officer would have noted the behavior on the screening form, notified the Corrections Sergeant, potentially notified a mental health provider, and placed Wallmow in a cell for observation. Those requirements are not abandoned simply because the inmate has cleared the booking process – post-booking officers were to treat inmates in the same manner as they were treated at booking with respect to detecting mental illness and reacting to it. (Suppl. A. App. 152, ¶ 85.)

While an officer's failure to follow administrative policies, by itself, may not be sufficient to make out a constitutional violation, evidence of such a violation may certainly be considered as relevant evidence in analyzing the reasonableness of actions under the totality of circumstances. *See Darden v. City of Fort Worth*, 880 F.3d 722, 732, n.8 (5th Cir. 2018) (citing *Guitierrez v. City of San Antonio*, 139 F.3d 441, 448-49 (5th Cir. 1998)). Therefore, according to OCJ's own requirements, it is objectively unreasonable for an officer who is made aware of an inmate displaying symptoms of a mental-health disorder to not take the same precautions as would be taken during the booking process. Neither Rudolph nor Holewinski abided by the standards applied at the booking process, rendering their conduct unreasonable.

i. **A Reasonable Jury Could Conclude that Rudolph's Conduct was Objectively Unreasonable.**

Rudolph's willful blindness to the serious risk that Wallmow's mental health posed to his safety was objectively unreasonable. There remains a genuine dispute of material fact as to what Bunce told Rudolph on July 6, 2021. On the one hand, a reasonable jury could conclude that after talking to Wallmow on July 6, 2021, Bunce told Rudolph the following about the interaction:

- Wallmow said he was already dead and that his skin was beginning to burn as he entered hell; (Suppl. A. App. 204, ¶ 197; Suppl. A. App. 207, ¶ 199.)

- Wallmow was potentially suicidal; (Suppl. A. App. 204, ¶ 197; Suppl. A. App. 208, ¶ 200.)

- Wallmow said he wanted to drive his car into traffic and that "[t]his whole thing is just so fucking demonic. This is the point where I fall off the face of the earth. This is the part where I die again. It's set up like this, my parents have killed me over and over. Nobody cares. They are psionically torturing me. You are speaking to a dead man"; (Suppl. A. App. 204, ¶ 197.)

- Wallmow would go from hysterically laughing to crying, repeating statements that did not make any sense; (*Id.*)

- At one point, Wallmow was striking himself in the head; (*Id;* Suppl. A. App. 210, ¶ 206.)

- Wallmow stated that no one would help him, no one cares, and that Bunce must think he is crazy; (Suppl. A. App. 204, ¶ 197.) and

- Wallmow continued to make odd comments, stating that when he ends up in a psych ward, he will have to drink his own intestines from a cup. (*Id.*)

Rudolph failed to take reasonable actions after learning about Wallmow's behavior. Rudolph only told Holewinski that Wallmow was acting strangely and talking about demonic stuff. (Suppl. A. App. 220, ¶ 227.) Rudolph only told Conkey that Bunce had called, so he should keep an eye out on Wallmow – she did not share any of the contents of the Bunce conversation. (Suppl. A. App. 226, ¶¶ 245, 246.) Given the bizarre nature of Wallmow's conduct that Bunce shared with Rudolph, Rudolph's decision to omit necessary information by minimizing Wallmow's actions was objectively unreasonable with respect to the substantial risk Wallmow's mental-health disorder posed to his safety.

On the other hand, a reasonable jury could conclude that Bunce only told Rudolph that Wallmow was acting strangely, speaking of demons, and hitting himself on the head. (Suppl. A. App. 207, ¶ 198.) If that was the case, Rudolph's decision to not ask Bunce for more details or context disregarded an inmate who she must have suspected was suffering from a mental illness or episode.

The District Court ruled that Rudolph's conduct was objectively reasonable under the willful blindness theory for two reasons. First, the District Court held that there was no evidence that Rudolph took affirmative steps to avoid learning the information. (A. App. 11.) This interpretation of the evidence does not accurately reflect Rudolph's conduct. In *Global-Tech Appliances, Inc v. SEB S.A.*, 563 U.S. 754, the Supreme Court ruled that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* at 770.

Rudolph certainly knew the critical facts: at the very least, she knew that Wallmow was acting strangely, speaking of demons, and hitting himself on the head. (Suppl. A. App. 207, ¶ 198.) Moreover, Rudolph took deliberate actions to avoid learning about the critical facts. Probation officers do not usually call with concerns about an inmate's well-being. (Suppl. A. App. 188, ¶ 154; Suppl. A. App.  215, ¶ 218.) Therefore, a reasonable jury could conclude that what Bunce observed was out of the ordinary. Rudolph knew that Wallmow acting strangely was a vague detail that required more context. (Suppl. A. App. 137, ¶ 49; Suppl. A. App.  139, ¶ 54.) She also knew that Wallmow hitting himself could fall on a wide spectrum of potentially harmful behavior. (*Id.*) Rudolph knew that the next officer in the chain of communication would be depending on information to inform their decision as to Wallmow's treatment. Rudolph failed to verify underlying facts that she strongly suspected to be true or declined to confirm inferences of risk that

she strongly suspected to exist. Specifically, Rudolph should have conveyed *all* the information Bunce shared with her, including the critical fact that Wallmow was striking himself. She should have treated Wallmow when he was in a jail cell the same way she would have treated him had he behaved this way at booking.

Furthermore, a reasonable jury could conclude that Rudolph's conduct was clearly deliberate, not a mistake. First, Rudolph does not claim she made a mistake. She testified that she *did* convey the information about Wallmow striking himself. Second, assuming she did fail to convey that information, Rudolph made two separate phone calls – first she called Holewinski, then she called Conkey – to relay information about Wallmow's behavior and chose to downplay the severity of the situation in both instances. (Suppl. A. App. 220, ¶ 227; Suppl. A. App. 226, ¶¶ 245, 246.) Rudolph's deliberate actions are readily distinguishable from Seventh Circuit caselaw defining a mistake under the Fourteenth Amendment. *Miranda v. Cty. Of Lake*, 900 F.3d 335, 354 (7th Cir. 2018) (mixing up two inmates' charts was the result of a nurse's mistake). Rudolph did not mix up information or accidentally forget to report a piece of information; she deliberately omitted crucial details in two distinct interactions with officers who were relying on Rudolph to provide information. A reasonable jury could conclude that these were affirmative decisions made by Rudolph to minimize Wallmow's behavior.

Whether Rudolph's willful blindness was unreasonable under the Fourteenth Amendment is a question that should be considered by a jury, not upon motion for summary judgment. *McGill*, 944 F.2d at 352. But as the Seventh Circuit has clearly ruled, Rudolph may still have acted unreasonably in response to a serious risk even if she did not know the specifics of the danger. *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005). The significant inquiry for the Court is whether Rudolph was aware of a serious risk of harm in "some form." *Id.* Even if Rudolph was

not aware of all Wallmow's conduct from his interaction with Bunce, that does not mean Rudolph was not made aware of the risk. *Id.*

In fact, if Rudolph was not made privy to some of the details of Bunce's interaction with Wallmow, a reasonable jury could conclude that it was unreasonable for Rudolph to not follow up with Wallmow or Bunce to obtain more information. *Id.* Once Rudolph became aware of the risk that Wallmow would harm himself, it was unreasonable for her to bury her head in the sand and refuse to look further into the matter. *Farmer v. Brennan*, 511 U.S. 823, 843 (1994); *McGill*, 944 F.2d at 351. From the facts presented herein, a reasonable jury could conclude that Rudolph may be liable for failing to confirm her suspicion that an inmate may be at a substantial risk of serious harm. *See Farmer*, 511 U.S. at 843 n.8.

Second, the District Court found that Rudolph was not willfully blind because "a reasonable officer in the defendants' position would not have suspected that Wallmow faced that risk in the first place." (A. App. 11.) This analysis overlooks the standard procedures applied at OCJ. Even if all Rudolph knew was that Wallmow was acting strangely, speaking of demons, and hitting himself on the head, that was still sufficient to prompt Rudolph to follow the same standards that would have applied if Wallmow had exhibited that same behavior during the booking process.

Holewinski's testimony aptly demonstrated how a reasonable officer would have responded in Rudolph's position after learning about Wallmow's behavior. Holewinski detailed the following reasonable responses: (1) at the very least, ensure that someone spoke to Wallmow (Suppl. A. App. 222, ¶ 229); (2) personally speak to Wallmow to determine why he was hitting himself (Suppl. A. App. 222, ¶ 230); (3) notify the medical staff of Wallmow's behavior (Suppl. A. App. 222, ¶ 231); and (4) pass on the information that Wallmow was hitting himself to make a difference in how other officers handle the situation. (Suppl. A. App. 223, ¶ 233.) These responses

mirror the standards officers are required to follow if they observe bizarre behavior or signs of mental illness at the booking process. (Suppl. A. App. 148, ¶ 74; Suppl. A. App. 149, ¶ 77.) In other words, Holewinski described the *reasonable* response to the information Rudolph received.

Rudolph failed to take any of the precautions detailed by Holewinski. According to OCJ's procedures and Holewinski's testimony, a reasonable officer with knowledge of Wallmow's bizarre behavior would have notified a Sergeant or the medical staff; Rudolph failing to do so was objectively unreasonable. (Suppl. A. App. 148, ¶ 74; Suppl. A. App. 149, ¶ 77.) While Rudolph's failure to follow OCJ policies, by itself, may not make out a constitutional violation, such evidence of her policy violations may certainly be considered as evidence of unreasonableness under the totality of circumstances. *See Darden v. City of Fort Worth*, 880 F.3d 722, 732, n.8 (5th Cir. 2018) (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 448-49 (5th Cir. 1998)).

Furthermore, there are notable distinctions between the events leading up to Wallmow's suicide and the facts in *Jump v. Vill. Of Shorewood*, 42 F.4th 782 (7th Cir. 2022), rendering the District Court's reliance on the case improper. Like *Jump*, the officers screening Wallmow at booking did not indicate any observations that he was suicidal. (A. App. 4.) The only evidence of strange behavior exhibited by the *Jump* inmate after booking was officers reporting that he was making loud noises and slamming the cell bars. *Id.* at 793-94.

But Wallmow's demeanor completely shifted after he completed the booking process, which alters how a reasonable officer would respond to his behavior. Once Bunce asked Wallmow about the incident with his sister, Wallmow began making statements such as "[t]his is the part where I die again," "[y]ou are speaking to a dead man," saying his skin was burning because he was entering hell. (Suppl. A. App. 201, ¶¶ 184, 185; Suppl. A. App. 202, ¶ 187.) Wallmow also began striking himself on the head, shifting from hysterically laughing to crying, and repeating

statements that did not make any sense. (Suppl. A. App. 202, ¶ 188.) Once again, the extent to which Bunce relayed Wallmow's behavior to Rudolph remains disputed and should be decided by a jury. What is not disputed is that after Wallmow's interaction with Bunce, his behavior became indicative of a mental-health issue and suicidal ideation, which was drastically different than his demeanor during the booking process. Wallmow's conduct, if made during the screening process at booking, would have led a reasonable officer to believe he posed a serious risk of substantial harm. The same cannot be said for the inmate in *Jump*.

      **ii.    A Reasonable Jury Could Conclude that Holewinski's Conduct was Objectively Unreasonable.**

Like Rudolph, Holewinski was willfully blind to the substantial risk Wallmow's objectively serious medical condition posed to his safety. A reasonable jury could conclude that Holewinski knew that Wallmow had hit himself, that he was acting strangely, and that he was speaking of demons. (Suppl. A. App. 220, ¶ 227.) According to Holewinski's own testimony, knowledge of that information by itself should have prompted her to contact medical staff and either speak directly to Wallmow or move him to an observation cell. (Suppl. A. App. 222, ¶¶ 229, 230, 231.) The following deliberate actions (and inactions) taken by Holewinski serve as evidence of her willful blindness: not speaking directly to Wallmow to follow up on the Bunce report, not requesting anyone else to speak to Wallmow, not notifying medical staff for an examination of Wallmow, and not calling Bunce to obtain more details. (Suppl. A. App. 226, ¶¶ 242-244.) When Holewinski had the opportunity to notify others of Wallmow's conduct via the muster, she continued to turn a blind eye by minimizing his behavior as a "little weird," even though she had no basis to make that judgment. (Suppl. A. App. 224, ¶ 238.). Holewinski acted objectively unreasonably by failing to verify these facts.

Even if Holewinski was unaware that Wallmow had hit himself, her conduct was still objectively unreasonable. Holewinski knew that Bunce had provided the report, which was out of the ordinary for a probation officer. (Suppl. A. App. 188, ¶ 154) Holewinski also knew that for Bunce to call OCJ, Wallmow's conduct must have been abnormal. (*Id*.) Based on that context, Holewinski must have known that the information she had was lacking necessary details – details which would establish whether Wallmow was stable or not. Despite this, Holewinski chose not to follow up with Bunce to obtain those details; she chose not to alert other officers about this alarming call; and she chose not to tell the medical staff about the Bunce report. (Suppl. A. App. 226, ¶¶ 242-244.)

The District Court erred in its analysis of Holewinski's conduct. First, the District Court focused its inquiry on whether Holewinski's knowledge of Wallmow's behavior would put her on notice that Wallmow was "suicidal." (A. App. 17.) Specifically, it stated that the question of whether Holewinski violated the Fourteenth Amendment "turns on whether a reasonable officer would appreciate the risk that Wallmow would commit suicide." (A. App. 18.) The District Court should have analyzed whether Holewinski's knowledge of Wallmow's behavior would put a reasonable officer on notice that Wallmow was "at a substantial risk of suffering serious harm," not whether he was "suicidal." *Thomas*, 39 F.4th at 841. The distinction between requiring that a reasonable officer have knowledge the inmate was "suicidal" and at "risk of suffering serious harm" cannot be overstated, as it improperly raises the evidentiary bar for Wallmow.

Second, when viewing the evidence in a light most favorable to Wallmow, a reasonable jury could conclude that Rudolph told Holewinski that Wallmow was hitting himself. (Suppl. A. App. 220, ¶ 227.) With that information, a reasonable officer would have ensured that someone spoke to Wallmow, the sergeant was notified, he was placed in an observation cell, and medical

staff was notified if needed. (Suppl. A. App. 148, ¶ 74; Suppl. A. App. 149, ¶ 77.) Just as Rudolph's willful blindness should be reflected in the analysis of her objective reasonableness, Holewinski turned a blind eye for fear of what she might find. Once Holewinski became aware of the risk that Wallmow would harm himself, it was unreasonable for her to bury her head in the sand and refuse to investigate the matter. *Farmer*, 511 U.S. at 843; *McGill*, 944 F.2d at 351. From the facts presented herein, a reasonable jury could conclude that Holewinski may be liable for failing to confirm her suspicion that an inmate may be at a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994). A reasonable officer with knowledge of Wallmow's behavior would have appreciated the substantial risk of serious harm.

### c. A Reasonable Jury Could Conclude that Reed Symonds and Matthew Turkiewicz Violated Wallmow's Fourteenth Amendment Rights.

When viewing the evidence in a light most favorable to Wallmow, Symonds and Turkiewicz's knowledge of the information in the muster about Wallmow's demeanor, paired with their knowledge of the covering in Wallmow's cell, was sufficient for a jury to conclude that their conduct was unreasonable. Prior to their shifts, both Symonds and Turkiewicz saw Holewinski's note in the muster that Wallmow was acting weird and talking about demons. (A. App. 18.) They also knew that staff were informed to keep an eye on Wallmow. (*Id.*)

The District Court's reliance on *Mathis v. Fairman*, 120 F.3d 88 (7th Cir. 1997) is improper because it ignores the muster note and the cell covering as additional evidence that a reasonable officer would have considered. In *Mathis*, the court found that odd behavior, by itself, did not put the officers on notice of the risk that a detainee would commit suicide. *Id.* at 91-92. But Symonds and Turkiewicz were privy to far more evidence of a substantial risk of serious harm than just "odd behavior." The muster note mentioned Wallmow's bizarre behavior *and* a warning to "keep an

eye" on Wallmow. (Suppl. A. App. 224, ¶ 238.) This information, when paired with the covering in Wallmow's cell, differentiates Wallmow's case from the inmate in *Mathis*.

While it is disputed what Symonds saw Wallmow doing in his cell, it is undisputed that Turkiewicz saw Wallmow's mattress cover hanging from the top bunk. (A. App. 19.) The genuine dispute over what Symonds did or did not see is an issue for the jury to resolve. *Hackett v. City of South Bend*, 956 F.3d 504, 507-08 (7th Cir. 2020). Symonds admits he looked at Wallmow's cell, and the covering was obvious. A jury can reasonably infer that he saw it; in fact, it is almost unreasonable to assume that he did *not* see it. When viewing the evidence in a light most favorable to Wallmow, a reasonable jury would conclude that Symonds also witnessed some sort of covering in the cell of an inmate who he was explicitly tasked with monitoring.

Like Rudolph and Holewinski, Symonds and Turkiewicz failed to verify underlying facts that they strongly suspected to be true or declined to confirm inferences of risk that they strongly suspected to exist. Symonds did not document any way in which he kept a closer eye on Wallmow, despite the instruction to do so from the muster. (Suppl. A. App. 233, ¶ 262.) Moreover, Symonds claimed that he checked the cells at 9:43 p.m. and that all the inmates were okay, even though Wallmow had been hanging in his bed for approximately thirty minutes. (Suppl. A. App. 253, ¶ 303.) A reasonable jury could conclude that when Symonds indicated that he conducted this cell check, he actually visualized the inmates, which would mean he saw the cover in Wallmow's cell and did nothing, or he saw Wallmow choking to death in his cell. (*Id.*)

The District Court held that a covering that obstructed the officer's view of Wallmow in his cell was not demonstrative of an inmate who was likely to harm himself. (A. App. 20.) To support that conclusion, the District Court relied on officers' testimonies that it was not uncommon for other inmates to hang sheets from their bed for privacy purposes or to block out the light. (A.

App. 20.) But such an obstruction is a clear security risk. *See Rogers v. Sheriff of Santa Rosa Cnty*., 2023 U.S. App. LEXIS 6482, *17 (11th Cir. 2023) (failing to actually visualize an inmate whose cell is partially concealed by an obstruction created an obvious risk of suicide).

Furthermore, evidence that other inmates hung sheets for privacy is not dispositive that it was reasonable for officers to ignore Wallmow performing the same conduct. Courts review the objective standard in "light of the totality of the facts and circumstances of each particular case." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). While it may have been reasonable for Symonds and Turkiewicz to ignore other inmates with coverings in their cells, a reasonable officer with knowledge of Wallmow's behavior would not have treated Wallmow as though he was just any other inmate. The information in the muster served to differentiate Wallmow from the other inmates. (Suppl. A. App. 224, ¶ 238.) Symonds and Turkiewicz could not "keep an eye on Wallmow," as they were instructed to do in the muster if they were unable to actually visualize him.

The test under the Fourteenth Amendment is whether a reasonable officer in Symonds and Turkiewicz's position would have been aware there was a significant **risk** of serious harm, not whether they actually witnessed the harm occurring. *Thomas*, 39 F.4th at 841. (Emphasis added). Adopting the Officers' view would allow prison staff to merely bury their heads in the sand even when there was a strong reason to believe an inmate is in danger. *Velez*, 395 F.3d at 736. But a defendant may "not escape liability if the evidence shows that he merely refused to verify underlying facts that he strongly suspected to be true or declined to confirm interferences of risk that he strongly suspected to exist. *Farmer*, 511 U.S. at 843 n.8.

Just because Symonds and Turkiewicz were not aware of all the details of Wallmow's interaction with Bunce does not mean they were left in the dark about the risk. *Velez v. Johnson*,

395 F.3d 732, 736 (7th Cir. 2005). A reasonable jury could find that the vague nature of the muster, paired with the coverings in Wallmow's cell, would make it even more necessary for Symonds and Turkiewicz to investigate further. *Id.* To rule otherwise would reward Symonds and Turkiewicz for putting their heads in the sand and reward their willful blindness. *Id.* Wallmow respectfully requests that this Court reverse the District Court's decision to grant summary judgment for Symonds and Turkiewicz.

### III. The Court of Appeals Should Reverse the District Court's Decision to Grant Summary Judgment for Oneida County Because a Reasonable Jury Could Conclude That Oneida County Had Notice Its Policy Was Constitutionally Inadequate.

A reasonable jury could conclude that Oneida County's cell-check policy which, in effect, permitted inmates to hang cell coverings and prevent officers from viewing their cells, was in violation of the Constitution. Municipalities such as a county are liable for constitutional violations arising from their policies or customs. *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 616 (7th Cir. 2022). A county's liability may stem from (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled that it constitutes a custom or usage within the force of law; or (3) a plaintiff's constitutional injury being caused by a person with final policymaking authority. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). Wallmow's claim is based on Oneida County's violation of the second prong – while Oneida County's actual cell-check policy on paper may not be inadequate, the County acquiesced to a practice of insufficient cell checks.

A county is only liable when its policy or custom is the moving force behind the constitutional violation. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018 (1978). To prevail on a claim against the county, the plaintiff must adduce evidence of (1) an action

pursuant to a municipal policy or practice, (2) policymakers' deliberate indifference to a known risk that the policy would lead to constitutional violations, and (3) causation – the county's action was the "moving force" behind the constitutional injury. *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020). Individual liability is not always a prerequisite for municipal liability. *Id.* at 555 (citing *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017)).

The Eleventh Circuit recently held that a reasonable jury could conclude that a policy similar to Oneida County's policy was constitutionally deficient. *Rogers v. Sheriff of Santa Rosa Cnty.*, 2023 U.S. App. LEXIS 6482, * 17 (11th Cir.). In *Rogers*, the jail's policies permitted the main windows of cells to be concealed by curtains. *Id.* *6. The deputies would have to physically walk to the door of the cell and look through the portion of the window that was uncovered to see fully inside the cell. *Id.* The interior of the cell was recorded by video cameras, but that feed was only available for the control room to watch. *Id.* *7. Contrary to the jail's written procedures, the deputies could only monitor the inmate by performing a solely visual check – which in this case meant seeing flashes of movement – from the booking desk rather than by confirming the inmate was safe. *Id.* * 16.

In determining whether the *Monell* claim failed as a matter of law, the *Rogers* Court held that the evidence established far more than a mere possibility that the inmate would inflict self-harm. *Id.* * 16. There was sufficient evidence that the partially concealed cells impeded adequate monitoring and posed an obvious risk. *Id.* * 17. Further, evidence showed that the jail's policy of placing an inmate in a cell with partially concealed windows and allowing deputies to monitor the inmate merely by catching momentary glimpses of him through the window created an obvious risk. *Id.*

As in *Rogers*, officers conducting cell checks at OCJ were not required to actually visualize any of the inmates, even an inmate who officers noted was in need of surveillance. (Suppl. A. App. 172, ¶ 119; Suppl. A. App. 188, ¶ 153). The effect of this policy gave officers discretion to ignore cell coverings, which created a significant risk that an inmate will use a cell covering to hide his suicide attempt. (Suppl. A. App. 188, ¶ 153.) By not being required to visualize the inmates during the cell checks, the officers were under no obligation to determine whether inmates under their supervision were safe. A reasonable jury could conclude that a cell-check policy which allows officers to monitor inmates by merely catching momentary glimpses of them through the window, or not viewing them through the window at all due to an obstruction, was constitutionally inadequate.

The District Court reasoned that "the record shows that staff monitored inmates in the general population in other ways, in addition to hourly visual checks" via "routine" staff walkthroughs. (A. App. 24.) This description of OCJ's monitoring of inmates overstates the thoroughness of the cell checks in practice. Case in point, when Symonds performed a cell check at 9:43 p.m., Wallmow had been lying off his bed, motionless, for nearly thirty minutes with a cell covering obstructing his cell. (Suppl. A. App. 253, ¶ 303.) After conducting the cell check, Symonds reported that all the inmates appeared to be okay. (*Id*.) Symonds was completely unaware that one of the inmates he reported to be "okay" had committed suicide. A cell check procedure that is unable to identify an inmate who has committed suicide is inadequate. A cell check procedure where officers are not even expected to actually visualize an inmate whom other officers explicitly noted was in need of monitoring is inadequate.

Oneida County acquiescing to a practice of utterly insufficient cell checks is unconstitutional. As provided in *Rogers*, if the officers conducting routine walkthroughs are unable

to visualize the inmates when they walk by their cell, they cannot effectively monitor the inmates' safety, which presents a significant risk. *Rogers*, 2023 U.S. App. LEXIS 6482 at * 17. The District Cout's ruling completely overlooks how a policy that renders cell checks completely inadequate poses an obvious risk that inmates will harm themselves. Simply because the policy affects the general population, as opposed to inmates on suicide watch, does not mean the risk of an inmate harming himself has dissipated. Inmates suffering from mental illness, a serious medical condition, may be suicidal even though they have not outwardly expressed suicidal ideation or been placed on suicide watch. Therefore, Oneida County had notice that its cell-check policy was inadequate, and the District Court erred by holding that Oneida County was entitled to summary judgment.

## CONCLUSION

For the reasons stated herein, Wallmow respectfully requests this Court reverse the District Court's decision and remand this case.

Dated this 28th day of August, 2023

Respectfully submitted,

GINGRAS, THOMSEN & WACHS, LLP

s/ *Paul A. Kinne*
Paul A. Kinne
State Bar No.: 1021493
8150 Excelsior Drive
Madison, WI 53717
Telephone: (608) 833-2632
Email: Kinne@gtwlawyers.com

Attorney for Plaintiff-Appellant

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff-Appellant, furnishes the following in compliance with Fed. R. App. P. Rule 32(g):

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32 because according to the word-count feature in Word and excluding the parts of the documents exempted from Fed. R. App. P. 32(f), this brief contains 11,648 words.

2. This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32 because the brief has been prepared with Microsoft Word for Microsoft 365 in a proportionately spaced typeface using Times New Roman font size 12 for the body and Times New Roman font size 11 for footnotes.

Dated this 28th day of August, 2023

Respectfully submitted,

GINGRAS, THOMSEN & WACHS, LLP

s/ *Paul A. Kinne*
Paul A. Kinne
State Bar No.: 1021493
8150 Excelsior Drive
Madison, WI 53717
Telephone: (608) 833-2632
Email: Kinne@gtwlawyers.com

Attorney for Plaintiff-Appellant

## CIRCUIT COURT 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), I, Paul A. Kinne, counsel of record for Plaintiff-Appellant, certify that all material required by Circuit Rule 30(A) is included in the Appendix bound with this brief. I further certify that all material required by Circuit Rule 30(b) is included in the Supplemental Appendix filed with this brief.

Dated this 28th day of August, 2023

Respectfully submitted,

GINGRAS, THOMSEN & WACHS, LLP

s/ *Paul A. Kinne*
Paul A. Kinne
State Bar No.: 1021493
8150 Excelsior Drive
Madison, WI 53717
Telephone: (608) 833-2632
Email: Kinne@gtwlawyers.com

Attorney for Plaintiff-Appellant

**CERTIFICATE OF SERVICE**

The undersigned, counsel for the Plaintiff-Appellant, hereby certifies that on August 28, 2023, Appellant's Brief, Required Short Appendix and Supplemental Appendix were delivered by ECF Filing and two copies were mailed via US First Class Mail to counsel for the Defendant-Appellee.

Dated this 28th day of August, 2023

Respectfully submitted,

GINGRAS, THOMSEN & WACHS, LLP

s/ *Paul A. Kinne*
Paul A. Kinne
State Bar No.: 1021493
8150 Excelsior Drive
Madison, WI 53717
Telephone: (608) 833-2632
Email: Kinne@gtwlawyers.com

Attorney for Plaintiff-Appellant

**TABLE OF CONTENTS TO REQUIRED SHORT APPENDIX**

Judgment……………………………………….…………………………………………A. App. 1

Opinion and Order Deciding Summary Judgment……………………………………….A. App. 2

## TABLE OF CONTENTS TO SUPPLEMENTAL APPENDIX

Complaint……………………………………..…………………………………..Suppl. A. App. 1

Order, dated April 29, 2022………………..…………………………………..Suppl. A. App. 6

First Amended Complaint…………………………..……………………Suppl. A. App. 8

Second Amended Complaint…………………………………….…………Suppl. A. App. 18

Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph, and Carrie Holewinski's Brief in Support of Summary judgment…………................................…Suppl. A. App. 25

Plaintiff's Response to Defendants' Proposed Findings of Fact……..………….Suppl. A. App. 56

Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph, and Carrie Holewinski's Reply Brief in Support of Summary Judgment…………….………………….Suppl. A. App. 97

Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph, and Carrie Holewinski's Response to Plaintiff's Proposed Findings of Fact in Opposition to Defendants' Motion for Summary Judgment……………………………………………….…………Suppl. A. App. 117

Plaintiff's Notice of Appeal…………………………………………………….Suppl. A. App. 279

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THE ESTATE OF GAVIN WALLMOW,
*by its Special Administrators Matthew and Michelle Wallmow*

      Plaintiff,

    v.

ONEIDA COUNTY, GLENN
KORTENHOF, IAN CONKEY, REED
SYMONDS, MATTHEW
TURKIEWICZ, MATT RUDOLF,
GEORGIA LASKA, KATIE RUDOLPH,
CARRIE HOLEWINSKI, LISA
MIRAMONTES, SARAH CLAIRMORE,
JANIS M. SOUTHWORTH and
MELISSA WILHELM,

      Defendants.

Case No.  22-cv-241-jdp

---

## JUDGMENT IN A CIVIL CASE

---

     IT IS ORDERED AND ADJUDGED that judgment is entered in favor of

defendants and against The Estate of Gavin Wallmow dismissing this case.

| | |
|---|---|
| /s/ J. Friedl | 5/18/2023 |
| Joel Turner, Clerk of Court | Date |

A. App. 001

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

THE ESTATE OF GAVIN WALLMOW, by its Special
Administrators Matthew and Michelle Wallmow,

<table>
<tr><td>Plaintiff,</td><td></td></tr>
<tr><td>v.</td><td>OPINION and ORDER</td></tr>
<tr><td></td><td>22-cv-241-jdp</td></tr>
</table>

ONEIDA COUNTY, REED SYMONDS,
MATTHEW TURKIEWICZ, KATIE RUDOLPH,
and CARRIE HOLEWINSKI,

Defendants.

---

Gavin Wallmow died by suicide while he was incarcerated at the Oneida County jail on a probation hold. Plaintiff, Wallmow's estate, contends that several members of jail staff violated Wallmow's rights under the Fourteenth Amendment to the United States Constitution by failing to take reasonable measures to prevent Wallmow's death. Plaintiff also contends that the jail had inadequate policies for mental health screening and inmate cell checks, so it also asserts a claim against the county. Defendants move for summary judgment. Dkt. 44.

Because Wallmow was a detainee, not a convicted prisoner, his claims are governed by the objective reasonableness standard under the Fourteenth Amendment. Plaintiff's claims against the individual officers turn on whether a reasonable officer in the defendant's position would appreciate the risk that Wallmow would seriously harm himself. Two days before he died, Wallmow made disconcerting statements in an interview with his probation agent: he said that he wanted to drive his car into traffic and told his probation agent that she was "talking to a dead man." But plaintiff has not adduced evidence that any member of jail staff knew about those specific statements. Jail staff knew that Wallmow had demonstrated strange

behavior during the interview. But strange behavior, without more, would not lead a reasonable officer to believe that an inmate is suicidal.

As for the claim against the county, plaintiff has not shown that jail staff had notice that their screening and cell check procedures were so plainly inadequate that they created an obvious risk that inmates would seriously harm themselves. The court will grant summary judgment for defendants and close the case.

UNDISPUTED FACTS

The court begins with an evidentiary issue. Several of plaintiff's proposed findings of fact are supported with citations to evidence that is not part of the record, in violation of Federal Rule of Civil Procedure 56(c). Plaintiff cites several depositions that were not submitted to the court. *See, e.g.*, Dkt. 75 ¶¶ 19, 20, 39, 40, 277. Defendants identified this deficiency in their response to plaintiff's proposed findings of fact, and plaintiff did not attempt to submit the missing depositions. The court disregarded any proposed findings of fact that relied on evidence outside of the record.

With that in mind, the following facts are undisputed except where noted.

Gavin Wallmow was admitted to the Oneida County jail on a probation hold just before midnight on July 4, 2021. The arresting officer from the Rhinelander Police Department gave booking officers at the jail a "gray sheet," a standardized form that includes information about the arrestee. The gray sheet asks the arresting officer to answer yes or no to whether they observed "threat of suicide," "medical problem[s]," and "violent behavior," as well as a catchall "other" category. Wallmow's arresting officer marked "no" for all four categories.

2

A. App. 003

Wallmow was booked into jail by Sergeant Glenn Kortenhof. Kortenhof reviewed Wallmow's gray sheet and asked Wallmow a series of standard booking questions, including mental health screening questions. Relevant to this case, Wallmow told Kortenhof that he was not under psychiatric care, he was not feeling suicidal, he had no suicidal or self-mutilation tendencies, and he did not have any mental or physical disability. Kortenhof noted on Wallmow's intake questionnaire that Wallmow was not displaying any unusual, bizarre, or violent behavior and that Wallmow appeared to understand the questions that he was being asked. Wallmow was placed in a single-occupancy cell in a secure block pursuant to the jail's COVID-19 quarantine protocols.

Two days later, on July 6, Wallmow's probation agent, Alexis Bunce, visited the jail to obtain a written statement from Wallmow about his arrest. Initially, Wallmow seemed to be in a normal mood, and he specifically denied that he was suicidal. Bunce had learned that the police department was investigating Wallmow for allegedly sexually assaulting his sister, so Bunce asked Wallmow what had happened with his sister. Wallmow's demeanor changed after his sister was mentioned and he began laughing, crying, hitting himself, saying things that did not make sense, and saying "demonic" things. Dkt. 35 (Bunce Dep. at 9:22–25). Wallmow stated that he was going to drink his intestines out of a cup, that he felt like driving his car into traffic, and told Bunce "you are talking to a dead man," among other things. Bunce stopped taking a written statement and just listened to Wallmow to try and calm him down. Wallmow eventually stopped laughing and crying and Bunce determined that Wallmow had calmed down.

Immediately after Bunce left the jail, she called the jail on her cell phone to tell them about her conversation with Wallmow. Bunce told the officer who answered the phone,

3

defendant Katie Rudolph, that Wallmow was acting oddly and that she was concerned about Wallmow's mental well-being. Bunce testified in her deposition that she cannot remember whether she shared any details about her conversation with Wallmow at that time. *Id.* at 26:18–2 ("Other than I know I voiced concerns, I don't know exactly what details were said."). Rudolph testified that Bunce said that Wallmow had hit himself, was having "demonic" thoughts, and was acting strangely. Dkt. 38 (Rudolph Dep. at 17:17–22). Bunce's call to Rudolph lasted less than a minute.

Rudolph called the secure block where Wallmow was housed and told an officer stationed there that Wallmow acted strangely in an interview with his probation agent and had hit himself. Rudolph told the officer to keep an eye on Wallmow. *Id.* at 26:4–8. Officers are trained to notify the sergeant on duty if they receive any outside calls expressing concerns about an inmate, so Rudolph called defendant sergeant Carrie Holewinski to report Bunce's call. Rudolph told Holewinski that Bunce was concerned about Wallmow because she had observed him acting strangely, talking about "demonic" things, and hitting himself. *Id.* at 26:17–19.

Holewinski made a note about Rudolph's call on a "muster," which is a log used to communicate information across shifts. Specifically, Holewinski wrote: "Keep an eye on Wallmow in Secure G 3. According to his probation agent, he was acting a little weird and talking about 'demonic' stuff." Dkt. 63-4.

Two days later, on July 8, nurse Melissa Wilhelm and defendant officer Matthew Turkiewicz approached Wallmow in his cell to ask if he would like to be tested for COVID. (As part of the jail's COVID procedures, quarantined inmates could be moved into the general population if they received a negative COVID test.) Wallmow agreed to the test. Turkiewicz

and Wilhelm did not observe any odd behaviors from Wallmow, and Wallmow did not appear to be upset or distressed.

Later that same day, defendant officer Reed Symonds assumed duties as the secure pod operator for Wallmow's block. Neither party fully explains what the "secure pod" is. But the court infers from the record that the secure pod is a command center located on the first floor of the secure block. An officer can physically see into the cells on the secure block from the secure pod. But it is more difficult to see into the cells on the upper tier, where Wallmow's cell was. The secure pod also has video screens that display live footage from several security cameras placed in different areas of the jail. One of the cameras is directed at the secure cells, which allows the secure pod operator to see the cells from a higher vantage point.

The pod operator is required to perform a visual cell check from the secure pod at least once an hour. The pod operator does not leave the secure pod; rather, he or she will scan the cells from the pod either by looking into the cells or by using the security camera. In practice, pod operators were not expected to actually view every inmate during a visual cell check.

Symonds had seen Holewinski's note in the muster stating that Wallmow had been acting a little weird and talking about demonic stuff, so he reviewed Wallmow's booking information so he could identify Wallmow and see his intake form. Symonds conducted visual cell checks at 7:31, 8:10, and 9:01 p.m. and reported each time that all inmates appeared okay. Dkt. 68-12, at 2–3 (Officer Activity Log).

At 9:04 p.m., security camera footage shows Wallmow sitting on the bottom bunk in his cell. Dkt. 68-23, at 1:42.[1] At some point between 9:04 and 9:06 p.m., Wallmow hung a

---

[1]The time stamps on the video recording are inaccurate: they are ahead by 36 minutes and 37 seconds. *See* Dkt. 75, ¶ 369; Dkt. 68-13, at 2 (Incident report). That means that where the

fabric mattress cover from his top bunk, which obscured the bottom bunk. *Id.* at 2:08. At 9:07 p.m., Wallmow's legs can be seen in a kneeling position by the side of his bed. *Id.* at 2:48. Wallmow's head is obscured by the mattress cover. Wallmow then quickly extends his legs out from under him. *Id.* at 2:50. He repeats this motion a few seconds later. *Id.* at 3:04. Wallmow then holds in what appears to be a planking position, with his arms on the bed and his legs on the floor.

The footage then skips ahead by about eight minutes to 9:16 p.m. *Id.* at 3:22. It is hard to make out Wallmow's position from the video, but it appears that Wallmow is lying with his legs on the floor with his torso on the bottom bunk. His torso is partially obscured by the mattress cover. He is motionless, and he remains in the same position for the rest of the recording.

Symonds performed another cell check at 9:43 p.m. Symonds does not recall whether he saw the mattress cover hanging from Wallmow's top bunk at that time. Dkt. 37 (Symonds Dep. at 38:23–39:2).

At 9:49 p.m., Turkiewicz took over as the secure pod operator for Wallmow's block. Turkiewicz performed a cell check at 9:50 p.m. and did not report any issues. Turkiewicz saw the mattress cover hanging from Wallmow's top bunk, but he does not remember seeing Wallmow during this check. Dkt. 42 (Turkiewicz Dep. at 31:14–16).

At about 10:00 p.m., Kortenhof and Symonds entered the secure block to lock down the block for the evening. Kortenhof was responsible for checking the cells on the upper tier of

---

timestamp reads 9:37 p.m., it was actually just after 9:00 p.m. In this opinion, the court will convert the time stamps to the actual time. The footage also skips at several points. Kortenhof testified that this is because the camera records only when it senses movement. *See* Dkt. 36 (Kortenhof Dep. at 37:8–10)).

the block. When Kortenhof reached Wallmow's cell at around 10:10 p.m., he looked through the cell door window and saw Wallmow kneeling with his knees on the ground and his upper torso on the bunk. Kortenhof tried to get Wallmow's attention to complete an inmate headcount, but Kortenhof did not receive a response. Kortenhof noticed that something was around Wallmow's neck, so he opened the cell door to check on Wallmow.

Wallmow had a pair of orange uniform pants tied around his neck. The other end of the pants had been tied to a plate under the lower bunk mattress. Wallmow was unresponsive. His face was purple and there was blood coming from his nose and covering his face. Officers and EMS attempted to resuscitate Wallmow. It appeared to Symonds that some color returned to Wallmow's face, but ultimately staff could not resuscitate Wallmow.[2] Wallmow was pronounced dead at 11:36 p.m., about an hour and a half after he was found.

The court will address additional facts as they become relevant to the analysis.

## ANALYSIS

Wallmow's estate asserts constitutional claims against Symonds, Turkiewicz, Rudolph, Holewinski, and Oneida County. On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*,

---

[2] Plaintiff writes in its proposed findings of fact that EMS was able to briefly establish a pulse, but the evidence cited to support that fact is not in the record. Dkt. 75, ¶ 318 (citing a missing page from Dkt. 68-17).

477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co.*, LLC, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

The court will begin with plaintiff's claims against the individual defendants before turning to the claim against the county.

**A.  Claims against the individual defendants**

Plaintiff contends that Rudolph, Holewinski, Symonds, and Turkiewicz violated Wallmow's constitutional rights by failing to take reasonable measures to prevent Wallmow's suicide. Although it is still unsettled whether claims brought by inmates on a probation hold are governed by the Eighth Amendment or the Fourteenth, *see Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017), the parties have stipulated that the Fourteenth Amendment applies to plaintiff's claims, *see* Dkt. 45, at 12 n.1. The court will assume that plaintiff's claims are governed by the Fourteenth Amendment.

Both sides characterize the claims against the individual defendants as ones for inadequate medical care. Plaintiff faults defendants for failing to take measures that aren't related to Wallmow's medical care, which suggests that they also mean to assert failure-to-protect claims. *See* Federal Civil Jury Instructions of the Seventh Circuit § 7.19 (2017) ("Failure to protect from self harm"). Regardless, both types of claims relate to the conditions of confinement, *Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019), so they are governed by the same substantive standards, *see id*; *see also Jump v. Vill. of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022) (applying same standard to Fourteenth Amendment medical care claim and failure to protect claim based on inmate's suicide).

The precise contours of the Fourteenth Amendment standard, however, remains unsettled. The court of appeals has provided different formulations of the standard. *Compare*

*Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (two-element test); *Gonzalez v. McHenry Cty.*, 40 F.4th 824, 827-28 (7th Cir. 2022) (four-element test); *Jump*, 42 F.4th at 792–793 (discussing only two elements). Drawing on more recent Seventh Circuit cases, the court concludes that to prevail on a Fourteenth Amendment claim related to Wallmow's suicide, plaintiff must show that: (1) the defendant made an intentional decision regarding the conditions of Wallmow's confinement; (2) those conditions placed Wallmow at substantial risk of suffering serious harm; (3) the defendant's decision was objectively unreasonable; and (4) the defendant's decision caused Wallmow's injuries. *See Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022).

The court will focus its analysis on the third element, which requires plaintiff to show that defendants' actions were objectively unreasonable. The court must assess whether defendants' actions were objectively reasonable "from the perspective of a reasonable officer on the scene, including what the officer knew at the time." *Thomas*, 39 F.4th at 842 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). To show that a defendant's conduct was unreasonable, plaintiff must show that the defendant knew, or should have known, of a serious risk of harm to Wallmow. *Thomas*, 39 F.4th at 841. Unlike a claim brought under the Eighth Amendment, there is no requirement to show that defendants subjectively appreciated that risk. *Id.* at 842. But plaintiff must show that "a reasonable officer in a defendant's circumstances would have appreciated the high degree of risk [Wallmow] was facing." *Id.* at 841; *see also Chilcutt v. City of Waukegan*, No. 19 CV 6732, 2022 WL 4466077 (N.D. Ill. Sep. 26, 2022) ("notice of the risk or condition at issue is a requirement to show that officers acted unreasonably").

Plaintiff has not adduced evidence that any defendant was aware of facts that would have led a reasonable officer to believe that there was a substantial risk that Wallmow was suicidal. Plaintiff contends that defendants "buried their heads in the sand," which suggests a willful blindness theory. But the failure to discover additional information is not willful blindness unless there is evidence that defendants took affirmative steps to avoid learning the information. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Plaintiff adduces no evidence of affirmative steps. An officer may be liable if he fails to confirm his suspicion that an inmate faces a substantial risk of serious harm. But a reasonable officer in defendants' position would not have suspected that Wallmow faced that risk in the first place, so defendants' failure to investigate Wallmow's bizarre behavior did not violate the constitution. Because the court is granting summary judgment on the merits of plaintiff's claims, it need not consider the individual defendants' arguments that they are entitled to qualified immunity.

### 1. Katie Rudolph

Defendant Rudolph was the officer who received the call from Bunce about Wallmow's erratic behavior during Bunce's interview. Plaintiff contends that there is a dispute of fact about what Rudolph learned on the call. Rudolph testified that, to the best of her recollection, Bunce told her only that Wallmow had hit himself, was having demonic thoughts, and was acting strangely; Bunce testified that she could not recall whether she shared any details beyond that Wallmow was acting strangely and she was concerned for his mental well-being. Plaintiff contends that a reasonable jury could infer that Bunce told Rudolph all of the details of her conversation with Wallmow, including that Wallmow told Bunce that she was talking to a dead man and that he wanted to drive his car into traffic.

The issue is not genuinely disputed because plaintiff has not adduced any affirmative evidence that Bunce told Rudolph about those statements. Although the court must draw reasonable inferences in plaintiff's favor, an inference is not reasonable if "the evidence supporting [plaintiff's] version of events does not rise above speculation or conjecture." *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 986 (7th Cir. 2020). Here, neither Bunce nor Rudolph testified that Bunce told Rudolph any details other than that Wallmow hit himself and was saying demonic things. Plaintiff argues that it is reasonable to infer that that Bunce shared more than that because she produced a detailed report about the conversation a few days later. But evidence that Bunce was able to remember details about the incident in preparing the report is not evidence that Bunce shared those details in her call with Rudolph. The phone call lasted less than a minute, and plaintiff has identified no other evidence that Rudolph was aware of Wallmow's specific statements of potential serious self-harm. Plaintiff can only speculate about what else Bunce may have said on the call, and speculation is not enough to create a genuine dispute of fact at summary judgment. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

Plaintiff adduces no evidence that Rudolph knew facts about Wallmow other than what she learned on the phone call with Bunce. Accordingly, the record shows that Rudolph knew that Wallmow was acting strangely, having "demonic" thoughts, and hit himself.

Those facts, without more, would not lead a reasonable officer in Rudolph's position to conclude that there was a serious risk that Wallmow was suicidal. *Jump v. Vill. of Shorewood*, 42 F.4th 782, 791 (7th Cir. 2022), is instructive here. Jump, the son of inmate who died by suicide (Jonah Marciniak) while in jail, brought an inadequate medical care claim and a failure to protect claim against a police officer who arrested Marciniak and observed Marciniak in the

jail. *Jump*, 42 F.4th at 792. Jump contended that Smith, the arresting officer, had notice that Marciniak was a suicide risk for the following reasons:

- Marciniak was naked and intoxicated when Smith arrested him.

- Paramedics at the scene observed that Marciniak was emotionally distressed and recommended that Marciniak go to the hospital.

- Officers arrested Marciniak on the belief that he had just pushed his roommate out of a fourth-floor window during a domestic dispute; Smith believed that Marciniak and his roommate were in an intimate relationship.

- Marciniak cried, repeatedly asked to see his roommate, and asked if his roommate was okay.

- Marciniak told Smith that he had past psychiatric treatment.

- Marciniak was visibly distressed in his cell and slammed his body against the cell bars.

- Smith knew that Marciniak overdosed on heroin within the past week.

*Id.* at 787, 796–97.

Applying the Fourteenth Amendment's objective unreasonableness standard, the court of appeals concluded that Smith had not acted unreasonably.[3] It reasoned that the facts known to Smith would not lead a reasonable officer in his position to believe that Marciniak was a suicide risk because, "[m]ost dispositively, we have no facts that Marciniak told Sgt. Smith or [another officer] that he was suicidal." *Id.* at 793–94. Marciniak's distress and his history of psychiatric treatment, without more, did not provide notice that Marciniak was suicidal. *Id.* at 794. Because "Marciniak never gave Sgt. Smith reason to think Marciniak might attempt

---

[3] The court declined to decide whether Marciniak's claims were governed by the Fourth Amendment (as an arrestee) or the Fourteenth (as a pretrial detainee) because claims "are analyzed via the objective reasonableness standard" under both amendments. *Id.* at 793.

suicide," it was reasonable for Smith to not take any additional precautions to prevent Marciniak from harming himself. *Id.*

The same conclusion applies in this case. Like the officer in *Jump*, Rudolph was not aware that Wallmow had made any statements to suggest that he was suicidal. Rudolph knew that Wallmow was acting strangely and saying demonic things, but those statements are too vague to give a reasonable officer notice that Wallmow would harm himself. As the court of appeals has repeatedly held in the Eighth Amendment context, bizarre behavior alone does not put officers on notice that an inmate is suicidal. *See Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003); *Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001) ("Bizarre behavior and suicidal behavior are different."). Rudolph also knew that Wallmow had engaged in minor self-harm by hitting himself. But Marciniak had engaged in similar self-harm by "slamming his body against the cell bars," which the court concluded was only a "general sign of distress" and was not evidence that Marciniak would commit suicide. *Jump*, 42 F.4th at 793.

This case differs from *Jump* because the officer in that case knew that Marciniak had expressly stated that he was not suicidal when the arresting officer completed Marciniak's intake form. Wallmow also stated that he was not suicidal at intake, but there is no evidence that Rudolph knew Wallmow had made that assurance. But that difference is immaterial. Most important is that in both cases, there is no evidence that the inmate told officers that they *were* suicidal. Indeed, the facts in *Jump* are, if anything, more worrying than those known to Rudolph. The officer in *Jump* personally observed Marciniak's behavior. Marciniak was not just acting strangely; he was visibly distraught and worried about the well-being of his partner. And the officer in *Jump* knew that Marciniak had a history of psychiatric treatment. Rudolph, by

A. App. 014

contrast, had no other information about Wallmow's mental health treatment history, and she did not personally observe any peculiar conduct.

A reasonable officer in Rudolph's position would not appreciate that Wallmow posed a substantial risk of serious harm to himself. Under the circumstances, Rudolph's response to Bunce's phone call was reasonable. Rudolph called both Ian Conkey, the officer manning the secure pod in Wallmow's block, and Holewinski, the sergeant on duty, to tell them about the call and that Wallmow had been acting strangely. She also told Conkey to keep an eye on Wallmow. Plaintiff contends that Rudolph's response was inadequate because she could have alerted mental health staff about Bunce's concerns. But "when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions" to prevent that harm from occurring. *Jump*, 42 F.4th at 793.

Plaintiff makes two additional arguments why Rudolph's response was unreasonable: (1) Rudolph should have asked Bunce for additional information about what Wallmow said and did during the interview; and (2) Rudolph did not communicate all of the information she knew to Conkey or Holewinski.

As for Rudolph's failure to follow up with Bunce, an officer may be liable for failing to confirm their suspicions that an inmate is at risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994). But the facts known to Rudolph would not lead a reasonable officer in her position to suspect that Wallmow faced that sort of risk, so Rudolph did not have a constitutional duty to inquire further.

As for Rudolph's failure to accurately communicate the information she learned from Bunce, plaintiff seizes on purported inconsistencies between the testimony of Rudolph, Conkey, and Holewinski. Specifically, Rudolph testified that she told Conkey and Holewinski

14

that Wallmow had hit himself; Conkey could not recall whether Rudolph shared that detail, Dkt. 39 (Conkey Deo. At 13:3–5), and Holewinski testified that she did not learn that Wallmow had hit himself until after Wallmow had died, Dkt. 43 (Holewinski Dep. at 11:25–12:7). Plaintiff contends that Rudolph lied in her deposition about whether she shared this detail with Conkey and Holewinski and that it was unreasonable for her not to share this information.

Even if the court assumes that Rudolph failed to communicate this information to Holewinski and Conkey, that would not show that Rudolph violated Wallmow's Fourteenth Amendment rights. The fact that Wallmow hit himself, either alone or considered with his other strange behavior, would not put a reasonable officer on notice that Wallmow was at risk of suffering serious harm. Plaintiff also fails to adduce evidence that any omission was deliberate. Actions made by mistake do not violate the Fourteenth Amendment. For example, a taser that went off by accident cannot support an excessive force claim, *Kingsley*, 576 U.S. at 396, and a plaintiff cannot bring a constitutional medical care claim against a nurse who mistakenly mixed up the plaintiff's chart with another detainee's, *Miranda v. Cty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018). Nothing in the record suggests that any omission was intentional, as opposed to merely negligent.

The bottom line is that plaintiff has not shown that a reasonable officer in Rudolph's position would have realized that there was a substantial risk that Wallmow would harm himself. *See Pulera*, 966 F.3d at 554 ("[defendant] was not even negligently responsible for a suicide risk that [plaintiff] never told her about.") Rudolph's response to Bunce's call was reasonable, so she is entitled to summary judgment on plaintiff's claim against her.

15

### 2.  Carrie Holewinski

In response to Rudolph's call, Holewinski made a note about Wallmow on the muster, which is used to communicate information between shifts. Specifically, Holewinski wrote "Keep an eye on Wallmow in Secure G 3. According to his probation agent, he was acting a little weird and talking about 'demonic' stuff." Dkt. 63-4. Plaintiff contends that in response to Rudolph's call, Holewinski should have reached out to Bunce or spoken to Wallmow directly to learn more information about any potential mental health issues.

The claim against Holewinski fails because plaintiff has not shown that a reasonable officer in Holewinski's position would appreciate a substantial risk that Wallmow would seriously harm himself. It is unclear from the record whether Holewinski knew that Wallmow had hit himself. But even if the court assumes that Holewinski knew everything that Rudolph did—that Wallmow was acting weird, talking about demonic stuff, and had hit himself—that information would not put Holewinski on notice that Wallmow was suicidal for the same reasons that it did not put Rudolph on notice.

Plaintiff provides an additional argument for why Holewinski's response was unreasonable. It identifies testimony from Holewinski that if she had known that Wallmow was hitting himself, in addition to his other strange behavior, she "probably would go make contact with that person to find out what's going on." Dkt. 43 (Holewinski Dep. at 11:19–12:7). In a similar vein, a jail nurse testified that if an inmate was "hitting himself in the face or head," she would assess that inmate for any mental health concerns. Dkt. 40 (Wilhelm Dep. at 18:7–25). Plaintiff contends that this testimony shows that Holewinski knew, or should have known, that Wallmow's behavior required some sort of mental health evaluation.

16

A. App. 017

Even if Holewinski knew that Wallmow had hit himself, Holewinski's testimony about what she would normally do in that situation does not establish the constitutional standard. Holewinski's testimony shows that it may be prudent to investigate reports of strange behavior, but the constitution does not require jails to adopt best practices. *See Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020). And even if jail policy required Holewinski to follow up with Wallmow, a policy violation does not violate the Constitution. *See Pulera v. Sarzant,* 966 F.3d 540, 551 (7th Cir. 2020) (citing *Thompson v. City of Chicago,* 472 F.3d 444, 454 (7th Cir. 2006)). "The only question that matters" is whether Holewinski violated the Fourteenth Amendment. *Id.* That question turns on whether a reasonable officer would appreciate the risk that Wallmow would commit suicide. And, for the reasons explained above, the fact that Wallmow was hitting himself, alone or together with his other strange behavior, would not put an officer on notice of that risk.

It was reasonable for Holewinski to respond to Rudolph's call by recording the information in the muster and informing staff to keep an eye on Wallmow. Holewinski is entitled to summary judgment on plaintiff's claims against her.

### 3. Symonds and Turkiewicz

Symonds and Turkiewicz were assigned to monitor Wallmow's cell block on July 8, the night that Wallmow died. The court will address their claims together because they had similar responsibilities, and plaintiff makes similar arguments on their claims against both defendants.

Prior to their shifts, Symonds and Turkiewicz both saw Holewinski's July 6 note in the muster that Wallmow was acting "a little weird" and saying "demonic" stuff, and that staff should keep an eye on him. Turkiewicz had also interacted with Wallmow earlier that day when Wallmow was tested for COVID, and Turkiewicz did not observe any odd behavior from

17

A. App. 018

Wallmow during that encounter. For the reasons explained above, the information in the muster, without more, would not lead a reasonable officer to believe that Wallmow was suicidal.

But plaintiff contends that a reasonable officer in Symonds and Turkiewicz's position would realize that Wallmow was suicidal because they observed Wallmow behaving oddly in his cell. Specifically, it argues that both Symonds and Turkiewicz observed that (1) Wallmow had hung a mattress cover from his top bunk and obscured his bottom bunk, in violation of jail rules; and (2) Wallmow was lying in an odd position by his bed after he tied his pants around his neck. Plaintiff also states that Symonds saw Wallmow kicking his feet out from underneath him prior to his death.

It is undisputed that Turkiewicz saw Wallmow's mattress cover hanging from the top bunk. But neither side has adduced evidence that Turkiewicz saw Wallmow in an odd position. Turkiewicz testified that he did not see Wallmow during his cell check. Plaintiff contends that a reasonable jury could nevertheless conclude that Turkiewicz saw Wallmow when he performed a visual cell check. But the record shows that officers were not expected to actually view every inmate during a check. Indeed, that widespread practice is the basis for one of plaintiff's claims against the county, which is discussed in the next section. As for Symonds, the parties adduce no evidence that Symonds observed *any* of the behaviors plaintiff identifies. In his deposition, Symonds reviewed security camera footage of Wallmow's cell and testified about what he observed on the video. But both sides cite his testimony about what he saw on the video to support facts about what he actually observed the night Wallmow died. *See, e.g.*, Dkt. 74, ¶¶ 115, 118 (defendants' proposed findings of fact); Dkt. 75, ¶¶ 287, 292, 293 (plaintiff's). Neither side identifies testimony from Symonds that he saw Wallmow hang a

mattress cover from his top bunk, kneel on the floor, or kick his feet out from under him. Despite this, both sides assume that Symonds saw all of those things. *See* Dkt. 45, at 23 (defendants' brief).

Even if the court assumes the same for the purposes of summary judgment, Wallmow's behavior would not lead a reasonable officer to believe that Wallmow was suicidal. Viewed in hindsight, Wallmow's actions in his cell are disturbing and tragic. But at the time, Symonds and Turkiewicz knew only that Wallmow had been acting "a little weird." They had no reason to believe that Wallmow was suicidal. Against that background, Wallmow's behavior was not so concerning that it would put a reasonable officer on notice that he was preparing to die by suicide. *See Mathis v. Fairman*, 120 F.3d 88, 91–92 (7th Cir. 1997) (odd behavior alone did not put officers on notice that a detainee was at risk for suicide when the officers were unaware of detainee's suicidal tendencies).

Wallmow's movements on his bed and the floor are odd, but it does not appear that Wallmow is trying to harm himself. Similarly, Wallmow's kneeling position by the side of his bed is somewhat unusual. But a reasonable officer viewing the security camera footage would not suspect that Wallmow was harming himself. Wallmow's neck cannot be seen. Wallmow's torso is leaning on the bed; he is not splayed out on the floor. He is not visibly hanging from the bed or any other structure. A reasonable officer could believe that Wallmow was praying, writing a letter on his bed, or sleeping in an odd position. Nothing in his position or movement clearly suggested self-harm.

As for the mattress cover obscuring Wallmow's bottom bunk, hanging a sheet from an inmate's bunk violates the rules. But plaintiff adduces no evidence that obscuring the bottom bunk demonstrates that an inmate is likely to harm himself. Several officers testified that it

was not uncommon for inmates to hang sheets from their bed out of a desire for privacy or to block out light. *See* Dkt. 36 (Kortenhof Dep. at 38:2–4) ("We have inmates try to block their bunks like that a lot"); Dkt. 37 (Symonds Dep. at 42:19–23); Dkt. 38 (Rudolph Dep. at 28:13–16). The mattress cover did not obscure the entire cell window, so officers could still see inside. And plaintiff cites no cases where similar behavior put officers on notice that an inmate was suicidal. Without the knowledge that Wallmow had made suicidal statements earlier that week, Wallmow's behavior in his cell was not so concerning that "the consequences of the defendant's inaction [was] obvious." *Thomas*, 39 F.4th at 841.

Plaintiff contends that the facts known to Symonds and Turkiewicz would, at minimum, lead a reasonable officer to "strongly suspect that something was afoot in Wallmow's cell." Dkt. 64, at 23. It argues that Symonds and Turkiewicz should have checked in on Wallmow and that they "played ostrich" by allowing Wallmow to obscure his bunk. But plaintiffs have not shown that a reasonable officer in Symonds and Turkiewicz's position would suspect that Wallmow was likely to seriously harm himself. Officials may not "simply bury their heads in the sand [] when there was a strong reason to believe that a prisoner was in danger." *LaBrec v. Meeker*, 345 F. Supp. 3d 1040, 1044 (W.D. Wis. 2018). But the facts known to Symonds and Turkiewicz would not put a reasonable officer on notice that Wallmow was at risk, so they did not violate Wallmow's rights by failing to investigate that risk. Officers are not required to confirm or deny suspicions that a reasonable officer would not have.

Symonds and Turkiewicz were not models of diligence. Despite Holewinski's note in the muster, it does not appear that Symonds or Turkiewicz made any special effort to "keep an eye" on Wallmow. They conducted only their scheduled visual cell checks, which were not thorough. And they did not stop Wallmow from obscuring his bottom bunk, even though

A. App. 021

inmates are not allowed to hang anything off their beds. But failing to follow instructions or enforce prison policy does not itself amount to a constitutional violation. Because a reasonable officer in Symonds's and Turkiewicz's position would not appreciate the risk that Wallmow would harm himself, their decisions about how they monitored Wallmow did not violate his rights under the Fourteenth Amendment. Symonds and Turkiewicz are entitled to summary judgment on plaintiff's claims against them.

**B. Claim against the county**

Plaintiff asserts a constitutional claim against Oneida County. Municipalities such as the county are liable for constitutional violations arising from their policies or customs. *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 616 (7th Cir. 2022). To prevail on a claim against the county, plaintiff must have evidence of (1) an action pursuant to a municipal policy or practice, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the moving force behind the constitutional injury. *Pulera*, 966 F.3d at 550 (internal quotation marks omitted). Individual liability is not always a prerequisite for municipal liability. *Id.* (citing *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc)).

Plaintiff identifies two practices that it contends are constitutionally deficient. The first is what plaintiff calls the "keep an eye on" policy. If an inmate displays "bizarre behavior" at booking, the officer checks the "bizarre behavior" box on the screening form. All screening forms were automatically forwarded to medical staff. But if an inmate displays odd or bizarre behavior after booking, sergeants have discretion whether to (1) refer the inmate to medical staff or (2) instruct officers to "keep an eye on" the inmate. Plaintiff contends that this practice was inadequate because it kept medical staff out of the loop and because directing officers to

21

"keep an eye" on an inmate is too vague to be effective. Second, plaintiff contends that the jail's visual cell check policy is inadequate because it does not require officers to actually view every inmate.

The parties focus on the second and third elements for municipal liability: whether policymakers were deliberately indifferent to a known risk that these policies would lead to a constitutional violation and whether these policies caused a constitutional injury. The county has creditable arguments for why plaintiff has not adduced evidence to prove either element, but the court will focus on whether the policymakers were deliberately indifferent to known risks to inmate safety.

To show that the county was on notice that a policy was constitutionally inadequate, plaintiff must show either (1) a prior pattern of similar constitutional violations resulting from the policy; or (2) that the policy is so plainly inadequate that the risk that it would lead to a constitutional violation was obvious. *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530–31 (7th Cir. 2022). Plaintiff concedes that it cannot show a pattern of suicides at the jail, Dkt. 64, at 30, so it must adduce evidence that the policies were so obviously inadequate that the county was effectively on notice that an inmate like Wallmow would kill himself. It is only under "rare circumstances" that a policy is so obviously inadequate that a single incident can give rise to liability based on that policy. *Helbachs Café*, 46 F.4th at 531.

Plaintiff has not met that burden. As for the "keep an eye on" policy, even an inadequate policy about what to do when an inmate demonstrates "bizarre" behavior would not create an obvious risk that inmates would seriously harm themselves because "bizarre behavior and suicidal behavior are different." *Jutzi-Johnson*, 263 F.3d at 757. What matters is how officers

responded to inmates demonstrating *suicidal* behavior. Plaintiff adduces no evidence that jail staff fails to respond appropriately to signs that inmates are likely to seriously harm themselves.

As for the jail's cell check policy, the policy that officers are not required to view every inmate during every check does not create an obvious risk that inmates will seriously harm themselves, for two reasons. First, plaintiff adduces no evidence that this policy applies to inmates actually on suicide watch. Jail staff are trained to place inmates who demonstrate suicidal behavior on suicide watch. Even if the jail inadequately monitored inmates in the general population, there is no evidence that staff fails to monitor inmates who are likely to harm themselves. Second, the record shows that staff monitored inmates in the general population in other ways, in addition to the hourly visual cell checks. Defendants adduced evidence that sergeants and other staff performed "routine" walkthroughs where they would walk by each cell. Dkt. 47, ¶ 35–37. Officers also performed five headcounts per day, which required officers to personally observe each inmate. *Id.* at ¶ 39. Plaintiff does not develop any argument why the jail's policies about monitoring inmates in general population are inadequate in light of these additional checks.

Plaintiff provides no authority that similar policies have been found to be obviously inadequate. In the only case plaintiff cites on this issue, *White v. Watson*, No. 16-cv-560-jpg-dgw, 2018 WL 2047934, *11 (S.D. Ill. May 2, 2018), the inadequate policy was a widespread practice of "ignoring suicide threats." That policy is far more egregious than the policies that plaintiff has identified in this case, and the risk of harm it poses is much more obvious. Plaintiff has not shown that Oneida County had notice that its policies were inadequate, so the county is entitled to summary judgment on plaintiff's claims against it.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, Dkt. 44, is GRANTED. The clerk of court is directed to enter judgment for defendants and close the case.

Entered May 18, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

A. App. 025