# The United States Court of Appeals for the Seventh Circuit

ESTATE OF GAVIN WALLMOW, by its Special Administrators
Matthew and Michelle Wallmow,

<div align="right">Plaintiff-Appellant,</div>

v.

ONEIDA COUNTY, WISCONSIN et al.,

<div align="right">Defendants-Appellees.</div>

Appeal from the United States District Court
for the Western District of Wisconsin
Case No. 22-CV-00241
United States District Judge Hon. James D. Peterson

## RESPONSE BRIEF OF DEFENDANTS-APPELLEES ONEIDA COUNTY, REED SYMONDS, MATTHEW TURKIEWICZ, KATIE RUDOLPH AND CARRIE HOLEWINSKI

SAMUEL C. HALL, JR.
WI State Bar No. 1045476
Counsel of Record
SARA C. MILLS
WI State Bar No. 1029470
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendants-Appellees,
   Oneida County, Reed Symonds,
   Matthew Turkiewicz, Katie Rudolph
   and Carrie Holewinski
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
shall@crivellolaw.com
smills@crivellolaw.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellees furnishes the following list in compliance with Circuit Rule 26.1:

1. The full name of every party the attorneys represent in this case:

   Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph and Carrie Holewinski.

2. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

   Crivello, Nichols & Hall, S.C.[1] represents Defendants-Appellees Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph and Carrie Holewinski.

3. Any parent corporation and any publicly held company that own 10% or more of stock or shares:

   Not Applicable—Defendants-Appellees Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph and Carrie Holewinski were municipal/governmental employees at all relevant times. Oneida County was and is a municipal corporation.

<div align="right">

s/ Sara C. Mills
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
Attorneys for the Defendants-Appellees
CRIVELLO, NICHOLS & HALL, S.C.
710 North Plankinton Avenue
Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
shall@crivellolaw.com
smills@crivellolaw.com

</div>

---

[1] The name of counsel's law firm recently changed from Crivello Carlson, S.C. to Crivello, Nichols & Hall, S.C. However, the law firm is the same firm and the counsel appearing for Defendants-Appellees has remained the same throughout the duration of the litigation No other firm has appeared for Defendants-Appellees.

1

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellees furnishes the following list in compliance with Circuit Rule 26.1:

1. The full name of every party the attorneys represent in this case:

   Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph and Carrie Holewinski.

2. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

   Crivello, Nichols & Hall, S.C.[2] represents Defendants-Appellees Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph and Carrie Holewinski.

3. Any parent corporation and any publicly held company that own 10% or more of stock or shares:

   Not Applicable—Defendants-Appellees Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph and Carrie Holewinski were municipal/governmental employees at all relevant times. Oneida County was and is a municipal corporation.

<div style="text-align: right">

s/ Samuel C. Hall, Jr.
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
Attorneys for the Defendants-Appellees
CRIVELLO, NICHOLS & HALL, S.C.
710 North Plankinton Avenue
Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
shall@crivellolaw.com
smills@crivellolaw.com

</div>

---

[2] The name of counsel's law firm recently changed from Crivello Carlson, S.C. to Crivello, Nichols & Hall, S.C. However, the law firm is the same firm and the counsel appearing for Defendants-Appellees has remained the same throughout the duration of the litigation No other firm has appeared for Defendants-Appellees.

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................ 1

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................ 2

TABLE OF AUTHORITIES ..................................................................... iii

JURISDICTIONAL STATEMENT ............................................................ 1

STATEMENT OF THE ISSUES .................................................................. 1

STATEMENT OF THE CASE ..................................................................... 1

   I.  FACTS ................................................................................................. 1

      a.  Wallmow's Booking into Oneida County Jail on July 4, 2021 .... 1

      b.  Contact With Probation Agent Alexis Bunce.............................. 6

      c.  Sergeant Holewinski's Muster Entry and Staff Monitoring......... 8

      d.  OCJ Cell Check Policies and Procedures................................... 12

      e.  Wallmow's Death on July 8, 2021 ............................................ 14

   II.  PROCEDURAL HISTORY ............................................................. 20

SUMMARY OF THE ARGUMENT ........................................................ 20

ARGUMENT........................................................................................... 22

   I.  STANDARD OF REVIEW ............................................................ 22

   II.  EACH INDIVIDUAL CAPACITY CLAIM FAILS UNDER THE OBJECTIVE REASONABLENESS STANDARD .......................... 23

      1.  The District Court Properly Applied the Fourteenth Amendment Standard Requiring Plaintiff to Show That Defendants Knew or Should Have Known of a Substantial Risk of Serious Harm....... 23

      2.  Each Individual Defendant Was Objectively Reasonable Based on the Information Known to Them at the Time........................ 29

   A.  Officer Rudolph Acted in an Objectively Reasonable Manner in Response to Agent Bunce's Phone Call............................................ 30

   B.  Sergeant Holewinski Acted in an Objectively Reasonable Manner in Response to the Information Relayed by Officer Rudolph ............... 35

   C.  Officers Symonds and Turkiewicz Acted in an Objectively Reasonable Manner in Response to the Information on the Muster and What they Observed ................................................................ 38

III. ALTERNATIVELY, THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ....................................... 43

IV. PLAINTIFF'S *MONELL* CLAIM FAILS ......................................... 49

CONCLUSION ........................................................................ 54

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g), FRAP RULE 32(c) ........................................................ 55

PROOF OF SERVICE ................................................................ 56

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................22, 23

*Borello v. Allison*, 446 F.3d 742 (7th Cir. 2006) ..............................................43, 44

*Brosseu v. Haugen*, 543 U.S. 194 (2004)...............................................................44

*Cham v. Wodnick*, 123 F.3d 1005 (7th Cir. 1997) .................................................43

*Colaizzi v. Walker*, 812 F.2d 304 (7th Cir. 1987) ..................................................44

*Collins v. Seeman*, 462 F.3d 757 (7th Cir. 2006)..............................................33, 34

*Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021) .....................50

*Estate of Cole by Pardue v. Fromm*, 94 F.3d 254 (7th Cir. 1996)...........................24

*Estate of Novack v. Wood County*, 226 F.3d 525 (7th Cir. 2000)...............20, 33, 47

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..............................................................35

*Gobitz v. Corvilla, Inc.*, 196 F.3d 879 (7th Cir. 1999)...........................................53

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...........................................................44

*J.K.J. v. Polk Cnty.*, 960 F.3d 367 (7th Cir. 2020)..................................................53

*Jump v. Vill. of Shorewood*, 42 F.4th 782 (7th Cir. 2022)...............33, 34, 35, 45, 46

*Jutzi-Johnson v. U.S.*, 263 F.3d 753 (7th Cir. 2001)...........................20, 27, 28, 33

*King v. Henricks County Comm'r*, 954 F.3d 981(7th Cir. 2020) ...........................22

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)..................................................24, 34

*Loertscher v. Anderson*, 259 F.Supp.3d 902 (W.D. Wis. 2017) .............................53

*Malley v. Briggs*, 475 U.S. 335 (1986) ..................................................................49

*Mannola v. Farrow*, 476 F.3d 453 (7th Cir. 2007) .................................................49

*Mathis v. Fairman*, 120 F.3d 88 (7th Cir. 1997) ...........................33, 41, 42, 47, 48

*Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003). ........20, 33, 48, 49

*McKinney v. Franklin Cnty., Illinois*, 417 F. Supp.3d 1125 (S.D. Ill. 2019) ..... 33, 46

*Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010) .................................................. 34

*Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018) ................................ 25, 34

*Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978) ....................................................................................................... 49, 50

*Mullenix v. Luna*, 577 U.S. 7 (2015) ..................................................................... 43

*Pittman ex rel. Hamilton v. Cnty. of Madison, Illinois*, 970 F.3d 823 (7th Cir. 2020) ........................................................................................................... 25

*Pulera v. Sarzant*, No. 15-C-461, 2019 WL 2476978 (E.D. Wis. June 13, 2019), *aff'd*, 966 F.3d 540 (7th Cir. 2020) ................................................ 29, 34

*Pulera v. Sarzant*, 966 F.3d 540 (7th Cir. 2020) ............................................ 26, 36

*Rogers v. Sheriff of Santa Rosa Cnty.*, 2023 WL 2566087 (11th Cir. March 20, 2023) .......................................................................................................... 51, 52

*Sallenger v. City of Springfield, Ill.*, 630 F.3d 499 (7th Cir. 2010) ........................ 50

*Saucier v. Katz*, 533 U.S. 194 (2001) .............................................................. 43, 44

*Springer v. Durflinger*, 518 F.3d 479 (7th Cir. 2008) ............................................ 31

*State Bank of St. Charles v. Camic*, 712 F.2d 1140 (7th Cir. 1983) ...... 33, 36, 42, 46

*Terry v. County of Milwaukee*, 357 F.Supp. 732 (E.D. Wis. 2019) ........................ 25

*Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2010) ....................... 53

*Thomas v. Dart*, 39 F.4th 835 (7th Cir. 2022) ............................................ 23, 24, 42

*Velez v. Johnson*, 395 F.3d 732 (7th Cir. 2005) ............................................... 39, 40

*Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061 (C.D. Ill. 2010) ............................... 33

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) ...................................... 26

*Wilson v. Layne*, 526 U.S. 603 (1999) .................................................................. 43

Fed. R. Civ. P. 56 ................................................................................................. 22

42 U.S.C. § 1983.....................................................................22, 26, 48

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant's jurisdictional statement is complete and correct.

# STATEMENT OF THE ISSUES

1. Whether a report of strange behavior, without more, would lead a reasonable officer in the position of Defendants-Appellees to appreciate the high degree of risk that Gavin Wallmow was suicidal or would otherwise suffer serious harm.

2. Did any clearly established law exist such that a reasonable official in the position of Defendants-Appellees Katie Rudolph, Carrie Holewinski, Reed Symonds, and Matthew Turkiewicz would understand that what s/he was doing violated a clearly established right of Gavin Wallmow?

3. Did Oneida County have any notice that any of its policies or practices would cause Gavin Wallmow to face a substantial risk of serious harm?

# STATEMENT OF THE CASE

## I.     FACTS

### a.     Wallmow's Booking into Oneida County Jail on July 4, 2021

On July 4, 2021, Gavin Wallmow ("Wallmow") was taken into custody by the Rhinelander Police Department on a probation hold and arrived at the Oneida County Jail ("OCJ") just before 11:00 p.m. (R. 47, ¶ 5; R. 36, p. 18; R. 63-1.) When Wallmow was brought into OCJ, the arresting officer from the Rhinelander Police Department provided OCJ booking officers with what officers refer to as a "gray sheet." (R. 47, ¶ 6; R. 63-2.) A gray sheet is a standardized form to be completed by the arresting officer and provided to OCJ at the time of booking, and it is the only source of information about an arrestee's current charges available to OCJ officers.

(R. 47, ¶¶ 7, 9, 11; R. 36, p. 12; R. 43, pp. 33-34.) Jail staff also use the gray sheet to assist them in assessing an inmate's potential for suicide or self-harm. (R. 41, pp. 50-51; R. 47, ¶¶ 7, 14; R. 36, p. 12.)

OCJ officers rely on information on the gray sheet included under the arrestee's charges, the "arresting officer's observations," and whether force was used during arrest to help them identify any potential suicide risks of the incoming inmate. (R. 47, ¶ 14.) If an inmate is booked into OCJ on certain types of serious charges, such as incest, this prompts OCJ corrections staff to consider immediate interventions, including proactive placement on suicide watch, to address any potential suicide risk that could arise from the seriousness and/or nature of the charges. (R. 47, ¶ 15; R. 43, pp. 31-32.) If an arrestee's gray sheet indicates that arresting officers observed any threat of suicide, medical problems, or violent behavior, this prompts OCJ staff to consider whether medical clearance or special watch status may be necessary either before or at the completion of the booking process. (R. 47, ¶ 16.) At OCJ, officers are trained, and it is the routine practice, to always err on the side of caution when considering whether to place an inmate on suicide watch. (R. 38, p. 13; R. 36, p. 9; R. 47, ¶ 17.)

As Sergeant Glenn Kortenhof ("Kortenhof") booked Wallmow into OCJ, he reviewed the gray sheet and saw that Wallmow was charged with a probation hold. (R. 36, pp. 18-19.) Kortenhof also saw that Wallmow's arresting officer had marked

"no" for all of the observation categories: threat of suicide, medical problem, violent behavior, and other. (R. 36, pp. 18-19.) After reviewing the information on an arrestee's gray sheet, OCJ officers ask each incoming inmate a series of standard booking questions that include medical and mental health screening questions and the booking officer's observations of the inmate. (R. 47, ¶ 18; R. 63-3.) During Wallmow's booking, Kortenhof asked Wallmow all of these standard booking questions and recorded all of the required observations. (R. 63-3.) Wallmow responded that he was not taking any medications, he was not under a doctor's care, he had not recently been hospitalized, and he had no recent illnesses or injuries. (R. 63-3, p. 2.) When Kortenhof asked Wallmow if he was feeling suicidal, Wallmow said no. (R. 63-3, p. 2.) Wallmow further responded to Kortenhof's questions by stating that he was not under psychiatric care, he had no suicidal or self-mutilation tendencies, he said he was not dependent on drugs or alcohol, and Wallmow told Kortenhof that he had family in the area. (R. 63-3, p. 6.) Wallmow confirmed that he did not have any mental or physical disability, he had not been the victim of rape or sexual assault in the past 10 years, and he did not have any history of predatory sexual behavior or abuse towards others. (R. 63-3, p. 9.)

In addition to recording Wallmow's responses to these booking questions, Kortenhof observed that Wallmow appeared to be in good physical condition, he had no obvious sings of injury or illness, Wallmow did not appear to be under the

influence of drugs, he was not carrying any medications, Wallmow's behavior did not suggest the need for immediate psychiatric treatment, and Wallmow's preliminary breath test reading was 0.02. (Ex. 63-3, p. 1.) Kortenhof observed that Wallmow understood the questions he was being asked; Wallmow was not displaying any unusual, bizarre, or violent behavior; he was cooperative; and he did not have any visible evidence of self-inflicted injury or needle marks. (R. 63-3, p. 4.)

Also during the booking process, Kortenhof reviewed Wallmow's criminal history and saw that Wallmow's most recent past charges prior to July 4, 2021 were from May 8, 2020 for theft and receiving stolen property. (R. 48, ¶ 3.) The July 4, 2021 incarceration was Wallmow's first incarceration at OCJ. (R. 47, ¶ 47.) Thus, there was no information or history about Wallmow from any prior bookings that might shed additional light on Wallmow's potential suicide risk.

Throughout the booking process, Kortenhof observed Wallmow to have a good demeanor, Wallmow answered all booking questions appropriately, he did not second-guess himself, and he was otherwise acting appropriately. (R. 36, p. 20.) Wallmow was calm and he was acting unremarkably. (R. 36, p. 20.) Based on the information Wallmow provided to Kortenhof during the booking process, combined with the information provided on the gray sheet and Kortenhof's own observations, Kortenhof did not identify Wallmow as being in the high-risk status categories of

"mental" or "suicidal," and he did not identify any "special conditions." (R. 47, ¶ 19; R. 63-3, p. 10.) Wallmow signed the completed questionnaire confirming Kortenhof's conclusions. (R. 63-3, p. 10.)

During the relevant time frame, OCJ had multiple policies in place designed to identify inmates at risk of suicide, prevent suicides, and to provide health care for suicidal inmates, including policies on health screenings at admission, inmate access to health care, suicide prevention, inmate observation, and inmate supervision and management. (R. 63-9 – 63-16.) When Wallmow was booked into OCJ, he was provided an Informed Consent form for the Authorization for Health Care explaining how he could request and obtain medical and mental health care while incarcerated. (R. 63-8.) At the time of booking, Wallmow initialed and signed the Informed Consent form, confirming that he understood that he could obtain health care by completing a Sick Call Request on a jail kiosk. (R. 63-8.) There is no evidence that Wallmow ever submitted a request for medical care of any kind or otherwise indicated to anyone that he wanted or needed medical attention while he was incarcerated at OCJ.

Because of COVID-19 quarantine protocols in place at OCJ during the relevant time period, Wallmow was assigned to a single occupancy cell in Secure G Block at around 1:00 a.m. on July 5, 2021 after the booking process was complete. (R. 36, pp. 19-20.) OCJ's COVID-19 protocols during that time required inmates to

test negative for COVID before they could be moved into the general population housing unit. (R. 47, ¶ 20.) During the other shifts worked by Kortenhof between July 4, 2021 and July 8, 2021, Kortenhof recalled Wallmow being in good health and he did not recall Wallmow acting strangely. (R. 36, p. 21.)

### b. Contact With Probation Agent Alexis Bunce

Ms. Alexis Bunce ("Bunce") was Wallmow's assigned probation agent. (R. 35, p. 8.) Bunce went to OCJ on July 6, 2021, to obtain a written statement from Wallmow for investigative purposes. (R. 38, pp. 9, 22.) Bunce's routine practice was to ask a probationer questions using the relevant police report as a guide; to write the probationer's responses on the statement form; and to then have the probationer review and sign the statement once complete. (R. 35, pp. 12, 36.)

OCJ corrections officers are not present during probation agents' meetings with inmates. (R. 47, ¶ 21.) When Bunce spoke with Wallmow, he initially seemed fine to her and was "just kind of downplaying what had happened [that led to his arrest], saying it was kind of just an emotional outburst, he'd gotten into an argument with his parents." (R. 35, p. 9.) During this initial part of their conversation, Wallmow denied suicidal ideation and denied wanting to harm anyone. (R. 35, p. 11.)

Bunce then asked Wallmow what had happened between Wallmow and his sister, because Bunce had received a police report alleging a sexual assault

perpetrated by Wallmow against his sister that was being investigated by the Rhinelander Police Department. (R. 35, p. 9.) It was Bunce's understanding that police were referring charges of incest against Wallmow to the district attorney. (R. 35, p. 11.) When Bunce asked Wallmow about his sister, she noted a switch in Wallmow's demeanor as he started "hysterically laughing and then crying and saying just very, very odd" things. (R. 35, p. 9.) In particular, Bunce heard "demonic talk" from Wallmow and "mention of things that just didn't make sense." (R. 35, p. 9.) As Bunce was taking Wallmow's statement, Wallmow said "you are speaking to a dead man." (R. 35, p. 10.)

Wallmow's comment about speaking to a dead man prompted Bunce to stop obtaining the statement; instead, she just listened to Wallmow until he was able to calm back down. (R. 35, p. 10.) By the time Bunce concluded her meeting with Wallmow, Wallmow had calmed down "back to ground zero" and he was no longer laughing or crying. (R. 35, p. 37.) Once she left the jail and was in the OCJ parking lot, Bunce called the jail from her phone. (R. 35, pp. 18-19.) Bunce told the person who answered the phone, Officer Katie Rudolph (née Kuchenbecker) ("Rudolph"), that she had just met with Wallmow and that she had concerns about his mental well-being. (R. 35, pp. 19-20; R. 38, p. 17.) Bunce does not recall exactly what she said during this call, but she remembered telling Rudolph that Wallmow was acting strangely, he was hitting himself, and he was speaking of demonic things. (R. 35,

pp. 21, 26; R. 38, p. 17.) Bunce did not tell Rudolph or any other OCJ staff at any time that she thought Wallmow was or might be suicidal. (R. 35, p. 19.) Further, Bunce did not tell Rudolph or any other staff that a police report from Wallmow's arrest noted that Wallmow had made broad suicidal comments to his family at the time of his arrest. (R. 35, pp. 23-24, 25.)

Based on her interactions with Wallmow and the seriousness of the crime of incest, Bunce and her supervisor decided they were going to serve Wallmow with a revocation and pursue a competency hearing. (R. 35, pp. 13-14, 39.) Bunce did not communicate this to anyone at OCJ. (R. 35, p. 39; R. 38, p. 18; R. 43, p. 34; R. 47, ¶ 24.) In addition to Wallmow's written statement obtained on July 6, 2021, Bunce drafted a report on July 9, 2021 recording her July 6, 2021 conversation with Wallmow (*see* R. 63-18), but neither document nor any of the information contained in them was provided to OCJ prior to Wallmow's death. (R. 35, pp. 14-15; R. 36, p. 22; R. 38, p. 14; R. 39, p. 17; R. 43, pp. 13-14; R. 37, p. 12.)

### c. Sergeant Holewinski's Muster Entry and Staff Monitoring

It is the common and trained practice at OCJ that when a corrections officer receives an outside call from someone, whether a probation agent or a family member, expressing concerns about an inmate, the officer notifies the sergeant on duty. (R. 43, pp. 8-9; R. 41, pp. 24, 30; R. 37, p. 14; R. 47, ¶ 25.) Sergeants are trained and expected to use the information relayed to them, along with information

and observations of correctional staff and their own observations, when responding to any situation of which they are made aware. (R. 47, ¶ 26.) OCJ sergeants are trained and expected to apply their discretion, training, and jail policies when making any decisions regarding the response to any particular situation. (R. 43, pp. 9-11; R. 47, ¶ 26.) The sergeant's specific response to any given outside caller expressing concern about an inmate is highly fact-specific and depends on the situation. (R. 47, ¶ 27.)

It is not at all unusual for OCJ officers to observe weird or bizarre behavior from inmates in their custody. (R. 37, pp. 21-22; R. 39, p. 18; R. 41, p. 34) Based on OCJ training and policies, the range of acceptable responses by a sergeant varies greatly and may or may not involve an officer or the sergeant making contact with the inmate. (R. 43, pp. 10-11; R. 47, ¶ 27.) Depending on the expressed concerns and information provided, one of the ways that a sergeant may respond to an outside call is to keep an eye on the inmate to see if officers observe any unusual behavior similar to the reported concerns. (R. 43, p. 11; R. 47, ¶ 28.)

Keeping an eye on an inmate is often appropriate when a caller reports concerns or behavior about an inmate that are not consistent with anything that jail officers have observed. (R.47, ¶ 28.) When a caller reports that an inmate is behaving in a way that is inconsistent with what officers have been observing, officers are trained to keep an eye on the inmate for any behavior that is out of the norm for that

inmate. (R. 47, ¶ 28.) OCJ officers are trained to watch for unusual inmate behavior while they monitor the surveillance video feeds. (R. 47, ¶ 29; R. 38, p. 28.) One of the ways officers are trained to monitor an inmate more closely is to select the video feed from the inmate's block so that it is enlarged on the monitors for better and easier observation. (R. 47, ¶ 29.)

When she received Bunce's phone call on July 6th, Rudolph was working as the assigned dorm pod operator. (R. 38, p. 20.) Therefore, she did not have access to any surveillance camera feeds of the secure pod where Wallmow was housed in Secure G Block and she could not leave her station. (R. 38, p. 20; R. 47, ¶ 35.) After receiving Bunce's call, Rudolph called the secure pod where Wallmow was housed and told the secure pod operator, Officer Ian Conkey—who did have access to the relevant surveillance camera feeds, about Bunce's call and told him to keep an eye on Wallmow. (R. 38, pp. 25-26, 30; R. 39, p. 11.) Officer Conkey could not remember specifics of what Rudolph told him, but he did recall being told to keep an extra eye on Wallmow as a result of Bunce's call and he did so. (R. 39, p. 23.)

After receiving Bunce's call, Rudolph also called the sergeant on duty, Sergeant Carrie Holewinski ("Holewinski"), to advise her of Bunce's report—just as she was trained and just as expected. (R. 38, pp. 23, 26.) Rudolph told Holewinski that Bunce had concerns about Wallmow because she observed him acting strangely and talking about demonic things. (R. 43, pp. 11-12.)

OCJ sergeants communicate with correctional staff through a pass down document referred to as a "muster" that is prepared by the sergeant on duty throughout his or her shift with information about inmates or occurrences that happened during the shift and about which the following shifts should be aware. (R. 36, p. 30; R. 43, p. 18; R. 47, ¶ 30.) At the end of the sergeant's shift, a printed copy of the completed muster is posted in the radio room and a digital copy of the completed muster is emailed to all corrections sergeants and administrators. (R. 47, ¶ 30.) The muster from each shift is added to the top of the stack of printed musters and each officer is trained and expected to review the musters from all shifts since they last worked. (R. 37, pp. 26-27; R. 47, ¶¶ 31-32.)

Upon receiving the call from Rudolph, Holewinski added the information that Rudolph had reported to her in the day shift's muster to the night shift. (R. 43, p. 18.) Specifically, on the day shift muster for July 6, 2021, Holewinski wrote: "Keep an eye on Wallmow in Secure G 3. According to his probation agent, he was acting a little weird and talking about 'demonic' stuff." (R. 43, p. 18; R. 63-4.)

"Keep an eye on Wallmow" meant that officers were expected to look for any kind of behavior that would suggest that Wallmow was not acting like himself or what officers had grown accustomed to seeing from Wallmow. (R. 43, p. 20; R. 37, pp. 22-23.) "Keep an eye on Wallmow" meant that officers need to be sure to specifically look at Wallmow at some point during their usual checks to make sure

that Wallmow was okay. (R. 43, p. 22.) If officers observing Wallmow did not notice anything out of the ordinary about Wallmow's behavior within a couple of days of the reported concerns, they would revert to monitoring him like any other inmate at the direction and discretion of the sergeant. (R. 43, p. 24.) During Holewinski's shift on July 6, 2021, she was not notified that anyone had observed that Wallmow was in any kind of distress or that anyone noticed anything weird. (R. 43, p. 25.) She did not work again for several days after that and only learned of Wallmow's death after the fact. (*Id*. at 17.)

### d. OCJ Cell Check Policies and Procedures

OCJ officers are trained and expected to observe all inmates at least once every hour and record confirmation of their observation. (R. 47, ¶ 34.) Officers can accomplish this hourly observation requirement in multiple ways. (R. 47, ¶ 34.) Officers may perform a "cell check," which is a visual observation of each inmate's cell from the pod officer's station. During a cell check, the officer may look directly at the cells or s/he may use the surveillance video feeds on the monitors. (R. 47, ¶ 34.) Another method of completing the hourly observation is a "walkthrough" of the pod. An officer may walk through the pod and past each cell to visually observe the inmates. (R. 47, ¶ 35.) Only roving officers can complete walkthroughs, because the assigned pod officer cannot leave the officer's station for any reason. (R. 47, ¶ 35.) In addition to walkthroughs, OCJ staff also performs routine "sergeant

walkthroughs." (R. 47, ¶ 36.) During a sergeant walkthrough, the sergeant on duty and one or more officers walk through the block and past each cell to visually observe the inmates. (R. 47, ¶ 36.)

It is against the rules for OCJ inmates to cover their cell windows or to hang objects from their bunks that obstruct officers' view of the cells. (R. 42, p. 35; R. 37, p. 35.) However, OCJ inmates, particularly new inmates who were not yet familiar with the jail rules, sometimes hung objects from their bunks to block the light. (R. 36, p. 38; R. 37, pp. 42-43.) If an officer saw that an inmate had hung something from his bunk, the officer would inform the inmate during a subsequent walkthrough that this was against jail rules. (R. 37, pp. 42-43; R. 36, pp. 37-38.)

In addition to the cell checks and walkthroughs, OCJ officers also perform and record a headcount of all inmates at least five times each day: lights on headcount, breakfast headcount, lunch headcount, dinner headcount, and lights out headcount. (R. 47, ¶ 38.) During the lights on and lights off headcounts, inmates must stand up so that they are visible to officers at the doors of their cells. Officers then observe and count the inmates to confirm that they are all accounted for and everything appears to be okay. (R. 47, ¶ 39.) During mealtime headcounts, inmates must also present themselves to officers to receive and return their food trays. (R. 47, ¶ 39.)

On July 5, 2021, OCJ officers performed visual checks on Wallmow, whether through a cell check from the officer's station, an in-person headcount, or an officer

or sergeant walkthrough of the pod at least 44 times. (R. 63-5; R. 47, ¶¶ 40-41; R. 49, ¶ 5; R. 50, ¶ 5; R. 57, ¶ 5; R. 52, ¶ 5; R. 53, ¶ 5; R. 54, ¶ 5; R. 55, ¶ 5; R. 56, ¶ 5; R. 57, ¶ 5; R. 48, ¶ 6; R. 58, ¶ 5; R. 59, ¶ 5; R. 60, ¶ 5; R. 61, ¶ 5.) On July 6, 2021, OCJ officers performed visual checks on Wallmow using these various methods at least 41 times. (R. 63-5; R. 47, ¶¶ 40, 42; R. 49, ¶ 5; R. 50, ¶ 5; R. 51, ¶ 5; R. 52, ¶ 5; R. 53, ¶ 5; R. 54, ¶ 5; R. 55, ¶ 5; R. 56, ¶ 5; R. 57, ¶ 5; R. 48, ¶ 6; R. 58, ¶ 5; R. 59, ¶ 5; R. 60, ¶ 5; R. 61, ¶ 5.) On July 7, 2021, OCJ officers performed visual checks on Wallmow through these methods at least 40 times. (R. 63-5; R. 47, ¶¶ 40, 43; R. 49, ¶ 5; R. 50, ¶ 5; R. 51, ¶ 5; R. 52, ¶ 5; R. 53, ¶ 5; R. 54, ¶ 5; R. 55, ¶ 5; R. 56, ¶ 5; R. 57, ¶ 5; R. 48, ¶ 6; R. 58, ¶ 5; R. 59, ¶ 5; R. 60, ¶ 5; R. 61, ¶ 5.) On July 8, 2021, OCJ officers performed visual checks on Wallmow using these methods at least 39 times. (R. 63-5; R. 47, ¶¶ 40, 44; R. 49, ¶ 5; R. 50, ¶ 5; R. 51, ¶ 5; R. 52, ¶ 5; R. 53, ¶ 5; R. 54, ¶ 5; R. 55, ¶ 5; R. 56, ¶ 5; R. 57, ¶ 5; R. 48, ¶ 6; R. 58, ¶ 5; R. 59, ¶ 5; R. 60, ¶ 5; R. 61, ¶ 5.) In addition to the visual checks identified above, Wallmow also had time out of his cell in the Secure G day room each day. This provided officers an additional point of extended visual observation of Wallmow each day for approximately two hours. (R. 37, p. 17; R. 63-7.)

### e. Wallmow's Death on July 8, 2021

On the evening of July 8, 2021, OCJ staff was trying to free up room in Secure G Block for an anticipated influx of new inmates due to the annual Hodag Country

Festival taking place that weekend in Rhinelander. (R, 47, ¶ 33.) In order to help move quarantining inmates from Secure G Block to general population, OCJ sergeants asked the jail health care staff to administer COVID tests to willing inmates. If the test came back negative, the inmate could be moved out of quarantine and into general population. (R. 47, ¶ 33.)

As part of this process, Nurse Melissa Wilhelm ("Wilhelm") and Officer Matthew Turkiewicz ("Turkiewicz") approached Wallmow in his cell shortly after 6:15 p.m. and asked if he would be willing to participate in COVID testing. (R. 40, pp. 21-22; R. 42, p. 40.) Turkiewicz had seen the muster from July 6, 2021 stating that there was a report of Wallmow acting a little weird and talking about "demonic" stuff. (R. 42, p. 18.)

While in Wallmow's cell to discuss the COVID test, Wallmow had good eye contact with Wilhelm and she did not notice anything amiss. (R. 40, p. 22.) Wallmow asked why they wanted to give him a COVID test, and Turkiewicz told Wallmow that if the test came back negative, he could be moved into general population. (R. 42, p. 41.) To Turkiewicz, Wallmow seemed pleased about the idea of moving to general population. (R. 42, p. 41.) Wallmow agreed to take a COVID test. (R. 42, p. 41.) As a nurse, Wilhem receives twice-yearly training on identifying signs and symptoms displayed by inmates that may suggest the inmate is suicidal or at a heightened risk for suicide. (R. 40, pp. 44-45.) At no point on July 8th did Wilhelm

observe Wallmow hitting himself, acting strangely, or talking about demons. (R. 40, p. 45.) Moreover, at no point in time did Wilhelm observe Wallmow exhibiting any sign or symptom of mental illness or otherwise suspect that Wallmow was mentally ill or suicidal. (R. 40, pp. 26, 46.)

Nothing about Wallmow's demeanor during this face-to-face visit on July 8th suggested to Turkiewicz that Wallmow was upset or distressed. (R. 42, p. 42.) Turkiewicz did not observe Wallmow crying, acting weepy, exhibiting any self-harm behavior, saying anything that seemed strange, talking about demons, or saying anything at all that seemed nonsensical or even slightly questionable. (R. 42, p. 42.) While in Wallmow's presence, Turkiewicz did not observe anything that would suggest to Turkiewicz that Wallmow was in any way in mental or emotional distress. (R. 42, p. 42.)

Officer Reed Symonds ("Symonds") was also working at OCJ on the evening of July 8, 2021 and assumed duties as the secure pod operator at 6:32 p.m. (R. 63-5, p. 36; R. 50, ¶ 5.) That day, Symonds saw the pass down muster from two days earlier directing officers to keep an eye on Wallmow and stating that Wallmow was "acting a little weird and talking about 'demonic' stuff." (R. 37, pp. 11-12, 30.) Upon seeing the comments about Wallmow on the muster, Symonds reviewed Wallmow's booking information to familiarize himself with Wallmow so he could identify him and monitor him. (R. 37, pp. 23-24.)

Symonds kept an eye on Wallmow for any weird behavior or anything that was abnormal or unusual to see from inmates. (R. 37, p. 42.) Symonds observed that Wallmow was not doing anything that was abnormal or too different from what other inmates were doing and everything was okay. (R. 37, pp. 43, 45.) Contrary to jail rules, Wallmow had hung fabric from the end of his bunk that blocked some of the view of Wallmow's bunk. (R. 37, p. 35.) However, the rest of Wallmow's cell was still visible, and during his visual checks, Symonds saw movement in Wallmow's cell and saw Wallmow in a position suggesting that Wallmow was either lying on his bed, sitting on the bed, or kneeling at the bed. (R. 37, pp. 34-35; R. 36, p. 39.)

It was not unusual for Symonds to see inmates moving around on the floor of their cell or on their bunk similar to what he observed from Wallmow. (R. 37, pp. 38, 42-43.) It was normal for officers to see inmates kneeling on the floor over their bunk to pray or write a letter. (R. 37, p. 44.) Further, because Wallmow was a new inmate, it did not appear strange to Symonds that Wallmow had hung something from his bunk and might need a reminder that it was against jail rules. (R. 37, pp. 42-43.) When Symonds saw Wallmow near the head of his bed during his observations, he never saw any clear sign of distress. (R. 37, p. 44.)

At 9:49 p.m., Turkiewicz assumed the duties of the secure pod operator from Symonds. (R. 63-5, p. 37.) Turkiewicz did a visual cell check at that time and did

not see anything amiss or anything that suggested that Wallmow was in distress or deceased. (Ex. 63-5, p. 37; R. 42, p. 39.)

Just after 10:00 p.m. on July 8, 2021, Kortenhof, Symonds, and Officer Matt Rudolph entered Secure G Block to complete a sergeant walkthrough, headcount, and lockdown for the night. (R. 63-5, p. 33; Dkt. 42, p. 31.) Officers Matt Rudolph and Symonds checked the cells on the lower tier in Secure G Block while Kortenhof checked the cells on the upper tier of the block. (R. 63-5, p. 33.) Turkiewicz remained at his position in the officer's station as required. (R. 63-6, p. 14; R. 52, ¶ 6.) When Kortenhof reached Wallmow's cell on the upper tier, he looked through the cell door window and saw Wallmow kneeling at the head of the lower bunk, which is located towards the back wall of the cell, with his knees on the ground, his upper torso on the bunk, and his hands up by his head. (R. 36, pp. 45-6, 48.) Wallmow was wearing his jail-issued uniform. (R. 36, p. 47.) It appeared to Kortenhof that Wallmow was praying or reading a book at a close distance. (R. 36, pp. 45-6.)

Kortenhof tried to get Wallmow's attention as required during headcount, but he received no response. (R. 36, pp. 46-7.) Kortenhof then noticed that something was around Wallmow's neck, so he opened the cell to check on Wallmow. (R. 36, pp. 46, 49.) When Kortenhof entered the cell, he saw that Wallmow had what appeared to be a pair of orange uniform pants tied around his neck. (R. 36, p. 49.)

Wallmow had tied the end of the uniform pants to a metal plate under the lower bunk mattress and somehow strangled himself. (R. 36, pp. 51-52.) It is undisputed that Wallmow was not "hanging" from anything when he was found by officers, and there is no evidence that Wallmow was ever hanging at any time. (R. 36, p. 51; R. 65, ¶ 133.)

No corrections officer or official who worked for any period of time in the secure pod of OCJ between July 4, 2021 and July 8, 2021 observed Wallmow acting strangely, hitting himself, speaking of demonic things, or otherwise exhibiting any unusual behavior at any point. (R. 49, ¶ 3; R. 50, ¶ 3; R. 51, ¶ 3; R. 52, ¶ 3; R. 53, ¶ 3; R. 54, ¶ 3; R. 55, ¶ 3; R. 56, ¶ 3; R. 57, ¶ 3; R. 48, ¶ 4; R. 58, ¶ 3; R. 59, ¶ 3; R. 60, ¶ 3; R. 61, ¶ 3; R. 47, ¶ 45.) Similarly, no corrections officer or official who worked during that time period observed Wallmow do or say anything at any point that would suggest to them that Wallmow was suffering from mental illness, had suicidal thoughts, or was suicidal. (R. 49, ¶ 4; R. 50, ¶ 4; R. 51, ¶ 4; R. 52, ¶ 4; R. 53, ¶ 4; R. 54, ¶ 4; R. 55, ¶ 4; R. 56, ¶ 4; R. 57, ¶ 4; R. 48, ¶ 5; R. 58, ¶ 4; R. 59, ¶ 4; R. 60, ¶ 4; R. 61, ¶ 4; R. 47, ¶ 46.)

Wallmow's suicide was the first in the history of the current OCJ facility, which opened in 1999. (R. 41, p. 27; R. 62, ¶ 5.) Sheriff Grady Hartman was only aware of one "serious suicide attempt" that failed at OCJ eight years earlier, in 2013. (R. 41, p. 27.)

## II.   PROCEDURAL HISTORY

Plaintiff-Appellant's discussion of the procedural history of this case is complete and correct, and therefore Defendants-Appellees adopt and incorporate it by reference.

## SUMMARY OF THE ARGUMENT

If the Court adopts Plaintiff's position in this case, it would directly contradict binding precedent in which courts have taken great pains to confirm the obvious: "bizarre behavior and suicidal behavior are different." *Jutzi-Johnson v. U.S.*, 263 F.3d 753, 757 (7th Cir. 2001). Even when the behavior in question includes signs of depression (something that Wallmow did not exhibit in any event), this does not mean that the inmate should or must be put on suicide watch. *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003). Instead, an inmate's strange behavior alone, without indications that the behavior has a substantial likelihood of taking a suicidal turn, is not sufficient to impute to jail personnel a subjective knowledge of a high risk of harm. *See Estate of Novack v. Wood County*, 226 F.3d 525, 530 (7th Cir. 2000).

Additionally, adopting Plaintiff's position would hold corrections officers to an impermissibly—and impossibly—high standard under the Fourteenth Amendment when interpreting inmate behavior. Any suggestion of strange behavior, even if not directly observed by the officer and even if reasonably subject to differing

interpretations, would require an officer to always assume the worst and to employ the highest levels of intervention available, such as placement on suicide watch, regardless of whether it is objectively reasonable to do so.

In this case in particular, Plaintiff's position relies almost exclusively on speculation and hindsight. Sadly, with the benefit of hindsight, it is clear that Gavin Wallmow was a very troubled man when he was booked into OCJ on July 4, 2021. Various police reports, Bunce's July 6, 2021 recorded statement from Wallmow, and her post-incident DOC report written on July 9, 2021 all confirm that Wallmow displayed signs of mental illness or suicidal behavior at various times on July 4, 2021 and in the days, weeks, months, and even years prior. (R. 63-17, 63-18, 63-19, 63-20; R. 35, p. 34.) However, <u>none</u> of this information was ever communicated to anyone at OCJ prior to Wallmow's suicide, and Plaintiff cannot fault these officers for failing to proactively search out that information based on what they did know. Instead, all information provided to OCJ staff and all observations by OCJ staff reasonably led to the opposite conclusion: Wallmow was not suicidal or at any risk of serious harm.

This Court should affirm the District Court's decision holding that Defendants Rudolph, Holewinski, Symonds, and Turkiewicz acted reasonably and did not violate Wallmow's constitutional rights in their handling of the information known to them. Similarly, this Court should affirm the District Court's holding that no

policy or practice of Oneida County caused any constitutional deprivation. Wallmow has not identified any factual or legal error in the District Court's conclusions and has not provided any basis to overturn the District Court's decision or to depart from well-established precedent.

## ARGUMENT

### I. STANDARD OF REVIEW

A district court's grant of summary judgment in a case brought under 42 U.S.C. § 1983 is subject to *de novo* review, including summary judgment based on qualified immunity. *King v. Henricks County Comm'r*, 954 F.3d 981, 983-84 (7th Cir. 2020). This Court may affirm on any basis for which it finds support in the record and that was adequately presented to the district court. *Id*. Summary judgment is appropriate when there is no dispute of material fact and the movant is entitled to judgment as a matter of law. *Id*. (citing Fed. R. Civ. P. 56(a)). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Id*. at 248.

Once the moving party meets this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine

issue for trial. *Id.* at 256. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* at 248.

## II. EACH INDIVIDUAL CAPACITY CLAIM FAILS UNDER THE OBJECTIVE REASONABLENESS STANDARD[3]

### 1. The District Court Properly Applied the Fourteenth Amendment Standard Requiring Plaintiff to Show That Defendants Knew or Should Have Known of a Substantial Risk of Serious Harm.

The parties agree that for Plaintiff to prevail on its Fourteenth Amendment claims related to Wallmow's suicide, it must show that: (1) the defendants made an intentional decision regarding the conditions of Wallmow's confinement; (2) those conditions placed Wallmow at substantial risk of suffering serious harm; (3) the defendants' decision(s) was objectively unreasonable; and (4) the defendants' decision(s) caused Wallmow's injuries. *See Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022). To establish the third element, Plaintiff was required to show that Defendants knew or should have known "of a serious risk of harm" to Wallmow "from the perspective of a reasonable officer on the scene, including what the officer

---

[3] As noted by Plaintiff, the parties stipulated to the application of the Fourteenth Amendment to the claims alleged in this case. (Pl.-Ap. Brf., p. 15.) In its decision on summary judgment, the District Court noted that it is still unsettled whether the Eighth or Fourteenth Amendment applies to claims brought by inmates on a probation hold—such as Wallmow—but agreed to apply the Fourteenth Amendment. (A.App. 009.)

knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

However, Plaintiff incorrectly claims that the District Court erred in its application of this standard by focusing on knowledge of a substantial risk of <u>suicide</u>, as opposed to a substantial risk of suffering <u>serious harm</u>. (Pl.-Ap. Brf., p. 12; 20.) First, this position mischaracterizes the District Court's analysis, in which it plainly stated, "To show that a defendant's conduct was unreasonable, plaintiff must show that the defendant knew, or should have known, of a serious risk of harm to Wallmow." (A. App. 010 (citing *Thomas*, 39 F.4th at 841).) The District Court did not misstate the standard, impermissibly narrow it, or misapply it.

Second, and perhaps more importantly, Plaintiff's argument is merely a distinction without a difference. It is undisputed that Wallmow committed suicide, that his suicide is the basis for this lawsuit, and that suicide constitutes "serious harm" for purposes of this type of Fourteenth Amendment claim. *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). The harm allegedly caused by the defendants' decisions or actions was Wallmow's suicide. (*See* R. 12, ¶ 1; Suppl. A. App. 018-019.) There has never been any allegation that the defendants' decisions or actions caused some other injury or harm to befall Wallmow. At its core, objective unreasonableness means that a defendant was aware or strongly suspected that his or her conduct would lead to harm—and harm then came to pass.

*See Pittman ex rel. Hamilton v. Cnty. of Madison, Illinois*, 970 F.3d 823, 828 (7th Cir. 2020).

It appears that Plaintiff may be conflating the concept of harm or injury with the concept of an objectively serious medical condition. (*See* Pl.-Ap. Brf., pp. 18-19.) In the context of a Fourteenth Amendment claim based on inadequate medical care, a plaintiff must demonstrate that s/he suffered from an objectively serious medical condition or need. *See Terry v. County of Milwaukee*, 357 F.Supp. 732, 745-46 (E.D. Wis. 2019) (citing *Miranda v. County of Lake*, 900 F.3d 335, 353-54 (7th Cir. 2018)). Mental illness—even that which does not include suicidality—may indeed constitute an objectively serious medical condition.[4] Further, there is no dispute that an objectively serious medical condition—even mental illness that does not involve suicidality—may create a substantial risk of serious harm to an inmate's health or safety.

---

[4] Within this argument, Plaintiff-Appellee discusses Wallmow's medical history and past mental health diagnoses. (Pl.-Ap. Brf., p. 19.) This can be disregarded entirely. There is no evidence that any defendant was aware of any of Wallmow's diagnoses or medical history. Nor is there any evidence that any defendant believed that Wallmow might suffer from any mental health issues whatsoever. In fact, the undisputed record establishes that no corrections officer or official who worked for any period of time in the secure pod of OCJ between July 4, 2021 and July 8, 2021 observed Wallmow acting strangely, hitting himself, speaking of demonic things, or otherwise exhibiting any unusual behavior at any point, nor did anyone observe Wallmow do or say anything at any point that would suggest to them that Wallmow was suffering from mental illness. *See supra*, p. 19.

But the analysis does not stop there. Every claim filed under 42 U.S.C. § 1983 includes the element of causation, which has two components: cause-in-fact and proximate cause. *Whitlock v. Brueggemann*, 682 F.3d 567, 582-83 (7th Cir. 2012). Cause-in-fact means that "the injury would not have occurred absent the conduct," and proximate cause means that "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id*. Mental illness is not the harm or injury alleged—Wallmow's suicide is. Thus, the test is: 1) whether the injury alleged here—suicide—would not have occurred absent objectively unreasonable conduct; and 2) whether suicide is the type of injury that a reasonable officer in the position of Defendants would see as a likely result of his or her conduct. Plaintiff attempts to impermissibly divorce each element from the others to eliminate these necessary connections.

Relatedly, Plaintiff's position is also entirely speculative. Had officers suspected a risk of harm because they thought Wallmow was mentally ill—but not suicidal—there are no facts in the record establishing that their response was nevertheless unreasonable, or that a reasonable response to that suspicion would have made any difference in this case. For example, officers believing Wallmow might be mentally ill may have simply suggested to Wallmow that he consider submitting a medical request slip to see a healthcare provider. This would have been objectively reasonable. *See*, *e.g.*, *Pulera v. Sarzant*, 966 F.3d 540, 550-51 (7th Cir.

2020). But Wallmow already knew he could do so (R. 63-8) and apparently chose not to. Additionally, he had a face-to-face meeting with Nurse Wilhelm approximately four hours before he committed suicide, but he never mentioned anything to her or asked if he could follow up with her about his mental health.

And even if Wallmow had followed this hypothetical suggestion and submitted a medical request slip, there is no evidence to show that he would have been seen by a healthcare provider prior to 10:00 p.m. on July 8, 2021 when he killed himself, or that he would have disclosed suicidal thoughts or behavior that would have resulted in protective placement. The *Jutzi-Johnson* decision is instructive on this point:

> True, had the jail's psychologist interviewed him, Johnson might have expressed suicidal thoughts and in that event the jail would doubtless have placed him on suicide watch and thereby prevented him from killing himself. (At least it would have moved him out of a cell that, because of the exposed pipe near the ceiling, made it easy for an inmate to hang himself.) "Might" is the operative word. Johnson had no history of psychiatric illness and had not revealed any suicidal ideation at his intake exam. Until nudged by his roommate to visit the physician's assistant he had made no effort to contact the medical (including psychiatric) personnel of the jail. It is sheer conjecture that an interview with the jail psychologist would have produced sufficient information to have enabled the psychologist to infer that Johnson was a suicide risk and place him on suicide watch. The psychologist would have noticed Johnson's sores—would even, we may assume, have pronounced him or his behavior bizarre. But bizarre behavior and suicidal behavior are different, and there is no evidence that suicidal tendencies can be inferred from the kind of behavior that Johnson exhibited.

*Jutzi-Johnson*, 263 F.3d at 756-57. This hypothetical and the *Jutzi-Johnson* case aptly illustrate why the "serious risk of harm" about which the defendant knew or should have known needs to be causally connected to the harm that resulted, and Plaintiff has not identified a single case that holds otherwise. The District Court recognized this and properly analyzed the claims under the correct framework. Plaintiff's arguments to the contrary are meritless.

Finally, even if Plaintiff's argument about the applicable standard is accepted, it would not change the result in this case. Even if Plaintiff only needed to establish that Defendants knew or should have known of a substantial risk of serious harm—as opposed to a risk of suicide—the undisputed facts established by the record would still lead to summary judgment in favor of Defendants.

> It is here that the analysis of causality and the analysis of foreseeability, though distinct (the issue of foreseeability does not arise until the defendant's negligent act is identified as a cause of the plaintiff's injury), blend insensibly into each other. The reason that measures to prevent Johnson's suicide probably would not have been taken even if the jail's staff had been exercising due care is that the suicide was not a foreseeable consequence of Johnson's behavior.

*Jutzi-Johnson*, 263 F.3d at 757. As discussed in more detail, *infra*, based on the information known to Defendants during the relevant time frame, no reasonable officer knew or should have known of any risk of serious harm to Wallmow. Therefore, this Court should affirm the District Court's decision.

## 2. Each Individual Defendant Was Objectively Reasonable Based on the Information Known to Them at the Time.

Ultimately, when an inmate gives no indication that he is thinking of harming himself, staff "cannot be faulted for failing to read his mind." *Pulera v. Sarzant*, No. 15-C-461, 2019 WL 2476978 at *5 (E.D. Wis. June 13, 2019), *aff'd*, 966 F.3d 540 (7th Cir. 2020). When taken in the light most favorable to Plaintiff, the District Court properly recognized that the evidence is insufficient as a matter of law to establish that any individual defendant had actual knowledge of facts to put them on notice of a substantial risk of harm to Wallmow, and each officer acted reasonably based on what he or she actually knew or should have known.

Additionally, the District Court correctly rejected Plaintiff's repeated arguments that the defendants "buried their heads in the sand" or were willfully blind. There is no evidence in the record that any of the individual defendants took any affirmative steps to avoid learning information that would have confirmed a suspicion that Wallmow faced a substantial risk of serious harm. In fact, the record is devoid of evidence that any defendant ever had any kind of suspicion about Wallmow being at a risk of harm at all.

Finally, the District Court appropriately recognized that Plaintiff's arguments about OCJ policies or best practices could not establish that Wallmow's constitutional rights were violated by any individual officer. What an officer "would normally do in that situation does not establish the constitutional standard . . . [and]

the [C]onstitution does not require jails to adopt best practices." (R. 76, p. 17; A. App. 018.)

### A. Officer Rudolph Acted in an Objectively Reasonable Manner in Response to Agent Bunce's Phone Call.

Unfortunately, the majority of Plaintiff's argument about Rudolph is based on blatantly obvious misrepresentations of the record. At the outset, Plaintiff's claims about a "genuine dispute" related to what Bunce told Rudolph—and therefore what Rudolph knew about Wallmow's condition and behavior—must be addressed.

Rudolph testified that, in a phone call that lasted <u>less than a minute</u>, Bunce told her only that Wallmow had hit himself, was having demonic thoughts, and was acting strangely. (R. 38, p. 17.) Bunce testified that she could not recall whether she shared any details beyond that Wallmow was acting strangely and she was concerned for his mental well-being. (R. 35, p. 19.) Neither Bunce nor Rudolph testified that Bunce told Rudolph any details other than that Wallmow hit himself and was saying demonic things. Both here and in the District Court, Plaintiff has failed to identify any evidence that Rudolph was aware of anything more or that she was aware of Wallmow's specific statements made to Bunce. Any inference to the contrary is entirely unsupported and unreasonable. Instead, at most, Plaintiff can only speculate that something more might have been said during this one-minute phone call. But speculation is not enough to create a genuine dispute of fact at summary judgment.

*Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Yet, Plaintiff has now doubled down on these entirely unsupported accusations.

Further, Plaintiff insinuates that Rudolph <u>purposely</u> chose to keep this (non-existent) knowledge to herself, without a shred of evidence as support: it claims that Rudolph deliberately chose "to omit necessary information" and "minimize[ed] Wallmow's actions" when she relayed what she was told to other officers. (Pl.-Ap. Brf., p. 23.) Aside from the illogical nature of this claim, <u>none</u> of Plaintiff's citations to the record actually supports its inflammatory arguments, including that "Rudolph took deliberate actions to avoid learning about critical facts" (*id*. at p. 24); "[p]robation officers do not usually call with concerns about an inmate's well-being" (*id*.); and that Rudolph harbored "inferences of risk that she strongly suspected to exist" but failed to confirm (*id*., pp. 24-25). Each of these allegations was systematically addressed and rebutted by Defendants at the most foundational levels, and many of the materials cited by Plaintiff do not even pertain to the alleged facts. (*See* R. 75 at ¶ 49, p. 21; ¶ 54, pp. 23-24; ¶ 154, pp. 72-74; ¶ 218, pp. 99-100.) Now in this appeal, Plaintiff offers no explanation as to how these baseless claims could possibly meet the requirements of FRCP 56(c)(1) or explain why the District Court erred in rejecting them.

For the sake of brevity, Defendants will not repeat each of these evidentiary arguments here. But by way of example, Plaintiff's claim that probation officers do

not usually call the jail with concerns about an inmate's well-being is directly contradicted by the record. In support of that allegation, Plaintiff cited to deposition testimony that is not part of the record. (*See* R. 75, p. 72; Suppl. A. App. 188, noting this error.) Plaintiff also cited to discovery responses that had no bearing on the proposed fact and to which Defendants responded only with an objection that was never challenged. (*Id.*) Additionally, the cited deposition testimony that <u>was</u> properly in the record actually established the <u>opposite</u> of Plaintiff's proffered fact: it is <u>not</u> uncommon for probation agents to call the jail with concerns about an inmate's wellbeing. (*See* R. 43, p. 7; R. 42, pp. 10-11 (discussed at R. 75, pp. 73-74; Suppl. A. App. 189-190).) Finally, the only other deposition testimony cited by Plaintiff omitted necessary context plainly demonstrating that it did not support the alleged fact. (*See* R. 39, pp. 5-6, 18; R. 38, p. 19; R. 63-5 (discussed at R. 75, pp. 73-74; Suppl. A. App. 189-190).)

A close, albeit tedious, examination of each of Plaintiff's citations to the record demonstrates that it lacks any basis whatsoever to support its spurious claims about what Rudolph knew and what she did with that knowledge. The same is true for Plaintiff's claims that Rudolph "chose to downplay the severity of the situation" when calling Officer Conkey and Sergeant Holewinski, and that Rudolph deliberately acted to conceal information—allegations that have no basis whatsoever in the record. (*See* R. 75, ¶ 227, pp. 104-105 (citing R. 38, p. 26); ¶¶ 245-46, pp.

110-111 (citing R. 38, pp. 20, 26 and R. 39, pp. 12-13).) When the cited evidence is actually reviewed and considered, it is clear that no reasonable jury could reach the conclusions proffered by Plaintiff. There is simply no evidence that Rudolph or any other OCJ officer was willfully blind or "played ostrich."

Instead, the record demonstrates that Rudolph was aware of Bunce's report that Wallmow was acting strangely, having "demonic" thoughts, and had hit himself during Bunce's meeting with him. It is also clear that neither Rudolph nor any other OCJ officer ever observed any similar behavior or even any unusual behavior from Wallmow. While Plaintiff attempted to dispute this fact at summary judgment, Plaintiff's dispute was not based on citations to evidence in the record and simply did not meet the substance of the fact. (*See* R. 74, ¶¶ 161-162, pp. 81-86.) The same is true for this appellate effort.

Binding precedent is clear that these undisputed facts, without more, would not lead a reasonable officer in Rudolph's position to conclude that there was a serious risk that Wallmow was at a substantial risk of serious harm. *See Jump v. Vill. of Shorewood*, 42 F.4th 782, 791 (7th Cir. 2022); *Jutzi-Johnson*, 263 F.3d at 757; *McKinney v. Franklin Cnty., Illinois*, 417 F. Supp. 3d 1125, 1139 (S.D. Ill. 2019); *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983); *Estate of Novack*, 226 F.3d 525; *Mathis v. Fairman*, 120 F.3d 88 (7th Cir. 1997); *Matos*, 335 F.3d 553; *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1076 (C.D. Ill. 2010); *Collins*

*v. Seeman*, 462 F.3d 757, 760-761 (7th Cir.2006); *Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010); *Pulera*, 2019 WL 2476978 (E.D. Wis. June 13, 2019), *aff'd*, 966 F.3d 540 (7th Cir. 2020). Even a "general sign of distress," like hitting oneself— which is not something that any officer ever observed—is not evidence that an inmate is at a substantial risk of harm. *Jump*, 42 F. 4th at 793.

Thus, based on what she knew or should have known, Rudolph's response was objectively reasonable. It is undisputed that Rudolph called Officer Conkey in the secure pod and told him about Bunce's call. (R. 65, ¶¶ 77-78, p. 19.) Similarly, it is undisputed that she told Officer Conkey to keep an eye on Wallmow and that Officer Conkey did so. (*Id.*) Additionally, just as she was trained to do, Officer Rudolph called Sergeant Holewinski, the sergeant on duty, and reported the same thing. (*Id.* at ¶¶ 79-80, pp. 19-20.)

While there is some discrepancy as to whether Rudolph told Sergeant Holewinski that Wallmow had hit himself (discussed in more detail, *infra*), this fails to create a material dispute of fact for purposes of summary judgment. As the District Court recognized, even if Rudolph omitted that piece of information, the only reasonable inference from the evidence in the record is that it was an inadvertent mistake. Actions made by mistake do not violate the Fourteenth Amendment. *Kingsley*, 576 U.S. at 396; *Miranda*, 900 F.3d at 354.

Because she had no reason to think that Wallmow was suicidal or at any substantial risk of suffering serious harm based on the information relayed by Bunce, Rudolph's failure to take any further special precautions was not objectively unreasonable. *Jump*, 42 F.4th at 793. This is particularly true because Rudolph was not even assigned to monitor Wallmow or his pod, and it is undisputed that she could not leave her station for any reason. (*See* R. 65, ¶ 138, p. 31.) Instead, she notified the individuals who were in the best position to take further action, if any was deemed necessary. Moreover, because there is no evidence that Rudolph actually suspected that Wallmow faced any risk of harm, and because the facts known to Rudolph would not lead a reasonable officer in her position to think otherwise, any failure to follow up with Bunce or undertake any investigation does not violate the Constitution. *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994); *Jump*, 42 F. 4th at 793.

**B.    Sergeant Holewinski Acted in an Objectively Reasonable Manner in Response to the Information Relayed by Officer Rudolph.**

Rudolph testified that when she called Holewinski, she told the sergeant that Bunce had reported three things: that Wallmow was acting strangely, saying demonic things, and had hit himself. (R. 38, p. 26.) However, Holewinski testified that she was only told about the report of Wallmow acting strangely and talking about demonic things via the shift muster. (R. 43, pp. 11-12.) In turn, Holewinski only notified staff of the report that Wallmow was acting strangely and saying

demonic things. (Dkt. 43, p. 18; R. 63-4.) Regardless, as the District Court correctly concluded, even if it is assumed that Holewinski was told all three things, this information would not have put Holewinski on notice that Wallmow was at a substantial risk of serious harm for the same reasons that it did not put Rudolph on notice.

At her deposition, Holewinski was asked what she would have done had she been told that Wallmow had hit himself. (R. 43, p. 12.) Although speculative, Holewinski said she would have talked to Wallmow and may have notified medical staff. (*Id.*) Nevertheless, the District Court properly recognized that what the sergeant might have done or would normally do in a situation "does not establish the constitutional standard." (R. 76, p. 17); *see also Camic*, 712 F.2d at 1146. Instead, "the only question that matters" is whether Sergeant Holewinski violated the Fourteenth Amendment. *See Pulera*, 966 F.3d at 551.

In response to the information provided by Rudolph, Holewinski recorded the following message on the day shift's muster for July 6, 2021: "Keep an eye on Wallmow in Secure G 3. According to his probation agent, he was acting a little weird and talking about 'demonic' stuff." (R. 63-4.) It is undisputed that musters are the method used by OCJ staff to communicate important information to other shifts about which they should be aware. (R. 65, ¶¶ 82-83, pp. 20-21.) It is also undisputed that this method of communication was successful, because Officers Symonds and

Turkiewicz both reviewed that muster when they arrived to work on July 8, 2021 and therefore became aware of the instruction to keep an eye on Wallmow. (*Id.* at ¶¶ 97, 110-111, p. 24, 26.)

People who work in jails are used to seeing inmates behaving strangely and hearing inmates saying bizarre things. So when Holewinski learned of the report of Wallmow exhibiting strange behavior, this was not an immediate indication that Wallmow was experiencing any kind of acute mental illness or that he was at any risk of substantial harm, including suicide. Further, she never received any other information that would have or should have changed her analysis. It is undisputed that during Holewinski's shift on July 6, 2021, she was not notified that anyone had observed that Wallmow was in any kind of distress or that anyone noticed anything weird. (Dkt. 65, ¶ 93, p. 23.) Nothing would suggest to a reasonable officer in Holewinski's position on July 6, 2021 that Wallmow was suicidal or that more intensive intervention or investigation was warranted or necessary at that time. Plaintiff has not cited a single case holding that the Constitution required Holewinski to do more with the information she had or that her response was in any way unreasonable.

### C. Officers Symonds and Turkiewicz Acted in an Objectively Reasonable Manner in Response to the Information on the Muster and What they Observed.

At the start of their shifts on July 8, 2021, Officers Symonds and Turkiewicz both saw the note in the July 6th muster that Wallmow was reportedly acting "a little weird" and saying "demonic" stuff, and that staff should keep an eye on him. Neither officer was aware of any report that Wallmow had hit himself. (R. 37, pp. 29-30; R. 42, p. 32.) Only Turkiewicz had any other substantive information about Wallmow, because he had been present in the early evening when the jail nurse tested Wallmow for COVID. As of 6:15 p.m., less than four hours before Wallmow was found lifeless in his cell, Turkiewicz observed that Wallmow was behaving in a completely normal manner and did not appear distressed or mentally ill.

Plaintiff erroneously claims that there is a dispute about what Symonds saw in Wallmow's cell on the night of July 8, 2021. (Pl.-Ap. Brf., p. 31.) Notably, Plaintiff cites nothing at all to support this alleged dispute. In fact, it is undisputed that Symonds saw movement in Wallmow's cell and saw Wallmow in a position suggesting that Wallmow was either lying on his bed, sitting on the bed, or kneeling at the bed. (*See* R. 65, ¶ 115, p. 27 (citing R. 37, p. 34 and R. 36, p. 39).) Symonds testified that when he saw Wallmow near the head of his bed in that position, he never saw any clear sign of distress. (R. 37, p. 44.) This is corroborated by Sergeant Kortenhof's testimony about what he saw when he arrived at Wallmow's cell just

after 10:00 p.m., when Wallmow appeared to be praying or reading a book at a close distance. (R. 36, pp. 45-46.) Further, unrebutted testimony establishes that it was not unusual to see inmates moving around on or near the floors of their cells, and nothing that Wallmow was doing during the relevant time period "was too abnormal or too different from what other inmates were doing." (R. 37, pp. 38, 42-43.)

Approximately ten minutes before Sergeant Kortenhof found Wallmow in his cell, Turkiewicz assumed the duties of the secure pod operator and performed a visual cell check. (R. 63-5, p. 37.) He saw a piece of fabric hanging from the end of Plaintiff's bunk, but there is no evidence suggesting that he had any reason to suspect that it was an indication of imminent harm. Instead, the record confirms that it was not uncommon for inmates to hang things from their bed out of a desire for privacy or to block out light. (R. 36. p. 38; R. 37, pp. 35, 42; R. 38, p. 28.) Further, the fabric did not obscure the cell window or officers' entire view into the cell, so officers could still see inside. (*Id.*)

Plaintiff faults the officers for failing to investigate what Wallmow was doing or failing to watch him more closely, but its reliance on *Velez v. Johnson*, 395 F.3d 732 (7th Cir. 2005) is unavailing. In *Velez*, the plaintiff was housed in a small cell with another inmate who was charged with criminal sexual assault—which in and of itself would put the plaintiff at an increased risk of serious harm. When the cellmate held a razor to the plaintiff's neck and threatened to rape him, the plaintiff

pressed the emergency call button in the cell to summon assistance. The plaintiff told the answering officer basically all that he could without incurring immediate injury: that he and his cellmate were "not getting along." *Id.* at 735. However, the officer who answered the call did nothing and the plaintiff was raped. *Id.* Based on the cellmate's known assault charges and the plaintiff's explicit cry for help using the emergency call button, the *Velez* Court held that a reasonable officer would have suspected a risk of serious harm and investigated further. But Turkiewicz received no such call for help, and his knowledge and personal observations provided no basis upon which to believe that Wallmow was at any risk of serious harm.

As with Rudolph and Holewinski, neither Symonds nor Turkiewicz "strongly suspected" any facts or harbored any "inferences of risk" about Wallmow at all, contrary to Plaintiff's allegations. (Pl.-Ap. Brf., p. 31.) Unsurprisingly, Plaintiff fails to cite any evidence at all to support these assertions. As the District Court correctly concluded, this information, without more, would not lead a reasonable officer in the positions of Symonds[5] or Turkiewicz to believe that Wallmow was at a substantial

---

[5] In its opinion, the District Court stated that "[n]either side identifies testimony from Symonds that he saw Wallmow hang a mattress cover from his top bunk, kneel on the floor, or kick his feet out from under him.

risk of serious harm. *See Mathis*, 120 F.3d at 91-92 (odd behavior alone did not put officers on notice that a detainee was at risk for suicide when the officers were unaware of detainee's suicidal tendencies).

With neither the facts nor the law on its side, Plaintiff grossly misrepresents the record and fails to cite to any caselaw that would support its arguments even if its version of events did have support in the record. For example, Plaintiff asserts that "Wallmow had been hanging in his bed for approximately thirty minutes" when Symonds performed a cell check at 9:43 p.m. (*Id.*) But again, it is undisputed that Wallmow was not "hanging" from anything when he was found by officers, and there is no evidence that Wallmow was ever hanging at any time. (R. 36, p. 51; R. 65, ¶ 133.) Nor is there any evidence in the record at all to establish that Wallmow was doing anything at all related to his suicide at about 9:15 p.m. or that the fabric hanging from his bunk blocked officers' view of Wallmow entirely.

---

Despite this, both sides assume that Symonds saw all of those things. *See* Dkt. 45, at 23 (defendants' brief)." (R. 76, pp. 18-19.) However, a plain reading of the cited brief shows that Defendants have never made any such assumption or claim. Instead, based on Officer Symonds' sworn testimony, Defendants have only ever asserted that Officer Symonds observed movement from Wallmow's cell and saw that Wallmow appeared to be either lying on his bed, sitting on the bed, or kneeling at the bed; and that Officer Symonds never saw any clear signs of distress. (R. 45, p. 23; R. 65, ¶¶ 115, 118, pp. 27-28 (citing R. 37, pp. 34, 44 and R. 36, p. 39).) Indeed, Defendants would dispute any claim that Officer Symonds saw Wallmow hang a mattress cover or kick his feet out from under him, because there is absolutely no evidence in the record to support those allegations.

Regardless, as the District Court recognized, Symonds and Turkiewicz knew only of the report on the muster that Wallmow had been acting a little weird. They had no reason to believe that Wallmow was suicidal, because the record establishes that no reasonable officer on the scene would or should have known "of a serious risk of harm" to Wallmow based on the information known to the officers or what they were actually observing. *See Thomas*, 39 F.4th at 841-42; *Mathis*, 120 F.3d at 91-92.

The Fourteenth Amendment does not require officers "to confirm or deny suspicions that a reasonable officer would not have." (R. 76, p. 20.) Even if jail policy dictated that Symonds and Turkiewicz should have told Wallmow to remove the fabric from his bunk, this does not amount to a constitutional violation. (*Id*. at pp. 20-21); *see also Camic*, 712 F.2d at 1146 ("Even if the defendants disregarded one or more of their established procedures, such as checking the cells every hour or effectively monitoring by visual or auditory systems the activities of prisoners incarcerated at a distance from the main booking room, the actions of the defendants do not constitute deliberate disregard for the possibility that Ward would take his own life. . . . [because] [t]he defendants had no actual knowledge that Ward was a suicide risk, and certainly none that he was an unusually high suicide risk."). Therefore, this Court should affirm the District Court's decision granting summary judgment to Defendants.

## III. ALTERNATIVELY, THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Because this Court may affirm on any basis for which it finds support in the record and that was adequately presented to the District Court, summary judgment is also appropriate because the individual defendants are entitled to qualified immunity. An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997).

First, this Court must determine whether the disputed conduct violated a constitutional right. *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006). Second, this Court must determine whether the right was "clearly established" at the time of the alleged conduct. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Whether the law was "clearly established" turns on the "objective legal reasonableness of the action" given the contemporaneous legal rules. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). Thus, a defendant government official is entitled to qualified immunity for unconstitutional conduct so long as there could be a reasonable, albeit mistaken, belief about its legality. *Saucier*, 533 U.S. at 205-06.

The dispositive question for purposes of the qualified immunity analysis is "whether the violative nature of <u>particular</u> conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original). "It is insufficient for a plaintiff simply to point out a recognized constitutional right and claim that the right has been

violated." *Borello*, 446 F.3d at 750 (citing *Brosseu v. Haugen*, 543 U.S. 194 (2004)). The Supreme Court instructs that the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). The inquiry is narrow and assesses whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Saucier*, 533 U.S. at 201; *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987) ("[T]he test for immunity [is] whether the law was clear in relation to the specific facts confronting the public official when he acted.").

Even assuming that Plaintiff could establish that one of more of the officers violated Wallmow's constitutional rights, these rights were not clearly established at the time of the alleged conduct based on the specific facts confronting them. Particularly given the wealth of relevant case law, no reasonable jail officer would interpret Agent Bunce's report to indicate that a substantial risk of serious harm existed. Similarly, no reasonable jail officer in the position of the defendants would understand that keeping an eye on an inmate in response to a report of strange behavior, demonic talk, and hitting oneself—especially when no officer observed any unusual behavior or signs of any mental illness or even being sad—would violate the inmate's constitutional rights.

Courts have routinely held that officers lacked the requisite notice of a substantial risk of harm under far more concerning facts than those established by the record in the present case. For example, as the District Court discussed, the recent case of *Jump v. Village of Shorewood* is instructive. Jump, the son of inmate Jonah Marciniak, who died by suicide while in jail, brought an inadequate medical care claim and a failure to protect claim against a police officer who arrested Marciniak and observed Marciniak in the jail. *Jump*, 42 F.4th at 792. Jump contended that Cody Smith, the arresting officer, had notice that Marciniak was a suicide risk because:

- Marciniak was naked and intoxicated when Smith arrested him.

- Paramedics at the scene observed that Marciniak was emotionally distressed and recommended that Marciniak go to the hospital.

- Officers arrested Marciniak on the belief that he had just pushed his roommate out of a fourth-floor window during a domestic dispute; Smith believed that Marciniak and his roommate were in an intimate relationship.

- Marciniak cried, repeatedly asked to see his roommate, and asked if his roommate was okay.

- Marciniak told Smith that he had past psychiatric treatment.

- Marciniak was visibly distressed in his cell and slammed his body against the cell bars.

- Smith knew that Marciniak overdosed on heroin within the past week.

*Id*. at 787, 796-97.

Applying the Fourteenth Amendment's objective unreasonableness standard, the *Jump* Court concluded that Smith had not acted unreasonably. It reasoned that the facts known to Smith would not lead a reasonable officer in his position to believe

that Marciniak was a suicide risk because, "[m]ost dispositively, we have no facts that Marciniak told Sgt. Smith or [another officer] that he was suicidal." *Id.* at 793-94. Marciniak's distress and his history of psychiatric treatment, without more, did not provide notice that Marciniak was suicidal. *Id.* at 794. Because "Marciniak never gave Sgt. Smith reason to think Marciniak might attempt suicide," it was reasonable for Smith to not take any additional precautions to prevent Marciniak from harming himself. *Id.*

Similarly, in *McKinney v. Franklin County,* a juvenile detainee who later committed suicide was upset during intake, cried on several occasions, expressed concerns about his behavioral level, and was in a minor altercation with another detainee. *McKinney*, 417 F.Supp.3d at 1139. Staff was aware that the detainee was taking psychotropic mediations and had previously undergone mental health evaluations. *Id.* But as a matter of law, this was not enough to put the officers on notice that the detainee was a suicide risk. In *State Bank of St. Charles v. Camic*, officers knew that the plaintiff was intoxicated and uncooperative during the booking process, and the plaintiff had actually attempted to assault them. At least one officer noted that the plaintiff was "acting in a 'freaky' manner." 712 F.2d at 1146. But as a matter of law, this was insufficient to put the officers on notice of a risk of suicide.

In *Estate of Novack v. Wood County*, 226 F.3d 525 (7th Cir. 2000), jail officers were told during booking that the plaintiff had been at a mental health facility earlier

that day and that he was a potential risk for suicide. *Novack*, 226 F.3d at 530. The plaintiff was also under the care of a psychiatrist, who called the jail the next day and prescribed medication for the plaintiff. Other inmates told jail officers that the plaintiff was behaving strangely by pounding on the walls of his cell and giggling. *Id*. But no jail officer observed or was aware of any suicidal behavior exhibited by the plaintiff, and the plaintiff told officers during booking that he was not contemplating suicide and had never attempted suicide. *Id*. As a matter of law, this "strange behavior alone, without indications that that behavior has a substantial likelihood of taking a suicidal turn" was insufficient to show that any officer was on notice of a substantial risk of suicide. *Id*.

In *Mathis v. Fairman*, 120 F.3d 88 (7th Cir. 1997), the plaintiff was incarcerated in a protective custody tier. During rounds, an officer saw that the plaintiff was mumbling to himself. *Mathis*, 120 F.3d at 89. The plaintiff then told the officer that someone was going to kill him. Shortly after the officer saw the plaintiff mumbling to himself, a paramedic spoke with the plaintiff and the plaintiff told the paramedic "that he was hearing voices of somebody wanting to kill him or he wanted to kill himself." *Id*. The paramedic requested a psychiatric consultation, at which the plaintiff denied any suicidal impulses and revealed no history of psychological problems. *Id*. at 90. The mental health specialist concluded that the plaintiff was stable and did not need any treatment. *Id*. When the plaintiff was returned to his tier,

he remained concerned that someone was going to kill him and called his family expressing this worry. *Id*. Due to the plaintiff's continued concerns, jail staff were directed to keep an eye on the plaintiff. Unfortunately, the plaintiff still ended up committing suicide.

Ultimately, the *Mathis* Court held that even if officers had not been keeping an eye on the plaintiff, "such a finding would not by itself suffice to" overcome summary judgment. *Id*. at 91. Further, even if the mental health specialist had not communicated her conclusions to jail staff, it was "no matter." *Id*. at 92. And even though the plaintiff's odd behavior continued into the afternoon, there was "no evidence that his behavior changed in a way that made the jail staff aware that he might harm himself." *Id*. As such, the court concluded that "[t]he most that can be said, then, is that Jenkins and his colleagues were negligent in failing to keep a closer eye on Mathis than they did." *Id*. But negligence is insufficient to state a claim under 42 U.S.C. § 1983. *Id*.

In *Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003), the plaintiff told a correctional officer that he was having troubles coping with the recent deaths of his mother and father and was very emotional. *Matos*, 335 F.3d at 555. He also expressed unhappiness with his transfer to a locked-down wing of the prison and complained of general malaise related to his incarceration. *Id*. at 558. However, he also stated that he did not feel like hurting himself at that time. *Id*. at 555. The court

rejected any attempt to impute subjective knowledge of a substantial risk of harm based on those facts: "not every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch," and the fact that the plaintiff was having trouble transitioning into prison life "was neither surprising nor remarkable." *Id.* at 558.

The Seventh Circuit instructs that "[a]lthough the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *Mannola v. Farrow*, 476 F.3d 453, 357 (7th Cir. 2007). Based on these and other cases cited herein, *supra*, at the very least, reasonable officials in the defendants' positions could disagree on the constitutionality of Defendants' actions. It follows that qualified immunity applies. *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[I]f [officials] of reasonable competence could disagree on this issue, immunity should be recognized."). Accordingly, even if it does not do so on the merits of the claims, this Court should affirm judgment in favor of each of the individual defendants on the basis of qualified immunity.

## III.   PLAINTIFF'S *MONELL* CLAIM FAILS

To succeed on this claim against Oneida County, Plaintiff must show that: a) Oneida County's policies or practices directly caused the alleged constitutional injuries; and b) Oneida County had notice that its policies, or lack thereof, would cause constitutional violations. *Monell v. Dep't of Social Servs. of the City of New*

*York*, 436 U.S. 658, 694 (1978); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021). However, even when taken in the light most favorable to Plaintiff, the record establishes that Plaintiff cannot satisfy these elements.

At the outset, the claim fails and must be dismissed because of the lack of any underlying constitutional violation for all the reasons set forth above, *supra*. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010). But even if there was some underlying violation, there is no evidence that any County policy or practice caused such violation. OCJ had multiple policies in place designed to identify the risk of and prevent suicides, and to provide health care for all inmates, including ones with mental illnesses. (R. 63-9 to 63-16.) Additionally, when Wallmow was booked into OCJ, he signed an Informed Consent form for the Authorization for Health Care confirming that he understood how to obtain health care. (R. 63-8.)

Ultimately, arguments about the sufficiency of OCJ's health care and suicide policies and procedures miss the mark. Weird or strange behavior is categorically different than suicidal behavior, so OCJ had no reason to treat Bunce's report of strange behavior as if it was a report of suicidal behavior. OCJ officers are trained, and it is the routine practice, to always err on the side of caution when considering whether to place an inmate on suicide watch. OCJ officers are also trained, and it is OCJ policy and expectation, that all inmates must be observed at least once an hour.

(R. 47, ¶ 34.) But Wallmow never presented to any correctional officer as being at a substantial risk of harm, so he was never placed on any kind of formal special watch status like a suicide watch. No officer actually observed any kind of unusual behavior at all, and this was not for lack of monitoring: the Officer Activity Log confirms that for the duration of Wallmow's incarceration, he was monitored and observed frequently via cell checks, walkthroughs, and headcounts.

Each day between July 6, 2021 and July 8, 2021, Wallmow was observed between 37 and 41 times through a combination of the above-referenced methods. (R. 63-5.) He also spent two hours out of his cell in the Secure G dayroom where officers could observe him even more closely than while in his cell. (R. 63-7.) Not a single officer saw anything out of the ordinary, let alone any behavior that was consistent with Bunce's report or behavior suggesting a risk of serious harm. (R. 63-5, 63-7.) The record establishes that no Oneida County policy or practice caused any violation of Wallmow's rights.

The same is true for Plaintiff's discussion of policies prohibiting inmates from hanging cell coverings. Plaintiff's reliance on *Rogers v. Sheriff of Santa Rosa Cnty.* is unavailing, because in *Rogers*, the jail policy explicitly <u>permitted</u> inmates to conceal cell windows with curtains. 2023 WL 2566087 (11th Cir. March 20, 2023). Here, it is undisputed that OCJ policy <u>prohibited</u> inmates from blocking cell windows. The facts do not support any claim that OCJ officers simply ignored this

policy, as discussed herein. But even assuming officers just blatantly ignored the policy, there is no evidence of any notice to the County that any such policy (or any practice of "ignoring" it) was creating a risk. And as explained multiple times, it is <u>undisputed</u> that Wallmow did not hang himself. He strangled himself while he knelt at the head of his bed. There is no evidence at all—and indeed Plaintiff has not cited to any—suggesting that officers failed to notice Wallmow committing suicide at the head of his bunk, or that they could not see him committing suicide at the head of his bunk, <u>because of</u> the fabric hanging at the end of his bunk.

The same is true for Plaintiff's claim that the District Court "overstate[d] the thoroughness of the cell checks in practice." (Pl.-Ap. Brf., p. 35.) While Plaintiff relies on Symonds' cell check to prove its point, the only evidence in the record establishes that Symonds saw Wallmow during the cell check at 9:43 p.m. and confirmed that Wallmow was not doing anything unusual or that would cause him concern. Plaintiff's other claims—that the fabric "obstruct[ed] his cell," that Wallmow had been motionless for 30 minutes, and that he had already committed suicide—are totally unsupported by the record as discussed, *infra*. All Plaintiff can offer on these points are unreasonable inferences and speculation, which fail to meet its burden. *Gobitz v. Corvilla, Inc*., 196 F.3d 879, 882 (7th Cir. 1999).

Finally, even if Plaintiff could show that some Oneida County policy or practice caused a violation of Wallmow's constitutional rights, there is no basis for

finding that the County had notice that its policies, or lack thereof, would cause constitutional violations. Plaintiff must identify evidence showing that there was a "known or obvious" risk that constitutional violations would occur because of the County's policies or practices. *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 380 (7th Cir. 2020). But Wallmow's suicide on July 8, 2021 was the <u>first in the history of the current Oneida County Jail facility</u>, which opened in 1999. (R. 41, p. 27; R. 47, ¶ 5.) And there has only been one "serious suicide attempt" that failed, in 2013. (R. 41, p. 27.) This is insufficient as a matter of law to demonstrate deliberate indifference. *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010); *Loertscher v. Anderson*, 259 F.Supp.3d 902, 923-924 (W.D. Wis. 2017). Thus, there is simply no evidence that the County knew, or even should have known, that any of its policies or practices would lead to the type of result that occurred here. Accordingly, this Court should affirm the District Court's grant of summary judgment.

## CONCLUSION

For all the reasons set forth herein, Defendants-Appellees respectfully request that this Court affirm the District Court's Order granting summary judgment and dismissing all claims against them.

Respectfully submitted this 27th day of September, 2023.

<div style="margin-left:50%">

s/ Sara C. Mills
_____

SAMUEL C. HALL, JR.

State Bar No. 1045476

SARA C. MILLS

State Bar No. 1029470

CRIVELLO, NICHOLS & HALL, S.C.

Attorneys for Defendants-Appellees

710 N. Plankinton Avenue, Suite 500

Milwaukee, Wisconsin 53203

Phone: (414) 271-7722

shall@crivellolaw.com

smills@crivellolaw.com

</div>

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g), FRAP RULE 32(c)

The undersigned, counsel of record for the Defendants-Appellees, Oneida County, Reed Symonds, Matthew Turkiewicz, Katie Rudolph and Carrie Holewinski, furnishes the following in compliance with F.R.A.P Rule 32(a)(7) and C.R. 32(c):

I hereby certify that this brief conforms to the type-volume rules contained in F.R.A.P Rule 32(a)(7) for a brief produced with a proportionally spaced 12-point (or larger) type-face font. The length of this brief is 13,997 words, excluding portions of the brief exempted by Fed. R. App. P. 32(a)(7)(F).

Dated this 27th day of September, 2023.

s/ Sara C. Mills
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendants-Appellees
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
shall@crivellolaw.com
smills@crivellolaw.com

**PROOF OF SERVICE**

Pursuant to Cir. R. 31(e), I e-filed a digital copy of the brief in searchable PDF

format via the ECF System and served all counsel of record with the digital version

via CM/ECF system and/or via regular mail to the following:

> Mr. Paul A. Kinne
> Gingras, Thomsen & Wachs, LLP
> 8150 Excelsior Drive
> Madison, WI 53717

Dated this 27th day of September, 2023.

> s/ Sara C. Mills
> SAMUEL C. HALL, JR.
> State Bar No. 1045476
> SARA C. MILLS
> State Bar No. 1029470
> CRIVELLO, NICHOLS & HALL, S.C.
> Attorneys for Defendants-Appellees
> 710 N. Plankinton Avenue, Suite 500
> Milwaukee, Wisconsin 53203
> Phone: 414-271-7722
> shall@crivellolaw.com
> smills@crivellolaw.com