## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

ESTATE OF GAVIN WALLMOW, by its Special
Administrators Matthew and Michelle Wallmow,

      Plaintiff-Appellee,

v.

ONEIDA COUNTY, et al.,

      Defendants-Appellants.

## REPLY BRIEF OF PLAINTIFF-APPELLANT

Appeal from the United States District Court
for the Western District of Wisconsin,
Case No. 22-cv-241-jdp
The Honorable James D. Peterson, W.D.

**GINGRAS, THOMSEN & WACHS LLP**
Attorneys for Plaintiff-Appellant

Paul A. Kinne
WI State Bar No. 1021493

8150 Excelsior Drive
Madison, WI 53717
Phone: 608-833-2632
Fax: 608-833-2874
Email: kinne@gtwlawyers.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

ARGUMENT ............................................................................................................................... 1

I.    THE DISTRICT COURT IMPROPERLY APPLIED THE FOURTEENTH AMENDMENT STANDARD TO THE FACTS OF THE CASE ................................... 1

II.    A REASONABLE JURY COULD FIND THAT EACH OF THE OFFICERS ACTED IN AN OBJECTIVELY UNREASONABLE MANNER ................................................... 4

    a.    A Reasonable Jury Could Find that Officer Holewinski Acted in an Objectively Unreasonable Manner in Response to the Information Relayed by Bunce ............ 4

    b.    A Reasonable Jury Could Find That Officer Holewinski Acted in an Objectively Unreasonable Manner in Response to the Information Relayed by Officer Rudolph ................................................................................................................................... 5

    c.    A Reasonable Jury Could Conclude that Officer Symonds and Officer Turkiewicz Violated Wallmow's Fourteenth Amendment Rights. ................................................. 6

III.    THE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. .................... 7

IV.    THE DISTRICT COURT ERRED IN DISMISSING WALLMOW'S *MONELL* CLAIM ..................................................................................................................... 12

CONCLUSION .......................................................................................................................... 15

CERTIFICATE OF COMPLIANCE ......................................................................................... 16

CERTIFICATE OF SERVICE .................................................................................................. 17

REPLY APPENDIX TABLE OF CONTENTS…………..…………………………….…………..18

# TABLE OF AUTHORITIES

## Cases

*Alicea v. Thomas*,
  815 F.3d 283, (7th Cir. 2016) .......................................................................... 9
*Cavalieri v. Shepard*,
  321 F.3d 616 (7th Cir. 2003) .......................................................................... 9
*County of McHenry v. Ins. Co. of the West*,
  438 F.3d 813, (7th Cir. 2006) .......................................................................... 8
*Dean v. Wesford Health Sources, Inc.*,
  18 F.4th 214, 236 (7th Cir. 2021) .................................................................. 12
*Estate of Miller, ex rel. Bertram v. Tobiasz*,
  680 F.3d 984, (7th Cir. 2012) .......................................................................... 9
*Estate of Novack v. Wood County*,
  226 F.3d 525 (7th Cir. 2000) ........................................................................ 11
*Estate of Perry v. Wenzel*,
  872 F.3d 439 (7th Cir. 2017) .................................................................... 8, 10
*Farmer v. Brennan*,
  511 U.S. 825 (1994) ................................................................................... 6, 9
*Gutierrez v. Kermon*,
  722 F.3d 1003, (7th Cir. 2013) ...................................................................... 10
*Hall v. Ryan*,
  957 F.2d 402 (7th Cir. 1992) ............................................................... 2, 3, 5, 6
*Harlow v. Fitzgerald*,
  457 U.S. 800, (1982) ....................................................................................... 8
*Hernandez v. Cook Cty. Sheriff's Office*,
  634 F.3d 906, (7th Cir. 2011) ................................................................... 7, 8
*J.K.J v. Polk Cty.*,
  960 F.3d 367, (7th Cir. 2020) ........................................................................ 13
*Jump v. Vill. Of Shorewood*,
  42 F.4th 782 (7th Cir. 2022) ......................................................................... 10
*Jutzi-Johnson v. U.S.*,
  263 F.3d 753 (7th Cir. 2011) ...................................................................... 3, 4
*Mathis v. Fairman*,
  120 F.3d 88 (7th Cir. 1997) .......................................................................... 11
*Matos v. O'Sullivan*,
  335 F.3d 553 (7th Cir. 2003) ........................................................................ 12
*McKinney v. Frankling Cty.*,
  417 F. Supp. 3d 1125 (S.D. Ill. 2019) ........................................................... 11
*Miller v. Harbaugh*,
  698 F.3d 956 (7th Cir. 2012) .......................................................................... 9
*Miranda v. Cty. Of Lake*,
  900 F.3d 335 (7th Cir. 2018) .......................................................................... 9

*Pearson v. Callahan,*
   555 U.S. 223, (2009)................................................................................ 8
*Pittman ex rel. Hamilton v. Cnty. Of Madison, Ill.,*
   746 F.3d 766, (7th Cir. 2014) ................................................................ 9
*Sanville v. McCaughtry,*
   266 F.3d 724 (7th Cir. 2001) ................................................................. 9
*Scaife v. VA,*
   49 F. 4ᵗʰ 1109, (7th Cir. 2022) ........................................................ 5, 6
*Singleton v. Wulff,*
   428 U.S. 120 (1976)................................................................................ 7
*State Bank of Charles v. Camic,*
   712 F.2d 1140 (7th Cir. 1983) ............................................................ 11
*Thomas v. Cook County Sheriff's Dep't,*
   604 F.3d 293, (7th Cir. 2009) ................................................ 12, 13, 14
*Thomas v. Dart,*
   39 F. 4th 835, (7th Cir. 2022) ............................................................... 1
*Woodward v. Correctional Medical Services of Illinois, Inc.,*
   368 F.3d 917, 929 (7th Cir. 2004) ...................................................... 13

## **Statutes**

42 U.S.C. § 1983 .......................................................................................... 13

## **Rules**

Circuit Rule 32 ............................................................................................. 16
Circuit Rule 32(c) ........................................................................................ 16
Fed. R. App. P. Rule 32(a)(5) ...................................................................... 16
Fed. R. App. P. Rule 32(a)(6) ...................................................................... 16
Fed. R. App. P. Rule 32(a)(7)(B)(i) ............................................................ 16
Fed. R. App. P. Rule 32(f) ........................................................................... 16
Fed. R. App. P. Rule 32(g).......................................................................... 16

**ARGUMENT**

## I. THE DISTRICT COURT IMPROPERLY APPLIED THE FOURTEENTH AMENDMENT STANDARD TO THE FACTS OF THE CASE

The District Court incorrectly applied the standard of objective reasonableness. While the District Court cited the correct standard in its explanation of the law (*See, e.g.*, A. App. 010), it deviated from that standard throughout its application of the Fourteenth Amendment to the facts of Wallmow's case. For example, the District Court reasoned that Wallmow did not adduce evidence that the Officers were aware of facts that "would have led a reasonable officer to believe that there was a substantial risk that Wallmow was **suicidal**." (A. App. 011.) Similarly, the District Court held that "[t]hose facts, without more, would not lead a reasonable officer in Rudolph's position to conclude that there was a serious risk that Wallmow was **suicidal**." (A. App. 012.) (Emphasis Added). Finally, the District Court stated "[t]hat question turns on whether a reasonable officer would appreciate the risk that Wallmow would commit **suicide**." (A. App. 018.) (Emphasis added).

The Officers overlook the objective reasonableness component of the Fourteenth Amendment analysis and focus on a separate and distinct question of causation. (Defs.'-Appellees' Br. p. 26.) But Wallmow is not alleging that the District Court erred in its analysis of causation. Rather, to prove a violation of objective reasonableness, the plaintiff must demonstrate that the "conditions put the plaintiff at a substantial risk of suffering serious harm" and that the "defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious." *Thomas v. Dart*, 39 F. 4th 835, 841 (7th Cir. 2022). This analysis focuses generally on the "high degree of risk" the detainee was facing; it does not require evidence that an officer would have predicted the specific outcome that would result

from the risk posed. *Id.* In turn, by requiring Wallmow to demonstrate that the Officers knew or should have known of a risk of suicide, as opposed to a substantial risk of suffering serious harm, the District Court improperly heightened the objective reasonableness standard.

Further, the Officers' knowledge of Wallmow's bizarre behavior would have prompted action from a reasonable officer. Officers with knowledge of a detainee's bizarre behavior may be liable for subsequent inaction even if the detainee does not make explicit suicidal threats. *Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir. 1992). In *Hall*, the Seventh Circuit affirmed the trial court's denial of summary judgement, determining that it was a jury question whether the officers showed willful neglect with regard to his psychological needs. *Id.* (citing *Joseph v. Brierton*, 739 F.2d 1244 (7th Cir. 1984)). The *Hall* detainee, whose demeanor was normal at the time of his arrest, began exhibiting bizarre behavior upon arriving at the police headquarters: he started cursing, flinging his shoes, urinating in his cell, and repeatedly flushing the toilet. *Id.* at 403. Approximately thirty minutes later, without the detainee providing any further indication of suicidal ideation, an officer found the detainee hanging in his cell. *Id.* Notably, the detainee's file indicated that he had a long arrest history with this police department, and that he was involved in a well-publicized suicide threat about nine months prior to this incident. *Id.* at 405. However, none of the officers personally involved in his most recent arrest were involved with his previous suicide attempt. *Id.* The *Hall* court determined that there was a genuine dispute of material fact whether the defendants "were recklessly indifferent in failing to consult his file after observing his wild behavior." *Id.*

A reasonable jury could find the Officers liable for their inaction. Similar to the detainee in *Hall*, Wallmow's demeanor initially appeared normal at his booking process, but markedly changed shortly after his incarceration. (A. App. 4.; Suppl. A. App. 201, ¶ 184.) Just as the officers in *Hall* became aware that the detainee was cursing, flinging his shoes, urinating in his cell, and

repeatedly flushing the toilet, the Officers learned that Wallmow was acting strangely, speaking of demonic things, and/or hitting himself. (Suppl. A. App. 203 ¶ 196; A. App. 5; Suppl. A. App. 220, ¶ 227; Suppl. A. App. 224, ¶ 238.) Despite this, *Hall* makes it clear that when officers learn about bizarre behavior, even without knowledge of an explicit suicide threat or a history of suicide attempts, they cannot bury their head in the sand. Just as a reasonable jury could find that the *Hall* officers acted with willful neglect by failing to consult the detainee's file after learning of his bizarre behavior, a reasonable jury could find that the Officers acted with willful neglect by failing to take reasonable precautions to follow up with Wallmow after learning of his bizarre behavior.

The Officers misstate the evidence by alleging that Wallmow's only recourse was to submit a medical slip, and that even then, there is no evidence he would have been seen by a healthcare provider prior to his death (Defs.'-Appelles' Br. p. 27.) The Officers knew or should have known that bizarre behavior may be a sign of mental illness, a serious health condition, which is why Oneida County required it be noted on a standardized form if displayed during the booking process. (Suppl. A. App. 138-139, ¶¶ 51, 53.) An inmate exhibiting signs of bizarre behavior in the jail was supposed to receive care as soon as reasonably practicable. (Suppl. A. App. 140, ¶ 57.) After learning of an inmate exhibiting bizarre behavior, officers were supposed to notify their sergeant of the observed behavior and had the opportunity to directly contact medical staff about the inmate's behavior. (Suppl. A. App. 148, ¶¶ 74, 75.) Despite the Officers' knowledge of Wallmow's bizarre behavior, they failed to take any of these minimal precautions to follow up with Wallmow, which is evidence of their willful neglect. *Hall*, 957 F.2d at 405.

The Officers' citation to *Jutzi-Johnson*, 263 F.3d 753 (7th Cir. 2001) is unavailing. In *Jutzi-Johnson*, the court applied the Federal Torts Claim Act, not the Fourteenth Amendment standard. *Id.* at 754. Moreover, the court granted summary judgment based on causation issues, not whether

the officers acted in an objectively reasonable manner. *Id.* at 757. In fact, the *Jutzi-Johnson* court held:

> The government does not deny that the jail staff was negligent in failing to discover that Johnson had some kind of nervous condition and to take steps to deal with it. The obsessive scratching and picking, in the context of a general pattern of abnormal behavior, should have alerted the staff to the fact that Johnson might have a psychiatric illness.

*Id.* at 755. Likewise, a reasonable officer would have been alerted to the fact that Wallmow was suffering from a psychiatric illness when he was acting strangely, talking of demons, and hitting himself, which should have warranted action from the Officers to determine Wallmow's status.

## II. A REASONABLE JURY COULD FIND THAT EACH OF THE OFFICERS ACTED IN AN OBJECTIVELY UNREASONABLE MANNER

### A. A Reasonable Jury Could Find That Officer Rudolph Acted in an Objectively Unreasonable Manner in Response to the Information Relayed by Bunce.

When analyzing the facts in a light most favorable to Wallmow, a reasonable jury could find that Officer Rudolph violated Wallmow's Fourteenth Amendment rights. Bunce contacted the Oneida County Jail to voice her concerns about Wallmow. (Reply App. 7, p. 27.) Rudolph answered Bunce's call and was the only Oneida County representative to receive information from Bunce regarding Wallmow's demeanor prior to his death. (Reply App. 7, p. 28.) At the very least, Rudolph knew that Wallmow was "having demonic thoughts and that he had hit himself." (Reply App. 54, pp. 17-18.) After learning of Wallmow's demeanor, Rudolph did not follow up with Bunce, either on the phone or at any other point, to determine the extent of Wallmow's bizarre behavior. (Reply App. 54, p. 18.) Rudolph did not ask Bunce for any details about Wallmow's conduct, nor did she try to establish the context for anything Bunce told her. (*Id.*) Even though she had the opportunity to inquire further to determine if Wallmow required medical attention, Rudolph opted not to. (*Id.*)

Rudolph's failure to further inquire about Wallmow's condition is sufficient for a jury to find her liable. *Hall*, 739 F.3d, at 405. It is undisputed that Rudolph knew that Wallmow was exhibiting bizarre behavior. (Reply App. 54, pp. 17-18.) According to *Hall*, that fact, by itself, warranted further inquiry to determine whether Wallmow was at a substantial risk of serious harm. *Hall*, 739 F.3d at 405. But Rudolph also knew that Wallmow had hit himself, exposing her to conduct which was far more severe than the conduct which the *Hall* officers were aware of. *Id.*; (Reply App. 54, pp. 17-18.) Rudolph did not ask any follow up questions to see how badly Wallmow was hurt, to see if he would be at a risk to hit himself again, or if he was at a risk to escalate the self-harm. (Reply App. 54, p. 18.) It remains a jury question whether Rudolph's unwillingness to take basic precautions to follow up on a detainee's status was objectively unreasonable.

**B. A Reasonable Jury Could Find That Officer Holewinski Acted in an Objectively Unreasonable Manner in Response to the Information Relayed by Officer Rudolph.**

When analyzing the facts in a light most favorable to Wallmow, a reasonable jury could find that Officer Holewinski violated Wallmow's Fourteenth Amendment rights. It is undisputed that Holewinski knew that Wallmow was acting strangely and talking about demonic things. (Suppl. A. App. 221, ¶ 228.) According to *Hall*, Holewinski's knowledge of Wallmow's bizarre behavior, by itself, warranted further inquiry to determine if Wallmow posed a substantial risk of serious harm. *Hall*, 739 F.3d at 405. Moreover, there is a genuine dispute of material fact as to whether Holewinski knew that Wallmow was hitting himself. (Suppl. A. App. 220, ¶ 227.) In turn, this Court must draw the inference that Holewinski did know that Wallmow was hitting himself. *Id. Scaife v. VA*, 49 F. 4th 1109, 1115 (7th Cir. 2022).

Like Rudolph, despite knowing that Wallmow was talking strangely, talking about demonic things, and that he was hitting himself, Holewinski did not follow up with Wallmow. Rather, she left an ambiguous message for the staff, instructing them to "keep an eye" on Wallmow. (Suppl. A. App. 224, ¶ 238.) "Keep[ing] an eye on" an inmate is not defined in Oneida County policy, and the message did not provide the staff with an affirmative request to check in on Wallmow. (Reply App. 81, p. 22.) Further, this muster note omitted Wallmow's self-harm. (*Id.*) Whether Holewinski knew Wallmow was hitting himself and left that out of the muster note should be for the jury to decide. *Scaife*, 49 F.4th at 1115. A reasonable jury may find that Holewinski showed willful neglect to Wallmow's psychological needs by failing to follow up with Wallmow or Rudolph and by providing an inadequate muster note. *Hall*, 739 F.3d at 405.

### C. A Reasonable Jury Could Conclude that Officer Symonds and Officer Turkiewicz Violated Wallmow's Fourteenth Amendment Rights.

Officers Symonds and Turkiewicz treated Wallmow as though he was any ordinary inmate despite their knowledge of the muster note, which unequivocally set Wallmow apart from the others. Officer Symonds never told staff to go check on Wallmow, nor did he try to communicate with Wallmow over the intercom to check in on him. (Reply App. 44, p. 41.) Further, when Symonds did make an effort to check in on Wallmow via his visual cell checks, he indicated everything was okay, even though Wallmow was lying half off his bed with a cell covering, motionless. (Suppl. A. App. 256, ¶ 316.) While this conduct may not have been too abnormal or different from what other inmates were doing, Wallmow was not just any other inmate. Symonds did not denote any way in which he treated Wallmow any differently from the other inmates.

Similarly, Officer Turkiewicz cannot escape liability merely because he could not visualize Wallmow due to the hanging fabric. *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994) (a defendant may "not escape liability if the evidence shows that he merely refused to verify underlying facts

that he strongly suspected to be true or declined to confirm inferences of risk that he strongly suspected to be true.") It is undisputed that Oneida County Jail prohibits inmates from covering their cell windows or hanging objects which obstruct officers' view of the cells. (Suppl. A. App. 188, ¶ 153.) Officers who noticed inmates hanging items in an obstructive manner would routinely inform the inmate that this violated jail rules. (Reply App. 44, pp. 42-43; Reply App. 25, pp. 37-38.) The Officers provided no such warning to Wallmow, even though Officer Turkiewicz saw fabric hanging from the bunk, which obstructed his view of Wallmow's cell. (Reply App. 70, pp. 37-38.) Officer Turkiewicz knew that Wallmow was acting weird and talking about demons from the muster. (A. App. 18.) He also knew that he was informed to keep an eye on Wallmow. (*Id.*) Officer Turkiewicz defied this instruction when he noticed something obstructing his view of Wallmow's cell and failed to take any proactive steps to actually visualize Wallmow.

A reasonable jury could find that Officer Symonds' and Turkiewicz's conduct was objectively unreasonable, in violation of Wallmow's Fourteenth Amendment rights.

## III.   THE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The District Court did not consider whether the Officers are entitled to qualified immunity, and the Officers' arguments pertaining to qualified immunity should be disregarded. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). The reason for this general rule is to "ensure that the opposing party is not prejudiced by being denied sufficient notice to respond to an argument." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011).

While there are circumstances where a federal appellate court is justified in resolving an issue not considered by the district court, this case does not fall into any of those recognized circumstances. *Id.* at 121. Federal appellate resolution of an issue not passed upon below is

appropriate where the proper resolution is "beyond any doubt" or where "injustice might otherwise result." *Id.* (citing *Turner v. City of Memphis*, 369 U.S. 350 (1962); quoting *Hormel v. Helvering*, 312 U.S. 552, 557 (1941)). The Seventh Circuit has explained that it is only "[i]n the rare case" where an appellate court has the power and the right to permit an issue to be raised for the first time on appeal. *County of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 820 (7th Cir. 2006) (quoting *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749 (7th Cir. 1993)).

The Supreme Court has ruled that qualified immunity is an issue that should first be addressed by the trial court. *Harlow v. Fitzgerald*, 457 U.S. 800, 819-20 (1982) (holding that it is appropriate for the trial court to consider qualified immunity on remand because it is more familiar with the record and is better situated to make further findings.) In this case, the District Court held that "it need not consider the individual defendant's arguments that they are entitled to qualified immunity." (A. App. 10.) Suffice it to say, this is not the "rare case" where proper resolution is "beyond a doubt" or where "injustice will otherwise result." Wallmow respectfully requests that this Court defer the resolution of qualified immunity to the trial court on remand.

Alternatively, the Officers are not entitled to qualified immunity. A court reviewing a defendant's motion for summary judgment on qualified immunity considers: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at that time. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A right is clearly established if it is sufficiently clear that any reasonable official would have understood that what he was doing violates that right. *Estate of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017).[1] If the right was clearly established, then qualified immunity is not a bar to suit. *Id.*

---

[1] While the *Estate of Perry v. Wenzel*, 872 F.3d (7th Cir. 2017) considered the Fourth Amendment standard, the Fourth Amendment standard is identical to the Fourteenth Amendment standard: the

A plaintiff need not identify a case directly on point to show that a right is clearly established. *Id.* To determine if a right is "clearly established," courts look at the right in a particularized sense, rather than at a high level of generality. *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016). This Court will turn to controlling precedent from the Supreme Court or the Seventh Circuit Court of Appeals when available; however, "a case holding that the exact question is unlawful is not necessary." *Id.* "Even when there are notable factual distinctions," previous caselaw may still provide an officer warning that his conduct is unlawful. *Id.*

Wallmow's constitutional right to be protected from self-harm was clearly established at the time of the alleged conduct. *Miranda v. Cty. Of Lake*, 900 F.3d 335, 349 (7th Cir. 2018). The obligation to intervene covers self-destructive behaviors up to and including suicide. *Id.* (citing *Cavalieri v. Shepard*, 321 F.3d 616, 620-22 (7th Cir. 2003)). The rule that a defendant cannot escape liability by sticking their head in the sand is also well-established. *Farmer v. Brennan*, 511 U.S. 825, 843 N.8 (1994); *Sanville v. McCaughtry*, 266 F.3d 724, 737-38 (7th Cir. 2001).

The Seventh Circuit has repeatedly held that statements that a prisoner is going to kill or seriously harm himself are sufficient to put staff on notice of a strong likelihood that a prisoner will engage in self-harm. *Miller v. Harbaugh*, 698 F.3d 956, 962-63 (7th Cir. 2012); *Key v. Kolitwenzew*, 620 F.App'x 620, 623 (7th Cir. 2015) (defendants were on notice because the inmate informed staff he experienced "self-mutilating impulses"); *Pittman ex rel. Hamilton v. Cnty. Of Madison, Ill.*, 746 F.3d 766, 778 (7th Cir. 2014) (defendants were on notice because prisoner asked to see a crisis intervention person and defendant was aware that prisoner was mentally ill); *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 990 (7th Cir. 2012) (defendants knew about prisoner's history of self-harm and suicide attempts). It was clearly established at the time of

---

objectively-unreasonable-under-the-circumstances standard is a less demanding standard than the Eighth Amendment's deliberate indifference standard. *Id.* at 453.

Wallmow's death that a failure to take action in light of a serious medical need would violate the objectively unreasonable standard. *Estate of Perry*, 872 F.3d at 460.

Further, qualified immunity is not appropriate in cases which turn on material factual disputes. *See Gutierrez v. Kermon*, 722 F.3d 1003, 1010-14 (7th Cir. 2013). For example, the extent to which Officer Rudolph had knowledge about Wallmow's conduct is disputed. (Suppl. A. App. 207, ¶ 199.) Similarly, the extent to which Holewinski had knowledge about Wallmow's conduct is disputed. (Suppl. A. App. 220, ¶¶ 227, 228.) This case is replete with disputed material facts, with multiple different contingencies that impact the qualified immunity analysis. For this reason alone, the Officers are not entitled to qualified immunity.

The Officers rely on factually distinguishable cases to support their argument that they are entitled to qualified immunity. In *Jump v. Vill. Of Shorewood*, 42 F.4th 782 (7th Cir. 2022), the only evidence of the inmate's strange behavior after booking was officers reporting that he was making loud noises and slamming the cell bars. *Id.* at 793-94. But Wallmow's demeanor completely shifted after he completed the booking process, which alters how a reasonable officer would respond to his behavior. Once Bunce asked Wallmow about the incident with his sister, Wallmow began making statements such as "[t]his is the part where I die again," "[y]ou are speaking to a dead man," and saying his skin was burning because he was entering hell. (Suppls. A. App. 201, ¶¶ 184; Suppl. A. App. 202, ¶ 187.) Wallmow also began striking himself on the head, shifting from laughing hysterically to crying, and repeating statements which did not make any sense. (Suppl. A. App. 202, ¶ 188.) Unlike in *Jump*, Wallmow's post-booking behavior was itself indicative of a mental-health issue and suicidal ideation, which would have led a reasonable officer to believe he posed a serious risk of substantial harm.

In *McKinney v. Frankling Cty.*, 417 F. Supp. 3d 1125 (S.D. Ill. 2019) the suicide victim did not show any signs of distress. *Id.* at 1139. The district court held that as a matter of law, evidence that the detainee was taking psychotropic medications and previously undergone mental health evaluations was insufficient to put the officers on notice of the risk of suicide. *Id.* But Wallmow definitively exhibited signs of distress: he was hitting himself, acting strangely, and speaking of demons. (Suppl. A. App. 220, ¶ 227.) The officers in *McKinney* did not have notice that the inmate was in distress, whereas in this case, the Officers did have such notice.

In *State Bank of Charles v. Camic*, 712 F.2d 1140 (7th Cir. 1983), the suicide victim did not engage in an act of self-harm prior to the suicide; he merely attempted to assault the officers and was acting in a "freaky" manner. *Id.* at 1142-43, 1146. The Officers in this case had notice of the strong likelihood that Wallmow suffered from mental illness (*See, e.g.*, Suppl. A. App. 212, ¶ 211) – he was acting in a delusional way and was hitting himself – making this case distinguishable from *Camic.*

In *Estate of Novack v. Wood County*, 226 F.3d 525 (7th Cir. 2000), the defendants ensured that the plaintiff received medical care: the defendants placed him in an observation cell, contacted a psychiatrist, and administered medication. *Id.* at 530. Moreover, there was no evidence that the plaintiff in *Novack* self-harmed prior to committing suicide. *Id.* In this case, Wallmow harmed himself, and the Officers simply ignored Wallmow's need for mental health care or a mental health assessment.

In *Mathis v. Fairman*, 120 F.3d 88 (7th Cir. 1997), the jail staff had a paramedic speak with the inmate, had him psychologically evaluated and changed his housing in response to the inmate's reported belief that someone was going to kill him or he wanted to kill himself. *Id.* at 89. When Oneida County Jail staff became aware that Wallmow was hitting himself, acting strangely, and

speaking of demons, they did not have him psychologically evaluated nor did they change his housing in response to his conduct.

In *Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003), the inmate received mental health care: staff encouraged him to go to counseling, referred him for a psychotropic consultation, immediately responded to his signs of depression, referred him to a psychiatrist for a follow-up evaluation, and more. *Id.* at 555. The defendants in *Matos* were not willfully blind to the inmate's risk of harm; they acted on the suspicion that he was mentally ill by ensuring he saw a health care professional. *Id.* As noted above, the Officers had their heads in the sand by avoiding verification of their suspicions that Wallmow was suffering from a mental illness and was at a substantial risk of harm.

The Officers rely on cases where inmates either exhibited significantly less noticeable signs of suicidality than Wallmow or where the staff provided care to inmates in response to signs of a mental health crisis, which the Officers did not provide to Wallmow. A reasonable officer in the Officers' position would have understood that taking no action to address the substantial risk Wallmow posed violated his constitutional right to be protected from self-harm. Therefore, the Officers are not entitled to qualified immunity.

## IV. THE DISTRICT COURT ERRED IN DISMISSING WALLMOW'S *MONELL* CLAIM

To succeed on a claim against Oneida County, Wallmow need only demonstrate that "some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation." *Dean v. Wesford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021). The municipality must have had notice of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff. *Thomas v. Cook County Sheriff's Dep't*, 604

F.3d 293, 303 (7th Cir. 2009). This may take the form of an implicit policy or a gap in expressed policies. *Id.* Courts have not adopted a consensus as to how frequently such conduct must occur to impose liability. *Id.*

A municipality may be liable under 42 U.S. § 1983 even without proof of a pre-existing pattern of violations. *J.K.J v. Polk Cty.*, 960 F.3d 367, 380 (7th Cir. 2020) (citing *Connick v. Thompson*, 563 U.S. 51, 64 (2011)). Absent evidence of a pattern of similar constitutional violations, a plaintiff may demonstrate municipal liability when the "violation of rights is a 'highly predictable consequence' of a failure to provide officers what they need to confront 'recurring' situations." *Id.* (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).

Oneida County is not free from liability merely because Wallmow's suicide was the first in the history of the current facility. *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). A municipality's notice of a risk may stem from evidence that the risk was so obvious that it compels municipal action. *Polk City*, 960 F.3d at 381. In *Woodward*, the Seventh Circuit upheld a jury's *Monell* verdict against a jail's healthcare provider for an inmate's suicide even though the plaintiff could not present evidence of a pattern of inmate suicides. *Woodward*, 368 F.3d at 929. The municipality's suicide prevention was so inadequate and so widely ignored that the trial evidence allowed the jury to infer that the policymakers had notice. *Id.* at 927. By failing to do anything, the policymakers must have encouraged or at least condoned the misconduct which caused the inmate's death. *Id.* "It did not matter that no one had been hurt before, as the law allowed no 'one free suicide' pass." *Id.* at 929.

It is obvious that if an inmate wishes to commit suicide, he will obstruct the view of his cell so his attempt will not be detected. Oneida County consciously disregarded this obvious risk by failing to enforce their policy prohibiting inmates from blocking cell windows. The Officers

admitted that they were not required to actually visualize the inmates, even an inmate who was noted to be in need of surveillance. (Suppl. A. App. 172, ¶ 119; Suppl. A. App. 188, ¶ 153.) When asked what officers were supposed to do when they saw an inmate obstructing the officer's view of their cell, Officer Turkiewicz replied "[b]efore this incident we really didn't do anything about that in any of the blocks." (Reply App. 69, p. 35.) Similarly, Officer Symonds provided that "[u]nfortunately, at that time a lot of inmates hung stuff from their bunks. There's certain rules and regulations that are enforced more than others. I wouldn't necessarily say it's too uncommon for inmates to try to hang stuff off their bunk…." (Reply App. 42, p. 35.) Wallmow hanging a sheet to obstruct the Officers' view of his cell was not an anomaly; this was a recurring incident which was routinely permitted by Oneida County Jail officers. This implicit policy or gap in the existing cell-check policy is evidence of municipal liability. *Thomas*, 604 F.3d at 303.

The Officers failed to notice Wallmow committing suicide <u>because of</u> this implicit policy or gap in the existing cell-check policy. When asked if he remembered visualizing Wallmow during his cell check, Officer Turkiewicz replied that he "looked into the cell as best [he] could" and he "remember[ed] stuff hanging from the bunk." (Reply App. 70, pp. 37-38.) Officer Turkiewicz confirmed that the fabric hanging from the bunk obstructed his view of the cell. (Reply App. 70, p. 38.) Similarly, officers were unable to visualize Wallmow by viewing his cell from the Oneida County Jail cameras. Officer Symonds testified that the blanket "blocks my view of the bunk" and agrees that he cannot see what Wallmow was doing on the bunk because of the obstruction. (Reply App. 42, pp. 35-36). In turn, the Officers were unable to see Wallmow committing suicide at the head of his bunk <u>because of</u> the fabric hanging at the end of his bunk.

The implicit policy or gap in the existing policy wherein inmates were permitted to obstruct the officers' view of their cells created a risk that was so obvious that it should have compelled

municipal action. The District Court erred by holding that Oneida County was entitled to summary judgment on Wallmow's *Monell* claim.

## CONCLUSION

The individual defendants in this case knew that Wallmow was exhibiting symptoms of mental illness, irrespective of whether they knew he was *suicidal*. There is no objectively reasonable justification for the individual defendants' respective reactions to this knowledge: ignoring an inmate showing symptoms of mental illness is *per se* unreasonable. Likewise, having a policy whereby inmates showing signs of mental illness are treated no differently from other inmates, or a policy whereby an inmate who showed signs of mental illness was allowed to hang items from his cell door blocking the view of his cell, would inevitably lead to injury of mentally ill inmates. For the reasons stated herein, Wallmow respectfully requests this Court reverse the District Court's decision and remand this case.

Dated this 18th day of October 2023

Respectfully submitted,

GINGRAS, THOMSEN & WACHS, LLP

s/ *Paul A. Kinne*
Paul A. Kinne
State Bar No.: 1021493
8150 Excelsior Drive
Madison, WI 53717
Telephone: (608) 833-2632
Email: Kinne@gtwlawyers.com

Attorney for Plaintiff-Appellant

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff-Appellant, furnishes the following in compliance with Fed. R. App. P. Rule 32(g):

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) and Circuit Rule 32(c) because according to the word-count feature in Word and excluding the parts of the documents exempted from Fed. R. App. P. 32(f), this brief contains 4,960 words.

2. This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32 because the brief has been prepared with Microsoft Word for Microsoft 365 in a proportionately spaced typeface using Times New Roman font size 12 for the body and Times New Roman font size 11 for footnotes.

Dated this 18th day of October, 2023

Respectfully submitted,

GINGRAS, THOMSEN & WACHS, LLP

s/ *Paul A. Kinne*
Paul A. Kinne
State Bar No.: 1021493
8150 Excelsior Drive
Madison, WI 53717
Telephone: (608) 833-2632
Email: Kinne@gtwlawyers.com

Attorney for Plaintiff-Appellant

**CERTIFICATE OF SERVICE**

The undersigned, counsel for the Plaintiff-Appellant, hereby certifies that on October 18, 2023, Appellant's Reply Brief and Supplemental Appendix were electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF filing system. The undersigned certifies that all participants in the case are registered CM/ECF users. The undersigned certifies that a copy of Appellant's Reply Brief and Supplemental Appendix were mailed via US First Class Mail to counsel for Defendants-Appellees.

Dated this 18th day of October, 2023

Respectfully submitted,

GINGRAS, THOMSEN & WACHS, LLP

s/ *Paul A. Kinne*
Paul A. Kinne
State Bar No.: 1021493
8150 Excelsior Drive
Madison, WI 53717
Telephone: (608) 833-2632
Email: Kinne@gtwlawyers.com

Attorney for Plaintiff-Appellant

**REPLY APPENDIX**
**TABLE OF CONTENTS**

Deposition of Alexis Bunce, dated December 5, 2022………………..…………Reply App. 001

Deposition of Glenn Kortenhof, dated December 5, 2022…………………………Reply App. 016

Deposition of Reed Symonds, dated December 5, 2022…………………..…….Reply App. 034

Deposition of Katie Rudolph, dated December 5, 2022…………………………Reply App. 050

Deposition of Matthew Turkiewicz, dated January 26, 2023………………..….Reply App. 061

Deposition of Carrie Holewinski, dated December 6, 2022…………………….Reply App. 076